# GIBSON DUNN

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JAN 29 2010

RECEIVED



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   JAN 29 2018

CLERK

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

William S. Scherman
Direct: +1 202.887.3510
Fax: +1 202.530.9557
WScherman@gibsondunn.com

January 29, 2018

18-1032

Clerk's Office
U.S. Court of Appeals for the District of Columbia Circuit
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:   Petition for Review of *Rover Pipeline LLC*, Federal Energy Regulatory Commission
      Docket Nos. CP15-93-002, CP15-94-001, CP15-96-001

Dear Sir/Madam:

Rover Pipeline LLC respectfully submits the enclosed original and three copies of a Petition for Review of two orders of the Federal Energy Regulatory Commission ("FERC"). The requisite filing fee is also enclosed, along with a copy of the orders, the corporate disclosure statement, and a list of the parties to the underlying proceeding that will be served. Rover Pipeline LLC will also serve copies on the Secretary and Solicitor of the FERC.

Also, please find enclosed two copies to be stamped as received and returned to us. Thank you for your assistance in this matter.

Sincerely,

William S. Scherman

*Counsel for Rover Pipeline LLC*

ORIGINAL

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 1 of 140

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROVER PIPELINE LLC

<div align="right">Petitioner,</div>

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

<div align="right">Respondent.</div>

Petition for Review

Case No. 18-1032

ORIGINAL

## PETITION FOR REVIEW OF ROVER PIPELINE LLC

Rover Pipeline LLC hereby petitions the United States Court of Appeals for the District

of Columbia Circuit for review of the following orders of the respondent Federal Energy

Regulatory Commission pursuant to Section 313(b) of the Federal Power Act, 16 U.S.C.

§ 825l(b), and Federal Rule of Appellate Procedure 15(a):

(1)     *Rover Pipeline LLC*, 158 FERC ¶ 61,109 (February 2, 2017);

(2)     *Rover Pipeline LLC*, Docket Nos. CP15-93-002, CP15-94-001, CP15-96-001,

Order on Clarification and Denying Rehearing, 161 FERC ¶ 61,244 (November

30, 2017).

A copy of each order is attached hereto.

<div align="right">
Respectfully submitted,

William S. Scherman
Jason J. Fleischer
Ruth M. Porter
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com
</div>

jfleischer@gibsondunn.com
rporter@gibsondunn.com

*Attorneys for Rover Pipeline LLC*

January 29, 2018

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

JAN 2 9 2018

RECEIVED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROVER PIPELINE LLC

Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

Respondent.

Petition for Review

Case No. 18-1032

### CORPORATE DISCLOSURE STATEMENT

Rover Pipeline LLC hereby provides the following Corporate Disclosure Statement in support of its Petition for Review pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1.

Rover Pipeline LLC is a limited liability company formed for the purpose of constructing and operating the Rover Pipeline. ET Rover Pipeline LLC, a Delaware limited liability company, owns 65% of the membership interests and Traverse Midstream Partners, LLC owns 35% of the membership interests in Rover Pipeline LLC. ET Rover Pipeline LLC is owned 50.1% by Energy Transfer Interstate Holdings, LLC, a Delaware limited liability company and 49.9% by BCP Renaissance L.L.C, a Delaware limited liability company. Energy Transfer Interstate Holdings, LLC is a subsidiary of Energy Transfer Partners, L.P., a Delaware master limited partnership, which is publically traded on the New York Stock Exchange.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 4 of 140

Respectfully submitted,

William S. Scherman
Jason J. Fleischer
Ruth M. Porter
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com
jfleischer@gibsondunn.com
rporter@gibsondunn.com

*Attorneys for Rover Pipeline LLC*

January 29, 2018

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 5 of 140

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused a copy of the foregoing Petition for Review and Corporate Disclosure Statement to be served by first-class mail upon the Secretary and Solicitor of the Federal Energy Regulatory Commission and upon each person designated on the official service list to the underlying proceedings compiled by the Commission by electronic mail. A list of those served by electronic mail is attached.

Dated at Washington, D.C., this 29th day of January, 2018.

William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Attorney for Rover Pipeline LLC*

**List of Parties to Underlying Proceedings Served by Electronic Mail**

| Party | Name | Email Address |
|---|---|---|
| Rover Pipeline LLC | Kelly Allen | kelly.allen@energytransfer.com |
| Consumers Energy Company | Deborah Moss | damoss@cmsenergy.com |
| Clinton Stahler | Clinton Stahler | stahler@gblegal.net |
| David Daniel | David Daniel | ddaniel127378@hotmail.com |
| Michigan Public Service Commission | Heather Durian | durianh@michigan.gov |
| Michigan Public Service Commission | Steven D Hughey | hugheys@michigan.gov |
| Michigan Public Service Commission | Lauren Donofrio | donofriol@michigan.gov |
| Heartwood | Ernest Reed | lec@wildvirginia.org |
| FreshWater Accountability Project et al. | Leatra Harper | wewantcleanwater@gmail.com |
| FreshWater Accountability Project et al. | Terry J. Lodge | tjlodge50@yahoo.com |
| Allegheny Defense Project | Ryan Talbott | rtalbott@alleghenydefense.org |
| Ohio Valley Environmental Coalition | Vivian Stockman | vivian@ohvec.org |
| NJR Energy Services Company | William Scharfenberg | wscharfenberg@njresources.com |
| NJR Energy Services Company | Ginger Richman | gprichman@njresources.com |
| NJR Energy Services Company | Doug Rudd | dcrudd@njresources.com |
| IOGA of West Virginia | Randall Rich | rrich@pierceatwood.com |
| Harrington, Hoppe & Mitchell, Ltd. | Alan Wenger | awenger@hhmlaw.com |
| Emens & Wolper Law Firm | Craig Wilson | craig@cjwilsonlaw.com |
| Emens & Wolper Law Firm | Michael Frabott | mfrabott@emenswolperlaw.com |
| Emens & Wolper Law Firm | Sean Jacobs | sjacobs@emenswolperlaw.com |
| Douglas Utz | Douglas Utz | utzs@frontier.com |
| Antero Resources Corporation | James Olson | jolson@jonesday.com |
| Antero Resources Corporation | Erica Youngstrom | eyoungstrom@jonesday.com |
| Antero Resources Corporation | William Prehm | bprehm@anteroresources.com |
| Stearns & Hammer | James Hammer | jim.hammer@stearnsandhammer.com |
| Lena Holzworth | Lena Holzworth | roushmotorsports@aol.com |

| Party | Name | Email Address |
|---|---|---|
| Wright & Talisman, PC | Michael Thompson | thompson@wrightlaw.com |
| Judy Kaylor | Judy Kaylor | jadkay@gmail.com |
| Gary Lehman | Gary Lehman | sabevier@gmail.com |
| EQT Energy, LLC | Paul Diehl | pdiehl@eqt.com |
| Murray Energy Corporation | Alex O'Neill | AlexO'Neill@coalsource.com |
| Gary Hummel | Gary Hummel | curlyhummel@centurylink.net |
| FirstEnergy Service Company | Stacey Burbure | sburbure@firstenergycorp.com |
| FirstEnergy Service Company | Morgan Parke | mparke@firstenergycorp.com |
| Putnam Township | Laura Genovich | lgenovich@fosterswift.com |
| Mark Amicone | Mark Amicone | mamicone@jayindinc.com |
| STC Holdings, LLC | William Williams | bwilliams@kwgd.com |
| STC Holdings, LLC | Gregory Watts | gwatts@kwgd.com |
| Stark Truss Company, Inc. | William Williams | bwilliams@kwgd.com |
| Stark Truss Company, Inc. | Gregory Watts | gwatts@kwgd.com |
| Yoder Florida, LLC | William Williams | bwilliams@kwgd.com |
| Yoder Florida, LLC | Gregory Watts | gwatts@kwgd.com |
| V K S Farms, L.L.C. | William Williams | bwilliams@kwgd.com |
| V K S Farms, L.L.C. | Gregory Watts | gwatts@kwgd.com |
| Kurt Roy-Borland | Kurt Roy-Borland | royborlandfarms@yahoo.com |
| Rice Energy Marketing LLC | Barbara Jost | barbarajost@dwt.com |
| Rice Energy Marketing LLC | Keith Shoemaker | keith.shoemaker@riceenergy.com |
| Vector Pipeline L. P. | Douglas John | djohn@jhenergy.com |
| Vector Pipeline L. P. | Robert F. Smith | bob.smith@vector-pipeline.com |
| Vector Pipeline L. P. | Matthew Rick | rickmatt@gmail.com |
| ROBINSON & MCELWEE | Douglas McElwee | dcm@ramlaw.com |
| michael boyce | michael boyce | boy11553@aol.com |
| Esther Boyce | Esther Boyce | Estheboyce@aol.com |
| David Morton | David Morton | dmorton@copper.net |
| dave baumberger | dave baumberger | djbhhhregion07@aol.com |
| SWN Energy Services Company, LLC | Brett Snyder | brett.snyder@cwt.com |
| Larry Helmick | Larry Helmick | wvuhelmick@hotmail.com |

| Party | Name | Email Address |
|---|---|---|
| Sequent Energy Management, L.P. | Kathryn McCoy | kmccoy@southernco.com |
| Sequent Energy Management, L.P. | Chris Russo | crusso@southernco.com |
| Frank Munsell | Frank Munsell | barleypc@msn.com |
| Range Resources-Appalachia, LLC | William Mapes | wrm@wrmapeslaw.com |
| OHIO FARM BUREAU FEDERATION, INC. | Amy Milam | amilam@ofbf.org |
| OHIO FARM BUREAU FEDERATION, INC. | Chad Endsley | cendsley@ofbf.org |
| OHIO FARM BUREAU FEDERATION, INC. | Leah Curtis | lcurtis@ofbf.org |
| International Transmission Company | Andrew Jamieson | ajamieson@itctransco.com |
| International Transmission Company | Amy Monopoli | amonopoli@itctransco.com |
| Michigan Electric Transmission Company, LLC | Andrew Jamieson | ajamieson@itctransco.com |
| Michigan Electric Transmission Company, LLC | Amy Monopoli | amonopoli@itctransco.com |
| The East Ohio Gas Company, d/b/a Dominion East Ohio | Lois Henry | lois.m.henry@dom.com |
| Old Wilson Farm Land Trust | Lawrence Bolind | bolind@cobweb.net |
| Marijan Grogoza | Marijan Grogoza | mgrogoza132@yahoo.com |
| Janet Grogoza | Janet Grogoza | jgrogoza@yahoo.com |
| Jeff Grogoza | Jeff Grogoza | azogorg@yahoo.com |
| Dale Markowitz | Dale Markowitz | dmarkowitz@tddlaw.com |
| Rover Pipeline LLC | Lisa M. Tonery | ltonery@orrick.com |
| Columbia Gas Transmission, LLC | Tyler Brown | Tyler_Brown2@oxy.com |
| JD Stillwater, Ann Stillwater & Barbara Dewey | Douglas McWilliams | douglas.mcwilliams@squirepb.com |
| Terrence Lahr | Terrence Lahr | terrylahr@yahoo.com |
| Marshall Land LLC | Douglas McElwee | dcm@ramlaw.com |
| Marshall Land LLC | Garrett P Lent | glent@postschell.com |
| CONSOL Mining Company LLC | Matthew Hutnick | matthewhutnick@consolenergy.com |
| Benjamin Polasek | Benjamin Polasek | ben@polasekfarms.com |
| ConocoPhillips Company | Ben Schoene | ben.j.schoene@conocophillips.com |
| ConocoPhillips Company | Marwa Bhatia | marwa.bhatia@conocophillips.com |

| Party | Name | Email Address |
|---|---|---|
| Panhandle Eastern Pipe Line Company, LP | Blair Lichtenwalter | blair.lichtenwalter@energytransfer.com |
| Missouri Public Service Commission | Shelley Brueggemann | shelley.brueggemann@psc.mo.gov |
| Missouri Public Service Commission | Janis Elaine Fischer | janis.fischer@psc.mo.gov |
| Missouri Public Service Commission | John Borgmeyer | john.borgmeyer@psc.mo.gov |
| Missouri Public Service Commission | Jennie Wells | jennie.wells@psc.mo.gov |
| Missouri Public Service Commission | Walt Cecil | walter.cecil@psc.mo.gov |
| Indiana Gas Company, Inc. d/b/a Vectren Energy Delivery of Indiana, Inc. | Michelle Quinn | mquinn@vectren.com |
| Indiana Gas Company, Inc. d/b/a Vectren Energy Delivery of Indiana, Inc. | Phillip Jason Stephenson, ESQ | jstephenson@vectren.com |
| Indiana Gas Company, Inc. d/b/a Vectren Energy Delivery of Indiana, Inc. | Ronald E Christian | rchristian@vectren.com |
| Vectren Energy Delivery of Ohio, Inc. | Michelle Quinn | mquinn@vectren.com |
| Vectren Energy Delivery of Ohio, Inc. | Phillip Jason Stephenson, ESQ | jstephenson@vectren.com |
| Vectren Energy Delivery of Ohio, Inc. | Ronald E Christian | rchristian@vectren.com |
| DTE Gas Company | Jon P Christinidis | christinidisj@dteenergy.com |
| Chevron U.S.A. Inc. | Brett Snyder | brett.snyder@cwt.com |
| Chevron U.S.A. Inc. | Mark Richard Haskell | mark.haskell@cwt.com |
| Chevron U.S.A. Inc. | Pamela Wu | pamela.wu@morganlewis.com |
| Chevron U.S.A. Inc. | J. Jeannie Myers | jmyers@chevron.com |
| Chevron U.S.A. Inc. | Charles R. Cook | chuck.cook@chevron.com |
| Anadarko Energy Services Company | Brett Snyder | brett.snyder@cwt.com |
| Anadarko Energy Services Company | Mark Richard Haskell | mark.haskell@cwt.com |
| Anadarko Energy Services Company | Pamela Wu | pamela.wu@morganlewis.com |
| Exelon Corporation | Christopher Wilson | FERCe-filings@exeloncorp.com |
| Exelon Corporation | Lisa Michelle Simpkins | lisa.simpkins@exeloncorp.com |
| Exelon Corporation | Christopher D. Young | Christopher.Young@Constellation.com |
| ConocoPhillips Company | Brett Snyder | brett.snyder@cwt.com |

| Party | Name | Email Address |
|---|---|---|
| ConocoPhillips Company | Mark Richard Haskell | mark.haskell@cwt.com |
| ConocoPhillips Company | Pamela Wu | pamela.wu@morganlewis.com |
| ConocoPhillips Company | Ben J. Schoene | ben.j.schoene@conocophillips.com |
| SWN Energy Services Company, LLC | Jason Kurtz | Jason_kurtz@swn.com |
| Vector Pipeline L. P. | Robert Smith | bob.smith@vector-pipeline.com |
| Vector Pipeline L. P. | Kim Clark | kclark@jhenergy.com |
| Columbia Gas of Ohio, Inc. | Kenneth Christman | kchrist@nisource.com |
| Columbia Gas of Ohio, Inc. | Deepak A Raval | draval@nisource.com |
| LACLEDE GAS COMPANY | Mark Darrell | mdarrell@lacledegas.com |
| LACLEDE GAS COMPANY | David A Yonce | david.yonce@thelacledegroup.com |
| Trunkline Gas Company, LLC | Stephen Veatch | stephen.veatch@energytransfer.com |
| Tennessee Valley Authority | Sherri Collins | srcollins@tva.gov |
| Michigan Public Service Commission | Kelly A. Daly | kelly.daly@stinson.com |
| Michigan Public Service Commission | David D'Alessandro | ddalessandro@stinson.com |
| Michigan Public Service Commission | Marie D Zosa | denyse.zosa@stinson.com |

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Cheryl A. LaFleur, Acting Chairman;
Norman C. Bay, and Colette D. Honorable.

| | |
|---|---|
| Rover Pipeline LLC | Docket Nos. CP15-93-000 |
| | CP15-93-001 |
| Panhandle Eastern Pipe Line Company, LP | CP15-94-000 |
| Trunkline Gas Company, LLC | CP15-96-000 |

ORDER ISSUING CERTIFICATES

(Issued February 2, 2017)

1.      On February 20, 2015, Rover Pipeline LLC (Rover) filed an application in Docket No. CP15-93-000, pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations,[2] for authorization to construct and operate approximately 510.7 miles of new interstate pipeline and related facilities extending from the Appalachian supply area to a proposed interconnection with Vector Pipeline, LP (Vector) in Livingston County, Michigan (Rover Pipeline Project).  The proposed pipeline is designed to provide up to 3,250,000 dekatherms per day (Dth/d) of firm transportation service.  Rover also requests a blanket certificate under Part 284, Subpart G of the Commission's regulations to provide open-access transportation services, and a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations.

2.      On May 19, 2016, Rover filed an amendment to its application in Docket No. CP15-93-001.  The amendment updates Rover's proposed cost-based recourse rates, *pro*

---

[1] 15 U.S.C. § 717f(c) (2012).

[2] 18 C.F.R. pt. 157 (2016).

*forma* tariff, and Exhibits K (Cost of Facilities), L (Financing), N (Revenues-Expenses-Income), O (Depreciation and Depletion), and P (Tariff) of its application.

3.     On February 23, 2015, Panhandle Eastern Pipe Line Company, LP (Panhandle) filed an application in Docket No. CP15-94-000, pursuant to section 7(c) of the NGA and Part 157 of the Commission's regulations, for authorization to construct and operate the system modifications necessary to enable Panhandle to provide 750,000 Dth/d of east-to-west firm transportation service within the Market Zone of its pipeline system (Panhandle Backhaul Project).

4.     On February 23, 2015, Trunkline Gas Company, LLC (Trunkline) filed an application in Docket No. CP15-96-000, pursuant to section 7(c) of the NGA and Part 157 of the Commission's regulations, for authorization to construct and operate the system modifications necessary to enable Trunkline to provide 750,000 Dth/d of north-to-south firm transportation service within Zones 1B and 1A of its pipeline system (Trunkline Backhaul Project).

5.     Rover has signed precedent agreements for the full capacity of Panhandle's and Trunkline's projects and will use the capacity to render service under its FERC tariff.  In addition, Rover states that it has signed a joint precedent agreement with Vector and its interconnected affiliated Canadian pipeline, Vector Pipeline Limited Partnership, to provide up to 950,000 Dth/d of firm transportation service on existing facilities for delivery in Michigan and to the Union Gas Dawn Hub in Ontario, Canada.

6.     As explained herein, we find that the benefits that the Rover Pipeline Project, Panhandle Backhaul Project, and Trunkline Backhaul Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities.  Further, as set forth in the environmental discussion below, we agree with Commission staff's conclusion in the Environmental Impact Statement (EIS) that, if constructed and operated in accordance with applicable laws and regulations, the projects will result in some adverse and significant environmental impacts, but that these impacts will be reduced to acceptable levels with the implementation of the applicants' proposed mitigation and staff's recommendations, now adopted as conditions in the attached Appendix B of this order. Therefore, for the reasons stated below, we grant the requested certificates of public convenience and necessity and Rover's request for a blanket certificate under Part 284, Subpart G of the Commission's regulations, subject to conditions.  However, because of Rover's intentional demolition of a house that was identified as eligible for listing in the National Register of Historic Places and within the visual area of potential effects of the project, as discussed more fully below, we deny Rover's request for a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 13 of 140

# I.   Background

7.     Rover, a limited liability company organized and existing under the laws of Delaware, is jointly owned by ET Rover Pipeline, LLC (ET Rover),[3] Traverse Rover LLC (formerly AE-Midco Rover, LLC), and Traverse Rover II LLC (formerly AE-Midco Rover II, LLC).  Rover does not currently own any pipeline facilities, nor is it engaged in any natural gas transportation operations.  Upon commencement of operations proposed in its application, Rover will become a natural gas company within the meaning of section 2(6) of the NGA,[4] and, as such, will be subject to the jurisdiction of the Commission.

8.     Panhandle, a limited partnership organized and existing under the laws of Delaware, is a natural gas company engaged in the transmission and storage of natural gas in interstate commerce, subject to the jurisdiction of the Commission.  Panhandle's transmission system extends from supply sources in Texas, Kansas, and Oklahoma though Missouri, Illinois, Indiana, Ohio, and Michigan to the International Boundary between the United States and Canada.

9.     Trunkline, a limited liability company organized and existing under the laws of Delaware, is a natural gas company engaged in the transmission and storage of natural gas in interstate commerce, subject to the jurisdiction of the Commission.  Trunkline's transmission system extends from its historical supply sources in Texas and Louisiana, through Arkansas, Mississippi, Tennessee, Kentucky, and Illinois to a principal terminus at the Indiana-Michigan border near Elkhart, Indiana.

# II.   Proposals

## A.   Rover Pipeline Project

### 1.   Facilities and Services

10.    The Rover Pipeline Project consists of nine supply laterals and three mainlines (Mainline A and B, and the Market Segment).  Generally, the supply laterals will transport gas from receipt points in the Marcellus and Utica shale supply areas in West Virginia, Pennsylvania, and Ohio to delivery points along Mainlines A and B, which will mostly run parallel from Harrison County, Ohio, to the Midwest Hub in Defiance County,

---

[3] ET Rover, an affiliate of Energy Transfer Partners, L.P. (Energy Transfer), is the majority interest owner, developer, and operator of the Rover Pipeline Project.

[4] 15 U.S.C. § 717a(6) (2012).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 14 of 140

Ohio. The Market Segment will run from the Midwest Hub north, to the interconnection with Vector in Livingston County, Michigan. The Rover Pipeline Project will involve the construction of the following facilities:

- approximately 54.1 miles of 36-inch-diameter pipeline commencing at the Sherwood Compressor Station in Doddridge County, West Virginia, extending to the Sherwood Tie-In and the interconnection with the Seneca Lateral in Monroe County, Ohio (Sherwood Lateral);

- approximately 5.9 miles of 24-inch-diameter pipeline commencing at the Columbia Gas Transmission (CGT) Tie-In at the interconnection with the Sherwood Lateral in Doddridge County, West Virginia, extending to the CGT Delivery Meter Station and the interconnection with CGT (CGT Lateral);

- approximately 25.8 miles of 42-inch-diameter pipeline commencing at the Seneca Compressor Station in Noble County, Ohio, and extending to the Clarington Compressor Station and the interconnection with the Clarington Lateral in Monroe County, Ohio (Seneca Lateral);

- approximately 4.3 miles of 24-inch-diameter pipeline commencing at the Berne Receipt Meter Station in Monroe County, Ohio, extending to the Seneca Compressor Station in Noble County, Ohio (Berne Lateral);

- approximately 33.0 miles of 42-inch-diameter commencing at the Clarington Compressor Station and the interconnection with the Seneca Lateral in Monroe County, Ohio, extending to the Cadiz Tie-In and the interconnection with the Cadiz Lateral and Supply Connector Line A and B in Harrison County, Ohio (Clarington Lateral);

- approximately 23.6 miles of 24-inch-diameter pipeline commencing at the Majorsville Receipt Meter Station in Marshall County, West Virginia, extending to the Majorsville Tie-In at the interconnection with the Clarington Lateral in Belmont County, Ohio (Majorsville Lateral);

- approximately 3.5 miles of 30-inch-diameter pipeline commencing at the Cadiz Compressor Station in Harrison County, Ohio, extending to the Cadiz Tie-In and the interconnections with the Clarington and Supply Connector Lines A and B (Cadiz Lateral);

- approximately 18.6 miles of dual 42-inch-diameter pipeline commencing at the Cadiz Tie-In in Harrison County, Ohio, extending to Mainline Compressor Station 1 and the interconnection with Mainlines A and B in Carroll County, Ohio (Supply Connector Line A and B);

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 15 of 140

Docket No. CP15-93-000, *et al.*                                                   - 5 -

- approximately 51.8 miles of 36-inch-diameter pipeline commencing at the Burgettstown Compressor Station in Washington County, Pennsylvania, extending to the Burgettstown Tie-In and the interconnection with Supply Connector Lines A and B in Carroll County, Ohio (Burgettstown Lateral);

- approximately 190.9 miles of dual 42-inch-diameter pipelines extending from Carroll County, Ohio, to the Midwest Hub in Defiance County, Ohio (Mainlines A and B);

- approximately 100.0 miles of 42-inch-diameter pipeline extending from the Midwest Hub to an interconnection with Vector in Livingston County, Michigan (Market Segment);

- the new 14,205 horsepower (hp) Sherwood Compressor Station located at milepost 0.0 on the Sherwood Lateral in Doddridge County, West Virginia, consisting of three natural gas-fired reciprocating compressor units;

- the new 18,940 hp Seneca Compressor Station located at milepost 0.0 on the Seneca Lateral in Nobel County, Ohio, consisting of four natural gas-fired reciprocating compressor units;

- the new 11,245 hp Clarington Compressor Station located at milepost 0.4 on the Clarington Lateral in Monroe County, Ohio, consisting of three natural gas-fired reciprocating compressor units;

- the new 7,100 hp Majorsville Compressor Station located at milepost 1.1 on the Majorsville Lateral in Marshall County, West Virginia, consisting of two natural gas-fired reciprocating compressor units;

- the new 15,980 hp Cadiz Compressor Station located at milepost 0.0 on the Cadiz Lateral in Harrison County, Ohio, consisting of four natural gas-fired reciprocating compressor units;

- the new 5,175 hp Burgettstown Compressor Station located at milepost 0.0 on the Burgettstown Lateral in Washington, Pennsylvania, consisting of three natural gas-fired reciprocating compressor units;

- the new 42,190 hp Mainline Compressor Station 1 located at milepost 18.8 on Main Lines A and B in Carroll County, Ohio, consisting of six natural gas-fired reciprocating compressor units;

- the new 38,745 hp Mainline Compressor Station 2 located at milepost 77.3 on Main Lines A and B in Wayne County, Ohio, consisting of six natural gas-fired reciprocating compressor units;

- the new 34,010 hp Mainline Compressor Station 3 located at milepost 127.9 on Main Lines A and B in Crawford County, Ohio, consisting of five natural gas-fired reciprocating compressor units;

- the new 25,830 hp Defiance Compressor Station located at milepost 0.0 on the Market Segment in Defiance County, Ohio consisting of four natural gas-fired reciprocating compressor units;

- seventeen new meter stations in West Virginia, Pennsylvania, Ohio, and Michigan; and

- various appurtenances.

Rover estimates that the proposed facilities will cost approximately $4.082 billion.

11.    Rover states that it met with potential shippers to explore interest in supporting new natural gas pipeline infrastructure serving the Marcellus and Utica shale supply areas. As a result, Rover initially executed eight precedent agreements that included pre-arranged conforming bids.[5] Rover subsequently held a 30-day binding open season commencing on June 26, 2014. After the end of the open season, Rover continued to solicit interest for capacity on the Rover Pipeline Project and, on October 30, 2014, Rover announced that it had secured an additional long-term binding precedent agreement. Consequently, the Rover Pipeline Project is subscribed through 15- and 20-year contracts to transport 3,100,000 Dth/d of natural gas. All of the shippers have elected to pay negotiated rates.

12.    Rover also requests approval of its proposed *pro forma* tariff. Rover proposes initial maximum and minimum recourse reservation and usage rates set forth under Rate Schedules FTS (Firm Transportation Service), ITS (Interruptible Transportation Service), and GPS (Gas Parking Service).

---

[5] Rover, in its application, requested that shipper names remain confidential pursuant to 18 C.F.R. § 385.1112 (2016), and no party requested the information pursuant to a protective order.

Docket No. CP15-93-000, *et al.*                                                                         - 7 -

### 2.    Blanket Certificates

13.    Rover requests a blanket certificate of public convenience and necessity pursuant to section 284.221 of the Commission's regulations authorizing Rover to provide transportation service to customers requesting and qualifying for transportation service under its proposed FERC Gas Tariff, with pre-granted abandonment authorization.[6]

14.    Rover requests a blanket certificate of public convenience and necessity pursuant to section 157.204 of the Commission's regulations authorizing future facility construction, operation, and abandonment as set forth in Part 157, Subpart F of the Commission's regulations.[7]

### B.    Panhandle Backhaul Project

15.    Panhandle proposes to construct piping modifications (i.e., station piping, valves, fittings, pressure regulation equipment, and other miscellaneous materials) at its existing Edgerton Compressor Station in Allen County, Indiana, Zionsville Compressor Station in Marion County, Indiana, Montezuma Compressor Station in Parke County, Indiana, and Tuscola Compressor Station in Douglas County, Illinois, as well at the existing Edgerton 10 Gate Valve Setting in Lenawee County, Michigan, Zionsville 3 Gate Valve Setting in Hamilton County, Indiana, and Tuscola 6 Gate Valve Setting in Vermillion County, Indiana, and mainline scrubbing facilities near the Montezuma Compressor Station. The proposed facilities allow bi-directional flow of natural gas within the Market Zone of Panhandle's system. Panhandle will also establish an interconnection with the Rover Pipeline Project near Defiance, Ohio, to allow firm transportation from the proposed Panhandle-Rover Interconnect to the existing Panhandle-Trunkline Interconnect near Bourbon, Illinois. The proposed modifications do not require the installation of additional compressor horsepower or mainline pipe. The Panhandle Backhaul Project will increase east-to-west capacity on the Panhandle pipeline system to meet the demand for additional transportation capacity to deliver natural gas to the Midwest and Gulf Coast market areas. Panhandle estimates the cost of the Panhandle Backhaul Project to be approximately $55 million.

16.    Panhandle proposes to charge its existing rates for service using the incremental capacity created by the project. Panhandle has executed a precedent agreement with Rover for the entire 750,000 Dth/d of firm service created by the project at Panhandle's

---

[6] 18 C.F.R. § 284.221 (2016).

[7] 18 C.F.R. § 157.204 (2016).

existing maximum recourse rate. Panhandle requests a pre-determination of rolled-in rate treatment for the costs associated with the project.

### C.    Trunkline Backhaul Project

17.    Trunkline proposes to construct piping modifications (i.e., station piping, valves, fittings, pressure regulation equipment, and other miscellaneous materials) at its existing Johnsonville Compressor Station in Wayne County, Illinois, Joppa Compressor Station in Massac County, Illinois, Dyersburg Compressor Station in Dyer County, Tennessee, and Independence Compressor Station in Tate County, Mississippi, in order to allow bi-directional flow of natural gas through these compressor stations, to modify the existing Panhandle-Trunkline Interconnect located near Bourbon, Illinois, by installing valves and fittings, making other ancillary modifications to piping within the existing Panhandle Tuscola Compressor Station in Douglas County, Illinois, and constructing and operating modifications to the existing Bourbon Meter Station in Douglas County, Illinois. The proposed modifications do not require the installation of additional compressor horsepower or mainline pipe. The Trunkline Backhaul Project will increase north-to-south capacity on the Trunkline pipeline system to meet the demand for additional transportation capacity to deliver natural gas to the Midwest and Gulf Coast market areas. Trunkline estimates the cost of the Trunkline Backhaul Project to be approximately $50.8 million.

18.    Trunkline proposes to charge its existing rates for service using the incremental capacity. Trunkline has executed a precedent agreement with Rover for the entire 750,000 Dth/d of firm service created by the project at Trunkline's existing maximum recourse rate, a rate Trunkline states will fully recover the cost of service associated with the project. Trunkline requests a pre-determination of rolled-in rate treatment for the costs associated with the project.

## III.    Procedural Issues

### A.    Notice, Interventions, Protests, and Comments

19.    Notice of the applications in Docket Nos. CP15-93-000, CP15-94-000, and CP15-96-000 was published in the *Federal Register* on March 16, 2015 (80 Fed. Reg. 13,527). In each docket, a number of timely and late motions to intervene were filed.[8] Timely,

---

[8] The Commission's regulations provide that interventions are timely if filed during the comment period on the notice of the application or if filed on environmental grounds during the comment period of the draft EIS. 18 C.F.R. §§ 157.10, 380.10(a), 385.214(c) (2016). Thus, if interventions are filed in between these periods, the intervention is late. *See Florida Southeast Connection, LLC*, 154 FERC ¶ 61,080, at n.13

(continued...)

unopposed motions to intervene are granted automatically pursuant to Rule 214 of the Commission's Rules of Practice and Procedure.[9]

20. Notice of the amendment to Rover's application in Docket No. CP15-93-001 was published in the *Federal Register* on May 31, 2016 (81 Fed. Reg. 34,334). No motions to intervene, protests, or comments were filed in response to the application amendment.

21. A number of individuals filed late, unopposed motions to intervene in each proceeding. We grant these motions.[10] Additionally, Sierra Club filed a late, opposed motion to intervene. As discussed below, we grant Sierra Club's motion.

22. Last, the timely motions to intervene by a group of Ohio landowners represented by Goldman & Braunstein, LLP (G&B Landowners) and the Ohio Farm Bureau Federation, Inc. (Farm Bureau) were opposed. As discussed below, the Commission grants these timely motions to intervene. All parties to each proceeding are listed in Appendix A of this order.

23. G&B Landowners, E&W Landowners, STC Holdings, LLC, Consumers Energy Company, and several individuals and landowners filed protests and adverse comments raising the following issues: (1) the need for an evidentiary hearing regarding Rover's proposed construction schedule and its impact on eminent domain proceedings; (2) a request to use the Commission's alternative dispute resolution service to resolve certain landowner issues; (3) the need for the proposed project; (4) the use of eminent domain and "quick take" authority; (5) the project's impact on existing pipelines; (6) Rover's budget for land acquisition and its effect on landowners; (7) the Commission's regulations regarding affiliate shippers; and (8) Rover's inability to negotiate an interconnection and operating agreement with Consumers Energy Company. On April 26, 2016, Rover filed an answer to protests filed by G&B Landowners and E&W

---

(2016). As we note below, however, the Commission has a liberal policy of accepting late interventions in natural gas certificate proceedings.

[9] 18 C.F.R. § 385.214(c) (2016).

[10] 18 C.F.R. § 385.214(d) (2016).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 20 of 140

24.     Landowners.  G&B Landowners and E&W Landowners filed answers to Rover's answer.[11]

25.     In addition, we received numerous comments in support of the Rover Pipeline Project, asserting it would, among other things, bring jobs to the area, increase economic growth, and provide affordable natural gas supplies to consumers.  On the other hand, a large number of comments were filed raising concerns over the environmental impacts of the proposed projects.  These concerns are addressed in the EIS, as well as the environmental section of this order.

### 1.     G&B Landowners Intervention

26.     On March 3, 2015, G&B Landowners filed a timely motion to intervene in Docket No. CP15-93-000.  The motion to intervene did not publicly identify the names of the individual landowners.  Rather, a list of the landowners was filed as privileged and confidential material.  The motion to intervene specifically requested that G&B Landowners be allowed to intervene as a consolidated group in the proceeding.[12]

27.     On March 18, 2015, Rover filed an answer opposing G&B Landowners' timely motion to intervene.  Specifically, Rover requested that we deny the motion because by withholding the names of the landowners, the motion failed to provide sufficient factual information to justify intervention under the Commission's Rules of Practice and Procedure.[13]  Additionally, Rover asserted that G&B Landowners failed to adequately justify its reason for filing the list of landowners as privileged information as required by section 388.112[14] of the Commission's regulations.[15]

---

[11] Although the Commission's Rules of Practice and Procedure generally do not permit answers to answers, 18 C.F.R. § 385.213(a)(2) (2016), we will accept G&B Landowners' and E&W Landowners' responses because they clarify the concerns raised and provide information that has assisted in our decision making.

[12] G&B Landowners March 3, 2015 Motion to Intervene at 6.

[13] Rover March 18, 2015 Answer in Opposition to Motion to Intervene of Goldman & Braunstein, LLP at 2-5 (Answer in Opposition).

[14] 18 C.F.R. § 388.112 (2016).

[15] Rover Answer in Opposition at 5.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 21 of 140

28.     On March 27, 2015, G&B Landowners filed a response to Rover's Answer in Opposition,[16] clarifying that it represents more than 100 landowners in 15 Ohio counties, whose land will be adversely affected by Rover's project as evidenced by the alignment sheets submitted by Rover to the Commission on February 20, 2015. G&B Landowners further explained that it has provided Rover a list of landowners, which is frequently updated by email notifications to both Rover's legal counsel and Rover's lead right-of-way representative.[17] Because the identities of the landowners are known to both the Commission and Rover, G&B Landowners request that the Commission grant its motion to intervene.

29.     On August, 7, 2015, G&B Landowners filed a motion to supplement its landowner list (First Motion to Supplement). The First Motion to Supplement was filed over four months after the established deadline for timely motions to intervene and requested that the list of additional landowners be added to those landowners previously named in the March 3, 2015 Motion to Intervene. On March 9, 2016, seven months after the First Motion to Supplement, G&B Landowners filed an additional Motion to Supplement its landowner list (Second Motion to Supplement).[18]

30.     Rover has asserted that G&B Landowners' failure to publicly disclose the identities of the individual landowners frustrates Rover's efforts to work with these individuals to resolve landowner concerns. However, both Rover and Commission staff are privy to the identities of the G&B Landowners.[19] Based on G&B Landowners'

---

[16] Although the Commission's Rules of Practice and Procedure generally do not permit answers to answers, 18 C.F.R. § 385.213(a)(2) (2016), we will accept G&B Landowners' response because it clarifies the concerns raised and provides information that has assisted in our decision making.

[17] G&B Landowners indicated that it had sent Rover 37 emails between December 11, 2014, and March 27, 2015, to update the list of its landowner clients.

[18] The Second Motion to Supplement also included a request that the Commission provide to G&B Landowners a revised version of Appendix I-1 "Status of Route Deviations Reported by Stakeholders," which appeared in the draft Environmental Impact Statement issued by the Commission on February 19, 2016, that includes the identities of any stakeholder that is part of the G&B Landowner group and whose land is referenced in Appendix I-1. G&B Landowners March 9, 2016 Motion for Production of Landowner-Client Information and to Supplement Client List at 2.

[19] As noted earlier, G&B Landowners provided Rover with a list of all landowners, which was frequently updated via email correspondence with Rover's legal counsel and its lead right-of-way representative. Following a comparison of G&B

(continued...)

representations that it includes numerous Ohio landowners affected by Rover's proposed pipeline and Commission staff's evaluation of its landowner list, we are satisfied that G&B Landowners have sufficiently demonstrated that it represents interests that may be affected by the outcome of the proceeding as required by Rule 214 of the Commission's Rules of Practice and Procedure.[20] Therefore, we grant G&B Landowners' timely motion to intervene. With respect to the Motions to Supplement, however, we note that G&B Landowners requested party status for the landowner group as a whole, and not for each individual landowner. Therefore, each individual landowner does not have individual intervenor status through the consolidated group, since G&B Landowners did not request such status and, in any event, did not publicly identify the names of the individual landowners.[21]

### 2.   Ohio Farm Bureau Intervention

31.     On March 30, 2015, the Ohio Farm Bureau Federation, Inc. (Farm Bureau), which describes itself as a grassroots organization representing agricultural interests at the state and local level, filed a timely motion to intervene in Docket No. CP15-93-000. On April 14, 2015, the Freshwater Accountability Project (Freshwater) filed an answer opposing the Farm Bureau's motion to intervene. While first asserting that the Farm Bureau failed to articulate a position, Freshwater continues on to argue that the Farm Bureau's support for the project is a position that is already being adequately advanced by Rover. For these reasons, Freshwater asks the Commission to deny the Farm Bureau's motion to intervene in this proceeding. On April 23, 2015, the Farm Bureau filed a response to Freshwater's answer in opposition,[22] detailing its energy development policy positions

---

Landowners' list to Rover's landowner list, Commission staff is satisfied that the landowners may be affected by the proposed pipeline. We further note that Rover's updated landowner mailing lists, filed on June 11, 2015, specifically list Goldman & Braunstein, LLP as the contact organization for a significant number of individual landowners. Rover's June 11, 2015 Supplement to the Environmental Report, Volume IV – Resource Report 1, Attachment 1A – Landowner Mailing Lists in Docket No. CP15-93-000.

[20] *See* 18 C.F.R. § 385.214(b) (2016).

[21] *See, e.g., Southern Natural Gas Co.*, 79 FERC ¶ 61,280 (1997).

[22] Although the Commission's Rules of Practice and Procedure generally do not permit answers to answers, 18 C.F.R. § 385.213(a)(2) (2016), we will accept the Farm Bureau's response because it clarifies the concerns raised and provides information that has assisted in our decision making.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 23 of 140

and emphasizing that no other existing party can adequately represent the energy development needs of farms, small businesses, and rural landowners in Ohio.

32.     Under Rule 214(b)(2), a movant seeking to intervene in a proceeding must state its interest in sufficient factual detail to demonstrate that its right to participate is expressly conferred by statute, Commission rule, order, or other action; that it has or represents an interest that may be directly affected by the outcome of the proceeding; or its participation is in the public interest.[23]  As noted above, the Farm Bureau states that it represents the energy development needs of farms, small business, and rural landowners in Ohio.  We find that the Farm Bureau's participation is in the public interest and that it has sufficiently demonstrated that it "has or represents an interest which may be directly affected by the outcome of the proceeding."[24]  Accordingly, we grant the Farm Bureau's motion to intervene.

### 3.     Sierra Club Late Intervention

33.     On September 1, 2016, Sierra Club filed an untimely motion to intervene.  Rover filed an answer opposing Sierra Club's late motion to intervene.  While we will grant this late-filed motion to intervene, we note that Sierra Club filed it motion to intervene over seventeen months after issuance of the notice of application, over six months after issuance of the draft EIS, and over one month after issuance of the final EIS.

### B.     Request for Evidentiary Hearing

34.     G&B Landowners request an evidentiary hearing concerning Rover's schedule and its impact on eminent domain proceedings.  An evidentiary, trial-type hearing is necessary only where there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[25]  No party has raised a material issue of fact that the Commission cannot resolve on the basis of the written record.  As demonstrated by the discussion below, the existing written record provides a sufficient basis to resolve the issues relevant to this proceeding.  The Commission has satisfied the hearing requirement

---

[23] 18 C.F.R. § 385.214(b)(2) (2016).

[24] *See* 18 C.F.R. § 385.214(b)(2)(ii) (2016).

[25] *See, e.g., Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Dominion Transmission, Inc.*, 141 FERC ¶ 61,183, at P 15 (2012).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 24 of 140

by giving interested parties an opportunity to participate through evidentiary submission in written form.[26]  Therefore, we will deny the request for a trial-type evidentiary hearing.

35.     On July 27, 2016, G&B Landowners filed a discovery request instructing Rover to produce certain documents pursuant to section 385.406 of the Commission's Rules of Practice and Procedure.[27]  The Commission's discovery regulations, set out in Part 385, subpart D of the Commission's Regulations, apply in proceedings that have been set for hearing.[28]  As discussed above, because we find that a trial-type hearing is not necessary in this proceeding, we deny G&B Landowner's request for discovery.

## C.     Request for Alternative Dispute Resolution

36.     On October 2, 2015, G&B Landowners filed a motion requesting the Commission to assign a matter in Docket No. CP15-93-000 to the Commission's Alternative Dispute Resolution process.[29]  G&B Landowners requested the use of alternative means of dispute resolution to resolve an ongoing dispute between Rover and G&B Landowners related to the maintenance and restoration of agricultural drainage tile systems prior to and during project construction and subsequent land restoration.  Specifically, G&B Landowners stated that project construction would impact drainage systems, but that Rover could mitigate these impacts by performing pre-construction drain tile work on the G&B Landowners' properties.  However, the motion further alleges that Rover conditioned performance of such mitigation measures on Rover's receipt of a permanent easement from each landowner, a condition G&B Landowners found unacceptable.

37.     The Commission has an Alternative Dispute Resolution process, which is covered under Rule 604 of the Commission's Rules of Practice and Procedure.[30]  Our regulations require that all participants to a pending matter concur in the use of alternative dispute resolution.  Here, Rover agreed to participate in the Commission's Alternative Dispute Resolution process in an attempt to resolve the drainage tile issue.  While the Dispute Resolution Division of the Office of Administrative Law Judges initiated alternative

---

[26] *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

[27] 18 C.F.R. § 385.406 (2016).

[28] *See* 18 C.F.R. § 385.401 (2016).

[29] G&B Landowners October 2, 2015 Motion to Assign Matter for Dispute Resolution in Docket No. CP15-93-000.

[30] 18 C.F.R. § 385.604(d) (2016).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 25 of 140

dispute resolution procedures with the parties to address the issues raised, to date, no agreement has been reached.

## IV.   Discussion

38.     Since the proposed facilities will be used to transport natural gas in interstate commerce, subject to the jurisdiction of the Commission, the construction and operation of the facilities are subject to the requirements of subsections (c) and (e) of section 7 of the NGA.

### A.   Application of Certificate Policy Statement

39.     The Certificate Policy Statement provides guidance for evaluating proposals to certificate new pipeline construction.[31] The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

40.     Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered.

---

[31] *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 26 of 140

1. **Rover Pipeline Project**

(a) **Subsidization and Impacts on Existing Customers**

41.     As discussed above, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without subsidization from existing customers. Rover is a new pipeline entrant with no existing customers. Thus, there is no potential for subsidization on Rover's system or degradation of service to existing customers.

(b) **Need for the Project**

42.     Several parties and commenters challenged the need for the proposed Rover Pipeline Project. They raise a variety of arguments including: (1) the creditworthiness of Rover's shippers; (2) insufficient demand for natural gas both domestically and for export; (3) insufficient production growth in the Marcellus and Utica shales; (4) the availability of alternatives – renewable energy and under-utilized pipeline capacity – to meet future demand; and (5) the fact that a portion of the gas transported on Rover will be exported to Canada and not consumed within the United States.

43.     The Certificate Policy Statement established a new policy under which the Commission would allow an applicant to rely on a variety of relevant factors to demonstrate need, rather than continuing to require that a percentage of the proposed capacity be subscribed under long-term precedent or service agreements.[32] These factors might include, but are not limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market.[33] The Commission stated that it will consider all such evidence submitted by the applicant regarding project need. Nonetheless, the Certificate Policy Statement made clear that, although precedent agreements are no longer required to be submitted, they are still significant evidence of project need or demand.[34]

44.     We find that Rover has sufficiently demonstrated that there is market demand for the project. Rover has entered into long-term, firm precedent agreements with nine

---

[32] Certificate Policy Statement, 88 FERC at 61,747.

[33] *Id.*

[34] *Id.*

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 27 of 140

producers for 3,100,000 Dth/d of firm transportation service, approximately 95 percent of the system's capacity.[35]

45.     Mr. Frank Zaski avers that Rover's binding precedent agreements do not demonstrate need for the project because some shippers have experienced a reduction in credit rating. Mr. Zaski argues that the reduction in credit rating indicates that these shippers may not utilize their contracted volumes in the future. Several commenters further state that producers of natural gas throughout the industry are not financially stable. This concern is speculative. There is no record evidence indicating that any of Rover's shippers intend to cancel their contracts or will not be able to utilize their future contractual demand. In fact, many of Rover's shippers have filed comments requesting the Commission approve Rover's application as quickly as possible.[36] Moreover, Rover's foundation shippers have a higher creditworthiness standard than the creditworthiness requirements found in Rover's tariff.[37] Rover must execute firm contracts for the capacity levels and terms of service represented in the signed precedent agreements before commencing construction. Should a foundation shipper be unable to meet the creditworthiness standard in the agreement, Rover would not be able to execute the precedent agreement, and thus, could not begin construction. Therefore, we conclude that Rover's signed precedent agreements demonstrate need for the proposed project.

---

[35] It is current Commission policy to not look beyond precedent or service agreements to make judgments about the needs of individual shippers. Certificate Policy Statement, 88 FERC at 61,744 (citing *Transcontinental Gas Pipe Line Corp.*, 82 FERC ¶ 61,084, at 61,316 (1998)). The United States Court of Appeals for the District of Columbia Circuit affirmed this policy in *Minisink Residents for Environmental Preservation & Safety v. FERC*, finding that the petitioners identify nothing in the policy statement or in any precedent construing it to suggest that it requires, rather than permits, the Commission to assess a project's benefits by looking beyond the market need reflected by the applicant's existing contracts with shippers. *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 110 n.10 (D.C. Cir. 2014).

[36] *See* Antero Resources Corp. January 24, 2017 Letter; EdgeMarc Energy December 7, 2015 Letter; Antero Resources Corp. November 25, 2015 Letter; Range Resources-Appalachia, LLC November 20, 2015 Letter; Rice Energy Marketing LLC November 18, 2015 Letter; SWN Energy Services Company, LLC November 17, 2015 Letter.

[37] *See infra* Section IV.D.5.

USCA Case #18-1032          Document #1715763          Filed: 01/29/2018          Page 28 of 140

46.     Commenters next argue that there is insufficient demand for natural gas in Michigan and Canada.  Commenters note that Rover is a producer-driven project and contend that projects should be driven by market demand for natural gas.  The Commission does not distinguish between classes of pipeline shippers.  In *ETC Tiger Pipeline*, issuing a certificate of public convenience and necessity for a producer-driven pipeline project, the Commission reasoned that the new pipeline would develop gas infrastructure that will serve to ensure future domestic energy supplies and enhance the pipeline grid by connecting sources of natural gas to markets in the Midwest and Atlantic Seaboard.[38]  Similarly, the Rover Pipeline Project will connect supplies in the Marcellus and Utica supply areas to markets in the Midwest and Gulf Coast, and to the Dawn Hub in Ontario Province, Canada.[39]

47.     Mr. Zaski's assertion that there is insufficient supply is also unpersuasive.  Relying on projections regarding Marcellus shale production, Mr. Zaski argues that the supply from the Marcellus is decreasing and that the pipeline will be under-utilized.  Rover has contracted with specific producers for capacity on its pipeline.  These long-term agreements accurately reflect the need for the proposed project.[40]

48.     With respect to project alternatives, our environmental review considered the potential for energy conservation and renewable energy sources, and the availability of capacity on other pipelines, to serve as alternatives to the Rover Pipeline Project and concluded that they do not presently serve as practical alternatives to the project.[41]  Thus,

---

[38] *ETC Tiger Pipeline, LLC*, 131 FERC ¶ 61,010, at P 20 (2010).

[39] At the Dawn Hub, shippers' may (1) utilize one of the natural gas storage facilities; (2) sell to Canadian markets; or (3) transport gas back to United States markets in the Northeast and Midwest through interconnecting pipelines.

[40] *See Algonquin Gas Transmission, LLC*, 154 FERC ¶ 61,048, at P 40 (2016) (finding that assessment of regional demand for natural gas was not necessary because the applicant demonstrated need for the project through executed precedent agreements).

[41] *See* Final EIS at 3-7 to 3-8 (concluding that existing pipelines do not have the capacity to transport the required volumes of gas) and 3-6 (concluding that generation of electricity from renewable energy sources or the gains realized from increased energy efficiency and conservation are not transportation alternatives and cannot function as a substitute for the Rover Pipeline Project).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 29 of 140

contrary to commenters' assertions, we are not persuaded that authorization of the Rover Pipeline Project would lead to the overbuilding of pipeline infrastructure.[42]

49.     Lastly, allegations that the project is not needed because gas will be exported, either to Canada or through an LNG terminal, are not persuasive.  The Commission does not have jurisdiction over the exportation or importation of natural gas.  Such jurisdiction resides with the U.S. Department of Energy (DOE), which must act on any applications for natural gas export or import authority.[43]  We note that there is no proposal before us to increase the export capacity of Vector's facilities and that the Rover shippers utilize existing export capacity should DOE approve the export of the commodity.

50.     In conclusion, we find that the Rover Pipeline Project will provide benefits to all sectors of the natural gas market by providing producers access to multiple markets

---

[42] Similarly, we find that the general quotes of Energy Transfer's CEO, Mr. Kelcy Warren, cited by commenters regarding the pipeline industry overbuilding to be unpersuasive.  As the quote made clear, Mr. Warren was not commenting on this specific project, which, as discussed, has demonstrated clear need.

[43] Section 3(a) of the NGA provides, in part, that "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so."  15 U.S.C. § 717b(a) (2012).  In 1977, the Department of Energy Organization Act transferred the regulatory functions of section 3 of the NGA to the Secretary of Energy.  42 U.S.C. § 7151(b) (2012).  Subsequently, the Secretary of Energy delegated to the Commission authority to "[a]pprove or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports."  DOE Delegation Order No. 00-004.00A (effective May 16, 2006).  The proposed facilities are not located at a potential site of exit for natural gas exports.  Moreover, the Secretary of Energy has not delegated to the Commission any authority to approve or disapprove the import or export of the commodity itself, or to consider whether the exportation or importation of natural gas is consistent with the public interest.  *See Corpus Christi Liquefaction, LLC*, 149 FERC ¶ 61,283, at P 20 (2014) (*Corpus Christi*).  *See also National Steel Corp.*, 45 FERC ¶ 61,100, at 61,332-33 (1988) (observing that DOE, "pursuant to its exclusive jurisdiction, has approved the importation with respect to every aspect of it except the point of importation" and that the "Commission's authority in this matter is limited to consideration of the place of importation, which necessarily includes the technical and environmental aspects of any related facilities").

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 30 of 140

throughout the United States and Canada and increasing the diversity of supply to consumers in those markets. Precedent agreements signed by Rover for approximately 95 percent of the projects' capacity adequately demonstrate that the project is needed.

### (c)    Existing Pipelines and their Customers

51.    The Rover Pipeline Project is designed to transport domestically sourced gas from the Marcellus and Utica supply areas to markets in Ohio and Michigan. Mr. Frank Zaski asserts that the project will negatively impact existing pipelines because any natural gas transported by Rover would not be available for transport on an existing pipeline. The EIS analyzed the availability of capacity on other pipelines to serve as alternatives to the Rover Pipeline Project, and concluded that they do not presently serve as practical alternatives to the project.[44] Further, no transportation service provider or captive customer in the same market has protested this project. Therefore, we find that the Rover Pipeline Project will have no adverse impact on existing pipelines or their captive customers.

### (d)    Landowners and Communities

52.    Regarding impacts on landowners and communities along the project route, Rover proposes to locate its pipeline within or parallel to existing utility corridors where feasible. Approximately 24 percent of Rover's pipeline rights-of-way will be collocated or adjacent to existing pipeline, roadway, railway, or utility rights of way.[45] Rover also proposes to use available capacity on other pipelines wherever possible to avoid new, undisturbed lands. For example, Rover has acquired capacity on the Vector system from Livingston County, Michigan to the Dawn Hub, thereby avoiding approximately 110 miles of pipeline construction impacts in Michigan and approximately 14 miles in Ontario, Canada.

53.    While we are mindful that Rover has been unable to reach easement agreements with some landowners, for purposes of our consideration under the Certificate Policy Statement, we find that Rover has generally taken sufficient steps to minimize adverse impacts on landowners and surrounding communities. Rover participated in the Commission's pre-filing process and has been working to address landowner and community concerns and input. Specifically, Rover incorporated over 150 route

---

[44] Final EIS at 3-7 to 3-8.

[45] Final EIS at 2-11.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 31 of 140

variations into its proposed route for various reasons, including landowner requests, avoidance of sensitive resources, or engineering considerations.[46]

54.      E&W Landowners argue that because Rover "under-budgeted" the costs for land acquisition and right-of-way damage, the proposed project will be "subsidized" by landowners receiving less compensation for an easement.[47] However, the compensation landowners receive for easements are a matter of negotiation between the pipeline company and landowner, or will be determined in an eminent domain proceeding. In the context of its certificate proceeding, Rover's estimated costs for land acquisition are used to establish its initial recourse rates. Those estimates should have no bearing on the compensation that individual landowners receive via negotiation or eminent domain proceedings. Further, the initial recourse rates established herein will be examined in a cost-and-revenue study or section 4 rate case after three years of operation.

55.      G&B Landowners and E&W Landowners argue that the impacts of Rover's project outweigh the potential benefits. The landowner groups state that Rover has failed to negotiate easements for its proposed pipeline and is inappropriately relying on the use of eminent domain to acquire the necessary land rights. The landowner groups contend that the Certificate Policy Statement requires project sponsors to acquire right-of-way through negotiation and that eminent domain should only be used against the "last few holdout landowners." In its April 11, 2016 filing, E&W Landowners allege that Rover has acquired less than 30 percent of the right-of-way in Ohio. The landowner groups argue that because Rover will be required to use eminent domain to an extent beyond what was contemplated in the Certificate Policy Statement, the project should be denied.[48]

56.      The landowner groups are incorrect in their interpretation of the Certificate Policy Statement as having established a bright-line or quota regarding the amount of property that may be acquired through eminent domain. The Certificate Policy Statement specifically warns that "[b]right line tests are unlikely to be flexible enough to resolve specific cases and to allow the Commission to take into account the different interests

---

[46] Final EIS at 3-37.

[47] E&W Landowners state that Rover's estimated costs are less than three other pipelines located in Ohio: the Nexus Pipeline project, the Leach XPress project, and the Texas Eastern OPEN project.

[48] In the alternative, E&W Landowners request that the Commission condition Rover's certificate on Rover acquiring 90 percent of the right-of-way through negotiation with landowners.

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 32 of 140

that must be considered."[49] In this vein, the Certificate Policy Statement specifically noted that where a pipeline has acquired property rights for a proposed project the benefits needed to be shown would be less than in a case where no land rights had been previously acquired by negotiation.[50] Thus, the Certificate Policy Statement specifically contemplated a scenario where a company might not be able to acquire a perhaps significant amount of property rights through negotiation.[51]

57.     Here, Rover has demonstrated public benefits for the proposed project. Approximately 95 percent of the Rover Pipeline Project is subscribed under long-term firm transportation precedent agreements, indicating a strong need for the project.[52] Once constructed, the project will transport natural gas from supply areas in the Marcellus and Utica shales to markets throughout North America, including the Southeast, Midwest, and Northeast[53] United States, and to the Dawn Hub in Canada. All sectors of the natural gas market benefit by providing gas supply access to multiple markets throughout the United States and increasing the diversity of supply to consumers in those markets.

### (e)     Conclusion

58.     We find that the benefits that the Rover Pipeline Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities. Consistent with the criteria discussed in the Certificate Policy Statement and subject to the environmental discussion below, we find that the public convenience and necessity requires approval of Rover's proposal, as conditioned in this order.

---

[49] Certificate Policy Statement, 88 FERC at 61,749.

[50] *Id.*

[51] While the Commission expects companies under its jurisdiction to respect the rights of property owners along the paths of their projects and to negotiate in good faith for any necessary property rights, we do not play a direct role in such negotiations. *Chestnut Ridge Storage LLC*, 128 FERC ¶ 61,210, at P 20 (2009).

[52] Certificate Policy Statement, 88 FERC at 61,749 ("if an applicant had precedent agreements with multiple parties for most of the new capacity, that would be strong evidence of market demand and potential public benefits").

[53] Gas from the Rover project may be transported into the Northeast United States' markets through third-party pipelines at the Dawn Hub.

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 33 of 140

### 2.     Panhandle Backhaul Project

59.    The Panhandle Backhaul Project is fully subscribed under a long-term precedent agreement with Rover. As is discussed below, Rover has agreed to a maximum rate that will recover, at minimum, the costs associated with the project. As such, the proposed project will not result in any subsidization by Panhandle's existing shippers.

60.    The Panhandle Backhaul Project will not adversely affect the interests of any competing existing pipelines or their captive customers. The proposed infrastructure modifications are anticipated to serve new demand and not to replace any existing service provided by another pipeline. Further, no pipelines or their captive customers have filed objections to the project.

61.    We also find that Panhandle's proposed project will have minimal adverse impacts on landowners and communities. The modifications proposed by Panhandle would all occur on lands owned by Panhandle and within its existing meter and compressor stations. Further, Panhandle will be providing service using existing, available capacity in part and using new capacity created by the construction of the proposed facilities to enable bi-directional flow on a portion of its system. By using existing capacity, Panhandle has reduced the amount of facilities needed to be constructed.

62.    We find that the benefits that the Panhandle Backhaul Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities. Consistent with the criteria discussed in the Certificate Policy Statement and subject to the environmental discussion below, we find that the public convenience and necessity requires approval of Panhandle's proposal, as conditioned in this order.

### 3.     Trunkline Backhaul Project

63.    The Trunkline Backhaul Project is fully subscribed under a long-term precedent agreement with Rover. As is discussed below, Rover has agreed to a maximum rate that will recover, at minimum, the costs associated with the project. As such, the proposed project will not result in any subsidization by Trunkline's existing shippers.

64.    The Trunkline Backhaul Project will not adversely affect the interests of any competing existing pipelines or their captive customers. The proposed infrastructure modifications are anticipated to serve new demand and not to replace any existing service provided by another pipeline. Further, no pipelines or their captive customers have filed objections to the project.

65.    We also find that Trunkline's proposed project will have minimal adverse impacts on landowners and communities. The modifications proposed by Trunkline would all occur on lands owned by Trunkline and within its existing meter and compressor stations.

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 34 of 140

66. We find that the benefits that the Trunkline Backhaul Project will provide to the market outweigh any adverse effects on existing shippers, other pipelines and their captive customers, and on landowners and surrounding communities. Consistent with the criteria discussed in the Certificate Policy Statement and subject to the environmental discussion below, we find that the public convenience and necessity requires approval of Trunkline's proposal, as conditioned in this order.

### 4. Eminent Domain Authority

67. Several commenters request that the Commission not grant Rover eminent domain authority. The Commission itself, however, does not confer eminent domain powers. Under NGA section 7, the Commission has jurisdiction to determine if the construction and operation of proposed interstate pipeline facilities are in the public convenience and necessity. Once the Commission makes that determination, NGA section 7(h) provides that a certificate holder is authorized to acquire the necessary land or property to construct the approved facilities by exercising the right of eminent domain if it cannot acquire the easement by an agreement with the landowner.[54]

68. G&B Landowners and STC Holdings, LLC object to the use of "quick-take" authority in eminent domain proceedings. The NGA does not specifically provide that a natural gas company may take possession of property pending the trial to determine just compensation.[55] However, courts have held that a natural gas company may be granted possession pending a trial for just compensation under a preliminary injunction procedure.[56] Once the Commission has authorized pipeline construction, the Commission does not oversee the acquisition of necessary property rights. Issues related to the acquisition of property rights by a pipeline under the eminent domain provisions of section 7(h) of the NGA, including issues regarding the timing of acquisition, are matters for the applicable state or federal court.

---

[54] 15 U.S.C. § 717f(h) (2012).

[55] *East Tennessee Natural Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir. 2004) (the NGA, "like most statutes giving condemnation authority to government officials or private concerns, contains no provision for quick-take or immediate possession").

[56] *Id.* at 828 ("we hold that once a district court determines that a gas company has the substantive right to condemn property under the NGA, the court may exercise equitable power to grant the remedy of immediate possession through the issuance of a preliminary injunction").

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 35 of 140

69.     G&B Landowners further argue that the Commission's required in-service date provides support to allow project sponsors to obtain a preliminary injunction in eminent domain proceedings and obtain property rights prior to the completion of a trial to determine just compensation.  G&B Landowners request the Commission establish a construction schedule that would allow for regular eminent domain proceedings prior to the acquisition of land.

70.     The Commission does not oversee the acquisition of property rights through eminent domain proceedings, and therefore makes no judgment on the value of the Commission's required in-service date in a preliminary injunction proceeding.  The Commission requires all pipeline projects to be completed by a specific date because the information supporting our public convenience and necessity determination goes stale with the passage of time.[57]  Based on our assessment of circumstances relevant to the Rover Pipeline Project, we find that two years is a reasonable period of time for Rover to conclude any necessary marketing efforts, complete construction, and make the project available for service.[58]  As stated above, issues related to the effect of the in-service requirement on eminent domain proceedings are matters to be addressed by the applicable state or federal court.

### 5.     **Affiliated Shipper**

71.     E&W Landowners request the Commission investigate and determine whether Rover is in violation of the Commission's policies concerning affiliate preference.  E&W Landowners provide no specific allegation of a violation, and only note that a shipper on the Rover Pipeline Project may be affiliated with Rover.  The Commission has previously approved projects where a shipper on a proposed project is affiliated with the project sponsor.[59]  The fact that two companies are affiliated does not, in and of itself, raise issues of affiliate preference.  To ensure against such preference, as the Commission has previously explained, affiliated marketers are potentially subject to greater regulatory

---

[57] When we act on an application, we rely on information available at that time. However, the data that underpin our conclusions on the need for a project, its commercial prospects, and its environmental impacts are subject to change. Thus, the validity of our conclusions and environmental mitigation conditions cannot be sustained indefinitely. Accordingly, when we issue a certificate authorizing a project, the certificate comes with an expiration date. *Chestnut Ridge Storage LLC*, 139 ¶ FERC 61,149 (2012).

[58] The Commission has granted extensions of the in-service deadline based on the specific circumstances associated with the request.

[59] *Millennium Pipeline Co., L.P.*, 100 FERC ¶ 61,277, at P 57 (2002).

USCA Case #18-1032          Document #1715763          Filed: 01/29/2018          Page 36 of 140

oversight than non-affiliates.[60] However, no one, including Rover's non-affiliated shippers or any potential shippers on the Rover project, has raised a specific allegation that Rover is in violation of the Commission's regulations. In light of these circumstances, there is no evidence to indicate that Rover is in violation of any Commission policy or regulation regarding affiliate shippers.

### 6. **Interconnection with Consumers Energy Company**

72. On December 1, 2015, Consumers Energy Company (Consumers Energy) filed comments requesting the Commission condition Rover's certificate authorizations on its building an interconnection with Consumers Energy. Consumers Energy argues that the benefits of the project cannot be realized without the interconnection. Consumers Energy states that despite identifying the interconnection in its application and representing to Consumers Energy that the interconnection will be provided at no cost, Rover has been unwilling to finalize the interconnection and operating agreement.

73. We will not condition Rover's certificate authorizations on its building an interconnection with Consumers Energy. As discussed above, the Rover pipeline will provide benefits to all sectors of the natural gas market by providing producers access to multiple markets throughout the United States and Canada. These benefits are not dependent on any single interconnection. However, under the Commission's interconnection policy stated in *Panhandle Eastern Pipe Line Company*, a pipeline may not deny a request for an interconnection, where the party requesting the interconnection satisfies five conditions.[61] We encourage Consumers Energy and Rover to continue to work together to provide the interconnection facilities. However, if a mutual agreement cannot be reached, and Consumers Energy believes it has met the *Panhandle* conditions,

---

[60] *Id.*

[61] A party desiring access to a pipeline may obtain an interconnection if: (1) the party seeking the interconnection will bear the cost of construction of the interconnection; (2) the proposed interconnection will not adversely affect the pipeline's operations; (3) the proposed interconnection and resulting transportation will not result in diminished service to the pipeline's existing customers; (4) the proposed interconnection will not cause the pipeline to be in violation of any applicable environmental or safety laws or regulations with respect to the facilities required to establish an interconnection with the pipeline's facilities; and (5) the proposed interconnection must not cause the pipeline to be in violation of its right-of-way agreements or any contractual obligations with respect to the interconnection facilities. *Panhandle Eastern Pipe Line Company*, 91 FERC ¶ 61,037, at 61,141 (2000).

USCA Case #18-1032 Document #1715763 Filed: 01/29/2018 Page 37 of 140

Docket No. CP15-93-000, *et al.*                                          - 27 -

it may file a complaint with the Commission under Rule 206 of the of the Commission's Rules of Practice and Procedure.[62]

### B.    Blanket Certificates

74.    Rover requests a Part 284, Subpart G blanket certificate in order to provide open-access transportation services.  Under a Part 284 blanket certificate, Rover will not require individual authorizations to provide transportation services to particular customers.  Rover filed a *pro forma* Part 284 tariff to provide open-access transportation services.  Since a Part 284 blanket certificate is required for Rover to offer these services, we will grant Rover a Part 284 blanket certificate, subject to the conditions imposed herein.

75.    Rover has also applied for a Part 157, Subpart F blanket certificate.  The Part 157 blanket certificate gives an interstate pipeline NGA section 7 authority to automatically, or after prior notice, perform certain activities related to the construction, acquisition, abandonment, and replacement and operation of pipeline facilities.  However, because of Rover's intentional demolition of a house that was identified as eligible for listing in the National Register of Historic Places and within the visual area of potential effects of the project, as discussed more fully in the Environmental Analysis below,[63] we will deny Rover's request for a Part 157, Subpart F blanket certificate.

### C.    Rates

#### 1.    Rover

##### (a)    Rover's Initial Rates Proposal

76.    Rover estimates the total cost of the proposed facilities to be $4.082 billion.  Rover developed its proposed cost of service utilizing a capital structure of 50 percent debt and 50 percent equity, with a debt cost of 6.50 percent, a return on equity of 13 percent,[64] and a depreciation rate of 2.50 percent.  Rover estimates its cost of service, after IT revenue

---

[62] 18 C.F.R. § 385.206 (2016).

[63] *See infra* section IV.G.2.p.

[64] We note that in prior cases the Commission has allowed a 14 percent return on equity for greenfield pipelines based on a capital structure that contains no more than 50 percent equity.  *Florida Southeast Connection*, 156 FERC ¶ 61,160, at P 25 (2016).

Docket No. CP15-93-000, *et al.*                                                    - 28 -

credits, to be $137,252,804 for the Early In-Service Supply Zone,[65] $271,848,623 for the
Supply Zone, $470,273,497 for the Mainline Zone, $177,458,840 for the Market-North
Zone, and $89,358,874 for the Market-South Zone.[66]

77.     Rover states that it designed its initial recourse rates consistent with the Straight
Fixed-Variable cost classification method of rate design. Rover proposes initial
maximum and minimum recourse reservation and usage charges for firm service under
Rate Schedule FTS, interruptible service under Rate Schedule ITS, and park and loan
service under Rate Schedule GPS. Rover proposes rate zones. The Supply Zone
originates in Doddridge County, West Virginia, and terminates where the Mainline Zone
commences at the Leesville Plant in Carrol County, Ohio.[67] The Mainline Zone
originates at the Leesville Plant[68] and continues westward to the Defiance, Ohio delivery
point. Market Zone South originates at the Defiance, Ohio delivery point and continues
southward to Panola County, Mississippi. The Market Zone North originates at the
Defiance, Ohio delivery point and continues northward to the International Boundary
with Canada in St. Clair and Wayne Counties, Michigan. Rover states that it used design
capacity as the billing determinants for calculating the initial rates.

78.     Rover proposes an additive zone matrix design, which recovers fixed, variable,
and fuel costs on the basis of the contract transportation path. The rates are distance
sensitive, as shippers are assessed rates depending on the number of zones the contract
transportation path crosses. Intra-zone transportation will only be subject to the costs of
that zone. Rover proposes a tracking and true-up mechanism to recover fuel gas, and lost
and unaccounted for gas (LAUF). This mechanism will include a deferred account with a
biannual recalculation of the applicable percentages for fuel gas and LAUF. LAUF will
be assessed on a system-wide basis. The initial LAUF charge is 0.20 percent.

---

[65] Rover proposes to offer service in its Supply Zone prior to the completion of the
facilities necessary to provide the remaining services.

[66] Rover's Amended Application, Exhibit P.

[67] The Commission notes that Rover's proposed tariff definition of the Supply
Zone does not match its proposed map of the Supply Zone or its Supply Zone rate base
work papers. The Supply Zone has several laterals which originate in locations other
than Doddridge County, West Virginia, including locations in Pennsylvania and Ohio.
Rover is directed to correct the Supply Zone definition when it files its actual tariff
records.

[68] The Leesville Plant is a natural gas processing plant located in Carroll County,
Ohio.

Docket No. CP15-93-000, *et al.*                                      - 29 -

79.    With regard to park and loan service, Rate Schedule GPS, gas may be either parked or loaned for receipt and delivery at only a single point but in any zone.[69] No physical transportation is involved. Rover proposes to use the equivalent of the Rate Schedule ITS charges for Rate Schedule GPS service.

80.    The Commission has reviewed Rover's Amended Application's proposed initial rates, cost of service, use of the Straight Fixed-Variable method of cost classification, billing determinants, and treatment of interruptible services and interruptible rate calculations, and finds they reasonably reflect current Commission policy.

81.    Rover's proposed *pro forma* rate summary tariff record includes the initial rates for the Early In-Service Supply Zone, Supply Zone, Mainline Zone, Market-North Zone, and Market-South Zone, including a proposed effective date for the Supply Zone, Mainline Zone, Market-North Zone, and Market-South Zone rates. However, as the in-service dates for the Supply Zone, Mainline Zone, Market-North Zone, and Market-South Zone are not known, the Commission requires that Rover not include these rates in its initial compliance filing. Rather, the Commission requires Rover to file tariff records between 30 to 60 days prior to the in-service date of these facilities as a separate compliance filing.

### (b)    Three-Year Filing Requirement

82.    Consistent with Commission precedent, Rover is required to file a cost and revenue study at the end of its first three years of actual operation to justify its existing cost-based firm and interruptible recourse rates.[70] In its filing, the projected units of service should be no lower than those upon which Rover's approved initial rates are based. The filing must include a cost and revenue study in the form specified in section 154.313 of the Commission's regulations to update cost of service data.[71] Rover's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, Rover is advised to include as part of the eFiling description, a reference to Docket No. CP15-93-001 and the cost and revenue study.[72] After reviewing

---

[69] Rate Schedule GPS, at Section 2.2.

[70] *Bison Pipeline, LLC,* 131 FERC ¶ 61,013, at P 29 (2010); *Ruby Pipeline, LLC,* 128 FERC ¶ 61,224, at P 57 (2009); *MarkWest Pioneer, L.L.C.,* 125 FERC ¶ 61,165, at P 34 (2008).

[71] 18 C.F.R. § 154.313 (2016).

[72] *Electronic Tariff Filings*, 130 FERC ¶ 61,047, at P 17 (2010).

the data, the Commission will determine whether to exercise its authority under NGA section 5 to investigate whether the rates remain just and reasonable. In the alternative, in lieu of this filing, Rover may make a NGA section 4 general rate filing to propose alternative rates to be effective no later than three years after the in-service date for its proposed facilities.

## 2.    Panhandle and Trunkline

83.    Panhandle states that it has entered into a precedent agreement to provide Rover with 750,000 Dth/d of firm transportation service under its open access transportation Rate Schedule FT. Panhandle states that the transportation service will initiate at an interconnection with Rover near Defiance, Ohio, and terminate at a point of interconnection with Trunkline near Bourbon, Illinois. To provide this transportation service, Panhandle proposes to construct and modify certain compressor station piping, meter facilities, and an interconnection with Rover at eight locations along its system. Panhandle states that these facilities will permit it to backhaul gas along the Defiance to Bourbon segment of its system. Panhandle estimates the costs of these facilities to be approximately $58 million. Panhandle proposes to recover the incremental cost of this service through the use of its existing system rates. Panhandle states that Rover has agreed to pay the maximum system rate under Rate Schedule FT. Panhandle does not identify any non-conforming terms to the service agreement.

84.    Trunkline states that it has entered into a precedent agreement to provide Rover with 750,000 Dth/d of firm transportation service under its open access transportation Rate Schedule FT. Trunkline states that the transportation service will initiate at an interconnection with Rover on Panhandle's system near Bourbon, Illinois, for delivery to Trunkline's Zone 1A in Mississippi. To provide this transportation service, Trunkline proposes to reconfigure four compressor stations and modify its point of interconnection with Panhandle at Bourbon, Illinois, to accommodate the Rover volumes. Trunkline states that with these facilities, it will be capable of providing bi-directional flow within its Zones 1B and 1A. Trunkline estimates the costs of these facilities to be approximately $50.8 million. Trunkline proposes to recover the incremental cost of this service through the use of its system rates. Trunkline states that Rover has agreed to pay the maximum system rate under Rate Schedule FT that will provide full cost recovery. Trunkline does not identify any non-conforming terms to the service agreement.

85.    Panhandle and Trunkline propose to use their currently effective system rates, including fuel rates, as initial recourse rates for the proposed new capacity and both seek a determination of rolled-in rate treatment. In support of their proposals, they demonstrate that the projected revenues from the incremental service calculated at the contract rate agreed to by Rover with each pipeline would significantly exceed the

estimated cost of service for the respective projects. Specifically, Panhandle and Trunkline each estimate that revenue will exceed the cost of service by approximately $32 million in the first year of proposed service.[73] The Commission approves the use of Panhandle's and Trunkline's system rates for both firm and interruptible transportation services as the initial recourse rates for their respective projects. We also grant Panhandle and Trunkline a pre-determination of rolled-in rate treatment for the cost of the respective facilities in their next NGA section 4 rate cases, barring a significant change in circumstances.[74]

86.     If either Panhandle or Trunkline enter into a negotiated rate agreement, they must file the agreement or tariff record describing the negotiated rate agreement associated

with their respective project in accordance with the Alternative Rate Policy Statement[75] and the Commission's negotiated rate policies.[76] Consistent with Commission policy, Panhandle and Trunkline must either file the shipper's negotiated rate agreements or a

---

[73] For year one, Panhandle's projected revenues of $43,526,250 exceed the projected costs of $11,514,926, and Trunkline's projected revenues of $43,991,625 exceed the projected costs of $11,667,892. Exhibit N, p. 9, of Panhandle's and Trunkline's Applications.

[74] To receive authorization for rolled-in rate treatment, a pipeline must demonstrate that rolling in the costs associated with the construction and operation of new facilities will not result in existing customers subsidizing the expansion. In general, this means that a pipeline must show that the revenues to be generated by an expansion project will exceed the costs of the project. For purposes of making a determination in a certificate proceeding as to whether it would be appropriate to roll the costs of a project into the pipeline's system rates in a future section 4 proceeding, we compare the cost of the project to the revenues generated utilizing actual contract volumes and the maximum recourse rate (or the actual negotiated rate if the negotiated rate is lower than the recourse rate). *See Tennessee Gas Pipeline, Co., L.L.C.*, 144 FERC ¶ 61,219, at P 22 (2013).

[75] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas* Pipelines, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194 (1996).

[76] *Natural Gas Pipelines Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

tariff record setting forth the essential terms of these agreements at least 30 days, but not more than 60 days, before the proposed effective date for such rates.[77]

### D.   **Non-Conforming Contract Provisions**

87.   Rover entered into precedent agreements with four categories of shippers:

- Cornerstone Shippers, which agreed to acquire firm service of at least 500,000 Dth/d for a term of at least 15 years;

- Foundation Shippers, which agreed to acquire firm service of at least 150,000 Dth/d for a term of at least 20 years;

- Anchor Shippers, which agreed to acquire firm service of at least 100,000 Dth/d for a term of at least 15 years; and

- Negotiated Rate Shippers, which contracted for firm service but do not meet the criteria for the other types of shippers.

Each category of shipper was granted certain rate and rate-related contractual rights.

88.   Cornerstone Shippers were offered the most beneficial negotiated rates and given the option to increase the maximum daily quantity (MDQ) up to a specified amount by a certain date. Cornerstone Shippers were also provided a right of first refusal beyond the primary term or any subsequent extensions. Last, Rover provided Cornerstone Shippers Most Favored Nations status and fuel caps, as discussed below.

89.   Foundation Shippers, Anchor Shippers, and Negotiated Rate Shippers were offered negotiated rates based on the shipper category, a fuel cap, and right of first refusal. Foundation Shippers were also given the opportunity to participate in the design and sizing of metering facilities.

90.   Therefore, as described above, the precedent agreements contain material non-conforming provisions that are intended to survive execution of the transportation agreements. Rover states that absent these provisions it could not go forward with the project, and thus, these project shippers cannot be viewed as similarly situated as shippers that contract for capacity after the in-service date. Rover also claims that none of the provisions affect the terms or quality of service on Rover, and do not create a risk of

---

[77] Pipelines are required to file any service agreement containing non-conforming provisions and to disclose and identify any transportation term or agreement in a precedent agreement that survives the execution of the service agreement.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 43 of 140

undue discrimination. Rover requests the Commission pre-approve these non-conforming provisions

91.     In particular, Rover identifies seven provisions as non-conforming: (1) fuel caps; (2) reduction rights; (3) Most Favored Nations (MFN) rights; (4) extension rights; (5) credit provisions; (6) maximum pressure; and (7) capacity release.[78]

92.     In *Columbia Gas Transmission Corp.,*[79] the Commission clarified that a material deviation is any provision in a service agreement that (1) goes beyond filling in the blank spaces with the appropriate information allowed by the tariff and (2) affects the substantive rights of the parties.[80] However, not all material deviations are impermissible. As explained in *Columbia*, provisions that materially deviate from the corresponding *pro forma* service agreement fall into two general categories: (1) provisions the Commission must prohibit because they present a significant potential for undue discrimination among shippers and (2) provisions the Commission can permit without a substantial risk of undue discrimination.[81] In other proceedings, we have also found that non-conforming provisions may be necessary to reflect the unique circumstances involved with constructing new infrastructure and to provide the needed security to ensure the viability of a project.[82] Below, we apply these standards of review to Rover's proposed non-conforming provisions.

93.     We find that, with the exception of the fuel caps and the rate portion of the MFN rights, the provisions identified by Rover are non-conforming terms of service that constitute material deviations from Rover's proposed *pro forma* service agreements.

---

[78] Rover provided the non-conforming language verbatim in a public document filed with the Commission on October 14, 2015.

[79] 97 FERC ¶ 61,221 (2001) (*Columbia*).

[80] *Id.* at 62,002. *See also ANR Pipeline Co.*, 97 FERC ¶ 61,224, at 62,022 (2001) (*ANR*).

[81] *Columbia*, 97 FERC at 62,003. *See also ANR*, 97 FERC at 62,024.

[82] *Midcontinent Express Pipeline LLC*, 124 FERC ¶ 61,089, at P 82 (2008); *Rockies Express Pipeline LLC*, 116 FERC ¶ 61,272, at P 78 (2006).

USCA Case #18-1032      Document #1715763            Filed: 01/29/2018      Page 44 of 140

### 1.    Fuel Caps

94.     Rover has negotiated fuel caps with Cornerstone, Foundation, Anchor, and Negotiated Rate Shippers.  The negotiated fuel charge establishes a cap on fuel and lost and unaccounted for gas costs between certain defined points or zones, provided certain minimum throughput levels are achieved.  Rover states that it will calculate fuel and lost and unaccounted for gas percentages assuming that the full recovery is achieved from all shippers.  Rover therefore concludes that no subsidization from other shippers will occur.  The Commission finds Rover's proposed fuel caps are not non-conforming provisions.  Rather, these provisions are negotiated rates that are subject to the Alternative Rate Policy Statement.[83]  Absent changed circumstances, and with Rover's compliance with proper filing and reporting requirements for negotiated rate contracts, Rover's proposed fuel rate caps are consistent with the Alternative Rate Policy Statement.

### 2.    Reduction Rights

95.     Rover states that certain shippers have the unilateral right to reduce their MDQ if Rover is unable to provide transportation service to the Dawn Hub by a specified effective date.  The Commission has approved non-conforming provisions that reflect the unique circumstance involved with the construction of new infrastructure and provide the needed security to ensure that the project gets built.[84]  Here, Rover states that these provisions were necessary to ensure contractual commitments without which the project could not go forward.  In addition, we find these non-conforming provisions are permissible because they do not present a risk of undue discrimination, do not affect the operational conditions of providing service, and do not result in any customer receiving a

---

[83] *Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines; Regulation of Negotiated Transportation Services of Natural Gas Pipelines*, 74 FERC ¶ 61,076, *order granting clarification*, 74 FERC ¶ 61,194 (1996) (Alternative Rate Policy Statement). *Natural Gas Pipeline Negotiated Rate Policies and Practices; Modification of Negotiated Rate Policy*, 104 FERC ¶ 61,134 (2003), *order on reh'g and*

*clarification*, 114 FERC ¶ 61,042, *dismissing reh'g and denying clarification*, 114 FERC ¶ 61,304 (2006).

[84] *See, e.g., Tennessee Gas Pipeline Co.*, 144 FERC ¶ 61,219, at PP 26-33 (2013); *Rockies Express Pipeline, LLC*, 116 FERC ¶ 61,272, at PP 74-78 (2006).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 45 of 140

different quality of service.[85]  Therefore, we find the proposed reduction rights are permissible.[86]

### 3.    Most Favored Nation (MFN) Rights

96.    Cornerstone Shippers have included in their precedent agreement a MFN right. Rover states that the MFN provision provides that if, at any time prior to the fifth anniversary of the in-service date, Rover enters into an agreement with more favorable conditions precedent, termination provisions, minimum pressure requirements, or with a negotiated rate, discounted rate, or recourse rate that is lower than the negotiated rate in the shipper's negotiated rate agreement for any current or future receipt or delivery point on the same transportation path and for the same or shorter term, Rover shall offer more favorable terms and conditions to the Cornerstone Shipper, and shall offer to reduce the shipper's negotiated rate for service under the FTS agreement to a rate equal to the lower rate.[87]  Rover also states that the MFN clause is limited to only negotiated rates.[88]

97.    Two shippers have an MFN clause in their precedent agreement:  Shipper A and Shipper B.[89]  However, the MFN clauses for Shippers A and B are different.  Both MFN clauses include provisions related to rates, but Shipper A's MFN clause also includes additional provisions that go beyond rates.  Specifically, Shipper A's MFN clause includes provisions related to conditions precedent, termination provisions, and minimum pressure requirements.

98.    Commission policy requires that MFN clauses relate only to rates and not result in the customer receiving a different quality of service from other shippers or adversely affect other shippers.[90]  In this case, the rate provisions of Shipper A and Shipper B's

---

[85] *Id.*

[86] Rover would be responsible for any lost revenue as a result of a shipper exercising its reduction rights.

[87] Rover February 20, 2015 Application at 22.

[88] Rover October 14, 2015 Data Response, at n. "*".

[89] Rover, in its application, requested that shipper names remain confidential pursuant to 18 C.F.R. § 385.1112 (2016).  Rover substituted letters for shippers' names in its public documents.  As noted previously, no party requested the confidential information pursuant to a protective order.

[90] *Northern Natural Gas Co.*, 110 FERC ¶ 61,321, at P 29 (2005).

MFN clause satisfies this requirement, and the Commission finds that this clause is a negotiated rate provision, not a non-conforming provision. As discussed above with regard to negotiated rate contracts, Rover is required to comply with the reporting and filing requirements for negotiated rate contracts should this provision remain in the final agreement.

99.     With respect to the non-rate provisions in Shipper A's MFN clause, we find that the provisions concerning conditions precedent and termination provisions of the MFN clause are not permissible.[91] With these provisions, Rover is negotiating terms and conditions of service with some shippers that are different from those offered to other shippers. In Order No. 637, the Commission determined to not allow pipelines to negotiate terms and conditions of service that it does not offer to all shippers.[92] Therefore, if Rover wishes to offer specific terms and conditions not found in its *pro forma* service agreement or tariff to any shipper, it must propose a tariff provision that is generally applicable and offer such rights to all shippers on a nondiscriminatory basis.[93] Rover's tariff includes the right to negotiate a mutually agreeable minimum pressure, but does not include provisions concerning conditions precedent and termination provisions. Accordingly, Rover must either remove the conditions precedent and termination provisions from the contract with Shipper A or modify its tariff to provide mutually agreeable conditions precedent and termination provisions.

### 4.     **Extension Rights**

100.    Rover proposes to permit Shippers A and C a unilateral right to extend the terms of their firm transportation agreements for some portion or all of the MDQ. This right allows up to four consecutive five-year extensions if the shipper requests an extension at least six months prior to the expiration of the primary or extension term. Shipper B also is provided with a similar extension right, but it must do so for the full MDQ.

---

[91] *Texas Eastern Transmission, LP*, 107 FERC ¶ 61,099, at P 13 (2004).

[92] *Regulation of Short-Term Natural Gas Transportation Services and Regulation of Interstate Natural Gas Transportation Services*, Order No. 637, FERC Stats. & Regs. ¶ 31,091, *clarified*, Order No. 637-A, FERC Stats. & Regs. ¶ 31,099, *reh'g denied*, Order No. 637-B, 92 FERC ¶ 61,062 (2000), *aff'd in part and remanded in part sub nom. Interstate Natural Gas Ass'n of America v. FERC*, 285 F.3d 18 (D.C. Cir. 2002), *order on remand*, 101 FERC ¶ 61,127 (2002), *order on reh'g*, 106 FERC ¶ 61,088 (2004), *aff'd sub nom. American Gas Ass'n v. FERC*, 428 F.3d 255 (D.C. Cir. 2005).

[93] *Northern Natural Gas Company*, 110 FERC ¶ 61,321, at P 29 (2005).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 47 of 140

101.    The Commission has approved non-conforming provisions that reflect the unique circumstance involved with the construction of new infrastructure and provide the needed security to ensure that the project gets built.[94]  Here, Rover states that these provisions were necessary to ensure contractual commitments without which the project could not go forward.  We find these non-conforming provisions are permissible because they do not present a risk of undue discrimination, do not affect the operational conditions of providing service, and do not result in any customer receiving a different quality of service.[95]

102.    Rover also identified as possibly non-conforming, the six-month notice timeline. Below, the Commission finds that GT&C section 11.2 was unclear as to the minimum ROFR notification dates.  As the proposed tariff is unclear as to the ROFR notification timelines, it is not possible to evaluate the negotiated six-month notice period.  When Rover clarifies its tariff ROFR timeline, it should also clarify whether or not the notice timeline in the non-conforming contracts are non-conforming.

### 5.    Credit Provisions

103.    Rover negotiated separate credit and creditworthiness provisions with its anchor shippers.  Rover states that absent these provisions it could not go forward with the project.  The Commission recognizes the need for greater collateral for initial shippers on new construction projects and accepts these non-conforming provisions as not unduly discriminatory.[96]

### 6.    Maximum Pressure

104.    Neither Rover's GT&C nor *pro forma* service agreements provide for a maximum pressure.  Rover identified seven contracts with non-conforming provisions that state that shippers will not deliver gas to Rover in excess of stated maximum pressures.

105.    The Commission has found that while pipelines may provide incentives to induce sponsoring shippers to commit to a project, we have held that these incentives may not

---

[94] *See, e.g., Tennessee Gas Pipeline Co.*, 144 FERC ¶ 61,219, at PP 26-33 (2013); *Rockies Express Pipeline, LLC*, 116 FERC ¶ 61,272, at PP 74-78 (2006).

[95] *Id.*

[96] *Policy Statement on Creditworthiness for Interstate Natural Gas Pipelines and Order Withdrawing Rulemaking Proceeding,* FERC Stats. & Regs. ¶ 31,191, at P 7 (2005) (Creditworthiness Policy Statement).

include minimum or maximum pressure provisions.[97]  Minimum or maximum pressures relate to the operational conditions of transportation service on the pipeline and affect the quality of service to be received by the shipper.  Thus, such provisions may not be negotiated absent a provision in the tariff authorizing such negotiation.[98]  Accordingly, Rover must either remove this provision from the contracts or modify its tariff to provide for maximum or mutually agreeable pressures.

### 7.    Capacity Release

106.    Rover states that its contract with Shipper G provides that, subject to Rover's tariff, Rover will release to Shipper G for periods of one month or less up to 200,000 Dth/d of Rover's capacity on Panhandle and Trunkline for deliveries to Shipper G at the maximum rates provided in Panhandle's and Trunkline's tariff.[99]  The provision further provides that the capacity release will be subject to the limitations of section 284.8(h)(2) of the Commission's regulations.[100]

107.    In response to Commission staff's October 25, 2016 data request, Rover clarified that any capacity release by Rover to Shipper G will be governed by, as applicable, Panhandle's or Trunkline's capacity release tariff provisions.[101]  The Commission finds the proposed non-conforming capacity release provision is consistent with the Commission's regulations as it does not impose any restrictions upon Shipper G's

---

[97] *Tennessee Gas Pipeline Co.,* 136 FERC ¶ 61,125, at P 29 (2011); *Bison Pipeline LLC*, 131 FERC ¶ 61,013, at P 59 (2010).

[98] *Dominion Transmission, Inc.*, 113 FERC ¶ 61,152 (2005); *Columbia*, 97 FERC at 62,004.

[99] *Texas Eastern Transmission Corp.*, 93 FERC ¶ 61,273 (2000), *reh'g denied,* 94 FERC ¶ 61,139, at 61,530 (2001) (*Texas Eastern*) (stating that when a pipeline that acquired off-system capacity releases the capacity, it is similarly situated to other shippers on the off-system pipeline and subject to the same rules).

[100] Section 284.8 allows firm shippers to release capacity to replacement shippers outside of the Commission's bidding requirements if the capacity release is for 31 days or fewer.  18 C.F.R. § 284.8(h)(1)(iv) (2016).  However, the shipper may not roll over, extend, or in any way continue the capacity release to the same shipper until 28 days after the first release period has ended.  18 C.F.R. § 284.8(h)(2) (2016).

[101] Rover October 25, 2016 Data Response.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 49 of 140

replacement shipper rights, including the rights to request secondary points, to segment capacity, or to re-release capacity.

108.    Rover is required to file its non-conforming service agreements associated with this project with the Commission at least 30 days, but not more than 60 days, before the proposed effective date for such agreements. A Commission ruling on non-conforming provisions in a certificate proceeding does not waive any future review of such provisions when the executed copy of the non-conforming agreements and a tariff record identifying the agreements as non-conforming are filed with the Commission consistent with section 154.112 of the Commission's regulations.[102]

### E.    Rover Tariff Issues

109.    Rover requests blanket transportation certificate authority pursuant to Part 284, Subpart G of the Commission's regulations. As part of its request, it filed a *pro forma* open-access tariff for the Commission's approval. Rover's proposed tariff generally conforms to the Commission's requirements. We will approve the tariff, as conditioned below.

#### 1.    Map

110.    Rover's proposal to reflect maps of its system and zones in its *pro forma* tariff does not comply with the Commission's regulations. Rover is required to revise its tariff to provide uniform resource locators (URLs) designating a location on the Internet for publication of its system maps and zone maps.[103]

#### 2.    General Terms and Conditions (GT&C) Section 1 – Definitions

111.    GT&C section 1 provides "[a] Pool Point may not be located at a point where Gas physically enters or leaves Rover's system." Order No. 636 created pools for the purpose of facilitating the creation of market centers.[104] Section 284.1(c) of the Commission's regulations provides that a market center may occur at "the intersection of different

---

[102] *See, e.g., Tennessee Gas Pipeline Co., L.L.C.,* 150 FERC ¶ 61,160, at P 44 and n.33 (2015).

[103] *See* 18 C.F.R. § 154.106 (2016).

[104] Order No. 636, FERC Stats. & Regs. ¶ 30,939, at 30,427-29, Order No. 636-B, 61 FERC at 62,012.

pipelines."[105] Rover's proposed definition would inhibit the creation of market centers at points of interconnection with other pipelines. The Commission rejects the prohibition on the creation of pools at points of interconnection with pipelines as contrary to the Commission's regulations.

112.    Rover's pooling point definition further provides that a pooling point "shall mean a point on Rover's system located near the Leesville Plant in the Supply Zone... ." The Commission's regulations require open access pipelines to provide at least one pool.[106] Rover has satisfied this regulatory requirement. However, pooling points may occur elsewhere on Rover's system. Rover's pooling point definition should not restrict the location of pools (other than its own) to just one point. The Commission requires Rover to modify the definition of a pooling point consistent with this discussion.

### 3.    GT&C Section 3 – Nomination and Scheduling of Services

113.    GT&C section 3.1(A)(1) requires shippers, as part of their nomination data, to identify the last seller of the gas to be received. This data element appears to be in addition to the nomination data elements required by Version 3.0 of Business Practices Standard 1.3.27 of the North American Energy Standards Board (NAESB) Wholesale Gas Quadrant (WGQ). Rover does not explain why this data is required for the purpose of performing its scheduling obligations. The Commission rejects this requirement.

114.    The Commission requires open access pipeline tariffs to include NAESB WGQ Business Practices Standard 1.3.2(i) through (v) verbatim.[107] Rover did not do so, and proposes at GT&C section 3.1(B) and (C) to omit certain Standard 1.3.2 material required for each nomination cycle and to insert additional language applicable to specific nomination cycles. Rover is required to include NAESB WGQ Standard 1.3.2 verbatim in its tariff.[108] Further, the Commission rejects all of Rover's proposed nomination cycle

---

[105] 18 C.F.R. § 284.1(c) (2016).

[106] 18 C.F.R. § 284.12(a)(1)(i) (2016) (incorporating by reference NAESB WGQ Standard 1.3.17: "If requested by a shipper or supplier on a transportation service provider's system, the transportation service provider should offer at least one pool.").

[107] *See Standards for Business Practices of Interstate Natural Gas Pipelines*, Order No. 587-S, FERC Stats. & Regs. ¶ 31,179 (2005).

[108] Order No. 809 revised the gas transportation nomination timeline provided for by NAESB WGQ Standard 1.3.2, effective April 1, 2016. *Coordination of the Scheduling Processes of Interstate Natural Gas Pipelines and Public Utilities*, Order No. 809, FERC Stats. & Regs. ¶ 31,368, *order on reh'g,* 152 FERC ¶ 61,212 (2015).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 51 of 140

specific provisions not provided for by the NAESB Standards. If Rover wishes to propose changes to the NAESB Standards (which are applicable industry-wide), the instant proceeding is not the appropriate forum.

115. GT&C section 3.2(E) provides that scheduled interruptible volumes may not be bumped in the Intraday 2 cycle. In Order No. 809, the Commission revised NAESB WGQ Standard 1.32 by creating the new Intraday 3 cycle as the last nomination cycle and upheld its policy that scheduled interruptible volumes may not be bumped in the last nomination cycle ("No-Bump Rule").[109] Therefore, when Rover files actual tariff records, it must incorporate revisions to conform to the latest NAESB standards adopted by the Commission at the time of filing, including the creation of the Intraday 3 cycle and allowing scheduled interruptible volumes to be bumped in the Intraday 2 cycle.

116. GT&C section 3.2 appears to have multiple misplaced sections. There are two GT&C sections 3.2(B) and (C). The first three paragraphs of GT&C section 3.2(C)(4) appear to address interruptible service scheduling priorities at constrained receipt and delivery points. The fourth paragraph provides how to accommodate multiple priorities under a single transportation contract and establish usage billing rates. This provision appears to be applicable to both firm and interruptible services, as multiple scheduling priorities are possible for both firm and interruptible contracts under Rover's proposed tariff. In its compliance filing, Rover is required to either remove or clarify the applicability of this paragraph. Finally, the fifth and sixth paragraphs of GT&C section 3.2(C)(4) appear to address segmentation rights. Segmentation rights are related to firm services and are not related to constrained interruptible receipt and delivery points. The right of firm shippers to segment their firm capacity is a regulatory right provided for by the Commission's regulations.[110] Rover is required to create a separate section in its GT&C that provides for segmentation.

117. The second GT&C section 3.2(B) provides that a daily scheduling penalty will apply "[i]f the *actual* Quantities of Gas received or delivered vary from *nominated* Quantities on any particular Gas Day."[111] The purpose of a scheduling penalty is to penalize a shipper for flowing a different amount than was scheduled rather than nominated as proposed by Rover. As written, this proposal may penalize shippers for delivering or receiving gas consistent with their *scheduled* quantities, but where Rover

---

[109] Order No. 809, FERC Stats. & Regs. ¶ 31,368 at PP 103, 106, *order on reh'g*, 152 FERC ¶ 61,212 at PP 27-29.

[110] 18 C.F.R. §§ 284.7(d) and 284.221(g) and (h) (2016).

[111] Emphasis added.

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 52 of 140

did not schedule volumes exactly as shippers nominated. Moreover, scheduling penalties are usually applied either at the receipt or delivery point, not both. The purpose of a scheduling penalty is not to penalize taking a different amount from the pipeline at the delivery point than the shipper put on the pipeline at the receipt point. In this context, imposing a penalty for scheduling variances at both the receipt and delivery point would penalize the same misconduct twice.[112] Therefore, Rover is required to revise its tariff so that its scheduling penalty complies with Commission policy.

118. Finally, Rover states in its application that authorized overrun service will be scheduled as interruptible transportation as provided in GT&C section 3.2.[113] The Commission agrees with this scheduling priority for authorized overrun services. However, GT&C section 3.2 does not mention authorized overrun service. Rover is required to revise its tariff to include authorized overrun service as an interruptible service for the purpose of scheduling.

### 4.    GT&C Section 4 – Curtailment and Interruption

119. Rover proposes at GT&C section 4:

> Rover shall have the right to curtail, interrupt or discontinue Transportation service in whole or in part, on all or a portion of its system at any time for reasons of force majeure *or when, in Rover's sole judgment, capacity, supply, or operating conditions so require or it is desirable or necessary to make modifications, repairs or operating changes to its system.*[114]

120. Curtailment can only occur for transportation service that has been scheduled. Scheduling is a daily event.[115] Rover proposes that, in its sole judgement, it may curtail scheduled transportation when "capacity, supply, or operating conditions so require or it

---

[112] *Williams Gas Pipelines Central, Inc.,* 100 FERC ¶ 61,232, at P 22 (2002).

[113] Rover February 20, 2015 Application at 28.

[114] Emphasis added.

[115] *CenterPoint Energy Gas Transmission Co., LLC,* 144 FERC ¶ 61,195, at P 75 (2013); *Ryckman Creek Res., LLC,* 136 FERC ¶ 61,061, at P 68 (2011); *Portland Natural Gas Transmission Sys.,* 76 FERC ¶ 61,123, at 61,663 (1996).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 53 of 140

is desirable or necessary to make modifications, repairs or operating changes to its system." This language appears to permit Rover to curtail scheduled volumes for normal operating requirements such as modifications, repairs, and operating changes that should be known to Rover prior to scheduling a gas day. Such limitations of available capacity should be known before the gas day, and Rover should not schedule transportation for which it does not have the ability to provide. Rover is required to remove the emphasized phrase from its proposed GT&C section 4.

121.    Rover's July 1, 2015 Data Response revised GT&C section 4.1, Curtailment, to provide that Rover would curtail in the reverse order in which the volumes were scheduled. Pursuant to Rover's proposed GT&C sections 3.2(A) through 3.2(C), firm capacity is scheduled in the following order: (i) primary points; (ii) primary receipt points to secondary delivery point; (iii) within the path secondary receipt points to primary delivery points on the basis of Maximum Rate paid; and (iv) secondary receipt points outside the path on the basis of Maximum Rate Paid.

122.    The Commission rejects Rover's proposal as it relates to scheduled firm services. The Commission policy is that once firm service is scheduled, all scheduled firm transactions, whether primary or secondary, must be curtailed on a *pro rata* basis.[116] Rover's proposed tariff would curtail certain types of scheduled firm transportation before other scheduled firm transportation, which is inconsistent with Commission policy. Rover is required, in its tariff compliance filing, to revise GT&C section 4.1 to provide that scheduled firm volumes may only be curtailed on a *pro rata* basis.

### 5.    GT&C Section 5 – Transportation Balancing

123.    In GT&C section 5.3, Rover proposes to implement an Unauthorized Overrun Penalty for deliveries in excess of the shipper's contract MDQ and scheduled quantity. Rover proposes a penalty of twice the highest daily published price of gas at certain markets, plus overrun charges, for each dekatherm taken in excess of the greater of the MDQ or scheduled quantity. Rover proposes to assess an unauthorized overrun penalty in all circumstances, regardless of the operational condition of the pipeline.

124.    Section 284.12(b)(2)(v) of the Commission's regulations provides:

> *Penalties.* A pipeline may include in its tariff transportation penalties only to the extent necessary to prevent the impairment of reliable service. ... A pipeline with penalty

---

[116] Order No. 636-B, 61 FERC at 62,013; *Algonquin Gas Transmission Co.*, 104 FERC ¶ 61,118, at P 34 (2003).

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 54 of 140

provisions in its tariff must provide to shippers, on a timely basis, as much information as possible about the imbalance and overrun status of each shipper and the imbalance of the pipeline's system. [117]

125.   For unauthorized overrun penalties, pipelines can only charge a nominal penalty not to exceed twice their IT rates during non-critical times, or they can charge a substantial penalty, but waive the penalty if the unauthorized overrun does not cause operational problems.[118]   The nominal charge is permitted to provide shippers an incentive to nominate overrun volumes.[119]

126.   Rover's proposed unauthorized overrun penalty is greater than the nominal penalty of twice its IT rates and applies during non-critical times.   Therefore, Rover must revise its tariff to either provide for a nominal penalty during non-critical periods or state that the penalty must be waived if the unauthorized overrun does not cause operational problems.   Rover must also revise its tariff to ensure that all services are subject to the same charge.

### 6.   GT&C Section 6 – OFOs

127.   GT&C section 6.1 provides that Rover may issue an OFO "to ensure compliance with the provisions of this tariff... ."   In Rover's July 1, 2015 Data Response to a question as to whether the quoted language was limited to conditions which threaten system integrity, safety, or reliability, Rover stated that it would issue an OFO consistent with NAESB WGQ Definition 1.2.6.   NAESB WGQ Definition 1.2.6 does not provide for the issuance of OFOs for the purpose of enforcing the terms of the tariff.   OFOs are limited to situations which "threaten or could threaten the safe operations or system integrity, of the transportation service provider's system or to maintain operations required to provide efficient and reliable firm service."[120]   The proposed tariff language is not consistent with NAESB WGQ Definition 1.2.6 or Rover's response.   The Commission requires Rover to remove this language from section 6.1.

---

[117] 18 C.F.R. § 284.12(b)(2)(v) (2016).

[118] *Canyon Creek Compression Co.*, 96 FERC ¶ 61,006, at 61,021 (2001).

[119] *See Natural Gas Pipeline Co. of America*, 101 FERC ¶ 61,200, at P 86 (2002).

[120] NAESB, WGQ Definition 1.2.6, v. 3.0.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 55 of 140

128.     GT&C section 6.2 provides that Rover will impose daily OFO "scheduling charges" (a penalty) on Points of Receipt upon twenty-four hours' notice of a need for corrective action "in accordance with Section 5.1(E) herein." Section 5.1(E) is missing from the tariff. The Commission requires Rover to remove the reference to section 5.1(E) or provide the appropriate language.

129.     Additionally, GT&C section 6.3(B) states "[w]hen an OFO is issued, daily scheduling penalties applicable to the affected Shipper or OBA Party and affected Quantities will be replaced by the penalty provisions of the OFO." We find that this language may lead to penalizing the same infraction twice, both as an OFO penalty and as an Unauthorized Overrun penalty. Commission policy prohibits multiple penalties for the same infraction.[121] Therefore, Rover is directed to revise its tariff to be consistent with Commission policy.[122]

### 7.     GT&C Section 7 – Operational Balancing Agreements (OBAs)

130.     At GT&C section 7.3, Rover states that it shall have no obligation to negotiate and execute an OBA with any party. Rover is required to revise its tariff to conform with the NAESB WGQ Standard 2.3.29, which provides "[a]t a minimum, Transportation Service Providers should enter into Operational Balancing Agreements at all pipeline-to-pipeline (interstate and intrastate) interconnects."

### 8.     GT&C Section 8 – Miscellaneous Purchases and Sales

131.     GT&C section 8 provides that Rover may engage in buying or selling gas necessary to maintain line pack, system pressure, or other functions related to transportation pursuant to its blanket sales certificate.[123]

---

[121] *Crossroads Pipeline Co.*, 71 FERC ¶ 61,076, at 61,265 (1995); *East Tennessee Gas Co.*, 98 FERC ¶ 61,060, at 61,157 (2002); *Crossroads Pipeline Co.*, 100 FERC ¶ 61,025, at P 51 (2002); *Columbia Gas Transmission Corp.*, 100 FERC ¶ 61,084, at P 201 (2002).

[122] *E.g., MoGas Pipeline LLC*, 151 FERC ¶ 61,201, at PP 22-23 (2015) (approving tariff language that permitted the imposition of the greater penalty).

[123] All open access pipelines with 18 C.F.R. Part 284, subpart B, blanket transportation certificate authority are granted blanket certificates for unbundled sales services. 18 C.F.R. § 284.284(a) (2016).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 56 of 140

132.    The Commission requires pipelines to include in their tariffs specific provisions addressing operational sales and purchases of gas.[124]  These provisions include:  (a) the specific circumstances in which the pipeline will perform an operational purchase or sale; (b) a statement that operational purchases or sales have a lower transportation priority than firm transportation and there will be no transportation service associated with its operational purchases or sales of gas; (c) a statement that operational sales service is unbundled from transportation service; (d) posting and bidding procedures for the sale of gas for operational purposes; and (e) a commitment to filing an annual report of sales and purchases and revenues derived from the sale of gas.[125]  The report must indicate the source of gas, date of the purchase or sale volumes, purchase or sale price, costs and revenues from purchase or sale, and the disposition of the costs and revenues.  Section 8 conforms with the first required provision.  Rover is required to file revised tariff language that incorporates the remaining provisions required for operational sales and purchases of gas.

### 9.    GT&C Section 9.1(B) – Capacity Eligible for Release

133.    Section 9(B) provides that Rover will sell unsubscribed firm capacity either by posting on "the Website or by using any other marketing services at its disposal." Section 284.13(d) of the Commission's regulations requires pipelines to post available capacity on its public website.[126]  Rover may market unsubscribed capacity using other marketing services.  However, posting available capacity on its publically available website is a requirement; it is not optional.  Rover is required to revise its compliance tariff accordingly.

### 10.    GT&C Section 11 – Contract Extension and Reduction

134.    GT&C section 11.2 provides the procedures for shippers to initiate the regulatory Right of First Refusal (ROFR) process.[127]  Section 11.2(A) provides the "Shipper must give timely notice *that it wants to continue service beyond the term* of the Long-Term Agreement."  Further, with that notice, section 11.2(B) provides that the "Shipper shall

---

[124] *ANR Pipeline Co.*, 110 FERC ¶ 61,069, at P 57 (2005) (*ANR*); *Colorado Interstate Gas Co.*, 107 FERC ¶ 61,312, at P 15 (2004), *order on reh'g*, 111 FERC ¶ 61,216 (2005); and *Dominion Transmission, Inc.*, 106 FERC ¶ 61,029, at P 17 (2004).

[125] *ANR*, 110 FERC at P 57.

[126] 18 C.F.R. § 284.13(d) (2016).

[127] 18 C.F.R. § 284.221(d)(2)(ii) (2016).

USCA Case #18-1032      Document #1715763           Filed: 01/29/2018      Page 57 of 140

be permitted to designate a Quantity of Gas less than its existing [maximum daily quantity (MDQ)] which Shipper wishes to retain under the Right of First Refusal ... ." These provisions imply that the shipper must decide to extend its long-term service agreement and the quantity it wishes to retain with its first notice to Rover. However, under the Commission's required ROFR process, shippers with long-term contracts are not required to make a decision as to whether to commit to a contract extension and at what quantities until further in the ROFR process. The Commission's long-standing policy is that such election is not required until the service provider has notified the existing shipper of the best bid(s) received from third parties for all or a portion of the expiring capacity.[128] The Commission requires Rover to clarify in section 11.2(A) that a shipper must give timely notice that it wishes to *initiate* the ROFR process, and move section 11.2(B) to section 11.2(E), which describes shippers' rights and obligations after Rover has posted the capacity and received an acceptable bid. Moving section 11.2(B) to section 11.2(E) will also correct the fact that section 11.2(E) is deficient, as it does not provide for the ROFR right of contract reduction.

135.    Section 11.2(A) provides that, for contracts two years or longer, notice must be provided "not later than" 12 months prior to contract expiration, and for contracts less than two years, "not later than" six months. The phrase "not later than" implies that Rover and a shipper may negotiate a deadline by which the shipper must provide the ROFR notice under section 11.2(A). The Commission has permitted the negotiation of the ROFR notice deadline.[129] However, the Commission also requires a stated outer limit on how far in advance of the end of the contract the ROFR process may begin. This permits the ROFR process to take place relatively close to the time the contract terminates so that existing shippers, as well as prospective shippers, are provided a timely opportunity to assess the value of capacity.[130] It is unclear whether the phrase "not later than" is intended to authorize negotiation of the ROFR notice deadline, which must be implemented on a not unduly discriminatory basis, and whether it is intended to function as a "not earlier than" outer limit on the ROFR prior notice.[131] Rover is required to

---

[128] *See Sierrita Gas Pipeline, LLC*, 147 FERC ¶ 61,192, at P 78 (2014); *Transcontinental Gas Pipe Line Corp.*, 101 FERC ¶ 61,267, at P 26 (2002).

[129] *Gulf South Pipeline Company, LP*, 115 FERC ¶ 61,301, at PP 11-13 (2006).

[130] *Id.*

[131] *E.g.,* Panhandle Eastern Pipe Line Company, LP, FERC NGA Gas Tariff, Fourth Revised Vol. No. 1, GT&C Section 7, Contracting for Service Rights, 1.0.0 provides that, for contracts two years or longer, notice must be provided "[n]ot earlier than 18 Months and not later than 12 Months."

Docket No. CP15-93-000, *et al.*                                            - 48 -

clarify and support its proposed notice date consistent with this discussion and Commission precedent.

136.    Finally, Rover proposes sections 11.2 and 11.4, but no section 11.3. In its compliance filing, Rover is required to correct the section numbers.

### 11.    GT&C Section 13 – Quality

137.    On July 1, 2015, Rover filed corrections to its minimum heating value in response to a data request issued by the Commission on June 11, 2015. The correction sets the minimum heating value of the gas Rover will accept at 967 Btu per cubic foot. This value is approved.

### 12.    GT&C Section 15 – Electronic Communication System

138.    Section 15 identifies specific information Rover will provide on its website and states that this information will be accessible by "any party." Rover's list of specific information that it will make available on its website is incomplete. For example, section 284.13 of the Commission's regulations requires the posting on a pipeline's website of information on firm and interruptible transportation, capacity release, index of customers, and notice of bypass.[132] None of these items are mentioned on Rover's specific list of information it will post. The Commission requires Rover to revise section 15 to ensure the information that is posted on its website is consistent with Commission regulations.[133]

139.    The Commission distinguishes between information that must be available to the public on a natural gas pipeline's website without a password,[134] and communications between the pipeline and its shippers for which a password is permitted. At section 1 of Rate Schedules FTS, ITS, and GPS, "party" is defined as Shipper. GT&C section 15.2 redefines "party" as "User." A User must have a password to access Rover's website. Users are also Shippers. Thus, Rover's proposed tariff does not provide the public access to documents the Commission requires to be accessible to the public without a password. The Commission requires Rover to revise section 15 to provide that the public has access

---

[132] 18 C.F.R. § 284.13 (2016).

[133] *See Corpus Christi Liquefaction, LLC*, 149 FERC ¶ 61,283, at P 85 (2014).

[134] 18 C.F.R. § 284.12(b)(3)(ii)(A) (2016) ("[D]ocuments must be accessible to the public over the public Internet…, without imposition of a password or other access requirement.").

to documents without the use of a password as identified in section 284.13, Commission order, or by agreement.

### 13.  GT&C Section 21 – Fuel Reimbursement Adjustment

140.    Section 21.1(B) provides that the fuel reimbursement adjustment will be performed each April 1 and November 1 through the following:

> Rover shall file with the Commission and post, as defined by Section 154.2(d) of the Commission's Regulations, a schedule of effective Fuel Reimbursement percentages.  With respect to the adjustment described herein, *such filing shall be in lieu of any other rate change filing required by the Commission's Regulations under the Natural Gas Act.*[135]

The language quoted above could be interpreted as permitting Rover to change its fuel retention charge only through simply posting and filing such changes, rather than making a limited NGA section 4 filing that proposes and supports such changes with the opportunity for shippers to review and challenge the basis for the changes.  Fuel retention charges are rates under the NGA.  Posting of changed rates cannot be in lieu of any other rate change filing required by NGA section 4.[136]  Section 21.5 provides that:

> In the event this Section 21 shall be changed *in any manner* that adversely affects Rover's recovery of the full amount of fuel amounts reflected in its deferred fuel accounts, each Shipper that received transportation service during the period

---

[135] Emphasis added.

[136] *See ANR Pipeline Co.*, 139 FERC ¶ 61,238, at P 157 (2012), wherein, rejecting TC Offshore LLC's proposed posting-only fuel rate proposal, we stated:

> If we were to approve this [fuel tracker] mechanism as proposed, shippers will not have an opportunity to review or challenge the first or any subsequent Transporter's Use retention percentages or the monthly estimates or calculation of subsequent retention percentages.  There would be no opportunity for shippers to request suspension or the protection of a subject to refund condition.  The burden of proof would be shifted away from TC Offshore and any NGA section 5 finding could only apply prospectively.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 60 of 140

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 61 of 140

> affected by such fuel adjustment deferred account shall be responsible to Rover for its proportionate share of the amount of Rover's unrecovered deferred fuel amounts for the transportation services which they were provided.[137]

This emphasized provision is overly broad because it provides for recovery of costs regardless of the manner in which changes to section 21 may occur. There may be situations where deferred accounts may not be recovered. This provision also compromises shippers' right to protest meaningfully and undermines the effect of a Commission finding to suspend and order refunds. We will reject this proposed tariff language.[138]

## 14. GT&C Section 22 – Flow Through of Cash Out Revenues and Penalties

141.    The Commission's regulations require that pipelines may not retain net penalty revenues.[139] In accord with this requirement, Rover, at GT&C sections 22.2(A) and (C), identifies the penalty revenues subject to the penalty revenue flow through mechanism. Section 22.2(C) specifically provides that it will reduce penalty revenues for out-of-pocket costs related to those penalties. Among other penalties subject to this provision, Rover identifies the penalty revenue collected as the result of Unauthorized Gas Deliveries, but not the penalty for revenue that results from Unauthorized Receipts. For Unauthorized Receipts, GT&C section 12.1 provides that Rover will purchase the gas at 50 percent of the spot market price.

142.    Under Rover's proposal, Unauthorized Receipts purchased at 50 percent of spot market prices and subsequently sold by Rover at market prices will result in a net penalty revenue. Rover does not propose to flow through this revenue. This proposal is contrary to the Commission's regulations. The Commission requires Rover to credit all net penalty revenues, including those derived from Unauthorized Receipts.

## 15. GT&C Section 23 – Business Practice Standards

143.    Part 284 of the Commission's regulations incorporates certain NAESB standards on nominations, allocations, balancing, measurement, invoicing, capacity release, and

---

[137] Emphasis added.

[138] *Corpus Christi Liquefaction, LLC*, 149 FERC ¶ 61,283, at P 45 (2014).

[139] 18 C.F.R. § 284.12(b)(2)(v) (2016).

Docket No. CP15-93-000, *et al.*                                                        - 51 -

electronic communications.  Rover states that its *pro forma* tariff complies generally with the NAESB standards, Version 2.0, the latest version of the standards adopted by the Commission at the time Rover filed its certificate application.  When Rover files actual tariff records, it must incorporate revisions to conform to the latest NAESB standards adopted by the Commission at the time of filing.[140]  The compliance tariff record must

also contain all the information required for this record.[141]  The filing must include a cross-reference showing each NAESB standard number, the tariff section containing the standard, and whether Rover incorporated the standard through tariff text or by reference. Rover should file any additional information it believes relevant to its compliance with the NAESB Standards.

### 16.    GT&C Section 25 – Reservation Charge Credit

144.    Partial reservation charge credits due to force majeure may be provided pursuant to:  (1) the No-Profit method under which the pipeline gives credits equal to its return on equity and income taxes starting on Day 1; (2) the Safe Harbor method under which the pipeline provides full credits after a short grace period when no credit is due (i.e., 10 days or less);[142] or (3) some other method that achieves equitable sharing "in the same ball park" as the first two methods.[143]  Rover chose the Safe Harbor method at GT&C section 25.2.

145.    Section 25.2(B) provides that the quantities of gas eligible for a reservation charge credit will be based on the average of scheduled quantities.  However, the Commission

---

[140] We note that Version 3.0 of the Business Practices Standards of the North American Energy Standards Board Wholesale Gas Quadrant was adopted on October 15, 2015.

[141] For example, Order No. 587-V added the requirement that the tariff record, for those standards not incorporated by reference, must identify the tariff provision that does comply with the standard. *Standards for Business Practices of Interstate Natural Gas Pipelines*, Order No. 587-V, FERC Stats. & Regs. ¶ 31,332, at P 36 (2012).

[142] *See Natural Gas Supply Ass'n*, 135 FERC ¶ 61,055, at P 17, *order on reh'g*, 137 FERC ¶ 61,051 (2011).

[143] *Id.*, 135 FERC ¶ 61,055 at P 18.

requires pipelines to provide reservation credits based on the amount of primary firm service the shipper nominated that the pipeline was unable to schedule or deliver.[144] Moreover, Rover does not provide how many days will be averaged or how the days to be averaged will be chosen. Rover is required to identify the number and selection method of days to be averaged.[145]

### 17.    **GT&C Section 27– Off-system Capacity**

146.   Rover's proposed section 27 provides as follows:

> Rover has entered into agreements with other pipeline systems and may, from time to time, enter into additional agreements with other interstate or intrastate pipeline companies for off-system capacity. When Rover acquires off-system capacity, Rover will provide service to Shippers with the off-system capacity pursuant to Rover's open access tariff and subject to Rover's Commission approved rates, as such tariff and rates may change from time to time. For purposes of transactions entered into subject to this Section 27, the "shipper must have title" requirement is waived.

147.   We find that this language is consistent with the Commission's *Texas Eastern* policy concerning the acquisition of upstream capacity by interstate pipelines.[146] Under that policy a pipeline can acquire off-system capacity without preapproval if it makes a tariff filing that includes a statement that it will only transport gas for others on the acquired capacity pursuant to its open access tariff and subject to its Commission-approved rates. Upon the pipeline's filing an appropriate tariff provision, we will grant a

---

[144] *SG Res. Mississippi, L.L.C.,* 153 FERC ¶ 61,364, at P 13 (2015); *CenterPoint Energy Gas Transmission Co.*, 144 FERC ¶ 61,195, at P 46 (2013).

[145] The Commission has found the use of the seven-day historical average on a day when the pipeline provided notice of the outage is acceptable. *Enable Gas Transmission, LLC*, 152 FERC ¶ 61,052, at P 126 (2015). However, in *Iroquois Gas Transmission Sys., L.P.*, 145 FERC ¶ 61,233, at P 52 (2013), the Commission recognized there is no perfect method for estimating the amount of service a shipper would have used during the outage. Therefore, the Commission has accepted proposals to use various periods of historical usage on which to base the credits.

[146] *Texas Eastern Transmission Corp.*, 93 FERC ¶ 61,273 (2000), *reh'g denied,* 94 FERC ¶ 61,139 (2001) (*Texas Eastern*).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 63 of 140

generic waiver of the "shipper must hold title" policy for any such transportation that the pipeline subsequently provides.

148.    However, section 27 concludes by stating that "[i]n addition, *no segmentation will be permitted* with any off-system capacity."[147]    The Commission rejects this proposed tariff language as contrary to *Texas Eastern* and the Commission's regulations.  *Texas Eastern* allows pipelines to hold capacity on other pipelines without prior approval so long as they comply with open access regulations.[148]    The Commission's open access regulations require pipelines to permit firm shippers to segment their capacity,[149] request secondary point rights,[150] and release capacity.[151]    Proposed section 27 improperly attempts to limit the right to segment capacity guaranteed to all open access shippers.

149.    Segmentation cannot occur without access to secondary points.  Rover's proposed Rate Schedule FTS section 2.2 provides that "Secondary Points of Delivery on off-system capacity are not available unless otherwise agreed to by Shipper and Rover." Rover does not explain or support why off-system capacity is specifically addressed, whereas requests for secondary points on its own facilities do not have a similar section in the proposed tariff.  Rover, under its firm transportation contracts with Panhandle, Trunkline, and Vector, has full access to all secondary points on those systems.  Rover cannot offer less flexibility on the capacity it holds on those systems to its own shippers.  As the Commission has discussed above, all of Rover's capacity is subject to the

---

[147] Emphasis added.

[148] *Texas Eastern*, 93 FERC at 61,886.

[149] 18 C.F.R. § 284.7(d) (2016).  The regulation provides:

> *Segmentation.*    An    interstate    pipeline    that    offers transportation service under subpart B or G of this part *must permit* a shipper to make use of the firm capacity for which it has contracted by segmenting that capacity into separate parts for its own use or for the purpose of releasing that capacity to replacement shippers to the extent such segmentation is operationally feasible.

(emphasis added).

[150] 18 C.F.R. § 284.221(g) (2016).

[151] 18 C.F.R. § 284.8 (2016).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 64 of 140

Commission's open access requirements. Rover's proposed language at Rate Schedule FTS section 2.2 implies that it would treat requests for secondary points on off-system capacity differently than requests for secondary points on its own facilities. If Rover did evaluate requests for off-system secondary point rights differently from requests for secondary point rights on its own facilities, it would be in violation of the Commission's regulations and its open access transportation certificate authority. The Commission rejects this language at Rate Schedule FTS section 2.2 as unnecessary and potentially contrary to the Commission's regulations.

### F.  Accounting

150.    Rover, a newly created company, proposes to calculate its Allowance for Funds Used During Construction (AFUDC) based on its proposed debt and equity capital structure. This approach is consistent with the accounting guidance we have given other newly created companies.[152] Consistent with Commission precedent, Rover is required to capitalize the actual costs of borrowed and other funds used for construction purposes, not to exceed the amount of debt and equity AFUDC that would be capitalized based on the overall rate of return approved. This will ensure that the amounts included in AFUDC are properly capitalized in this project, consistent with the Commission's requirements for newly created companies approved in other cases.

### G.  Environmental Analysis

#### 1.  Pre-filing and Application Review

151.    Commission staff began its environmental review of the Rover Pipeline Project following staff's approval on June 27, 2014, for Rover to use the pre-filing process in Docket No. PF14-14-000. As part of the pre-filing review, staff issued a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned Rover Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* (NOI) on November 4, 2014. This notice was published in the *Federal Register* on November 18, 2014,[153] and sent to more than 15,600 interested entities on the staff's environmental mailing list, including federal, state, and local agencies; elected officials; environmental and public interest groups; Native American tribes; potentially affected landowners as defined in the Commission's regulations (i.e., landowners crossed or adjacent to pipeline facilities or within 0.5 mile of a compressor station); local libraries

---

[152] *See, e.g., ETC Tiger*, 131 FERC at P 80; *Creole Trail LNG, L.P.*, 115 FERC ¶ 61,331, at P 43 (2006), *Port Arthur LNG, L.P.*, 115 FERC ¶ 61,344, at P 57 (2006).

[153] 79 Fed. Reg. 68,676 (Nov. 18, 2014).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 65 of 140

and newspapers; and other stakeholders who had indicated an interest in the project.  The notice briefly described the project and the environmental impact statement (EIS) process, provided a preliminary list of issues identified by Commission staff, invited written comments on the environmental issues that should be addressed in the draft EIS, listed the date and location of ten public scoping meetings[154] to be held in the area of the project, and established a closing date for receipt of comments of December 18, 2014.

152.    A total of 113 speakers provided comments on the Rover Pipeline Project at the scoping meetings.  In addition, more than 2,000 written scoping comments regarding the project were filed by federal, state, and local agencies; elected officials; environmental and public interest groups; potentially affected landowners; and other interested stakeholders.[155]

153.    As stated above, on February 20, 2015, Rover filed its application with the Commission under section 7(c) of the NGA seeking authorization to construct and operate the project's facilities.  On February 23, 2015, Panhandle and Trunkline filed applications with the Commission, related to Rover's application, to conduct upgrades and modifications at existing facilities.

154.    On May 1, 2015, the Commission issued a supplemental *Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Panhandle Backhaul Project and Trunkline Backhaul Project, and Request for Comments on Environmental Issues*.  The notice was published in the *Federal Register* on May 7, 2015,[156] and mailed to more than 400 interested parties, including federal, state, and local government representatives and agencies; elected officials; environmental and public interest groups; Native American Tribes; affected property owners as defined in the Commission's regulations (i.e., landowners within 0.5 mile of the compressor transfer station); local libraries and newspapers; and other stakeholders who had indicated an interest in the projects.  Commission staff evaluated the potential environmental impacts of the proposed projects in the draft and final EIS, in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA).[157]  The U.S. Environmental

---

[154] Between November 17, 2014, and December 11, 2014, scoping meetings were held in Cadiz, Defiance, Navarre, New Washington, and Toronto, Ohio; Paden City, West Virginia; and Adrian, Flint, Chelsea, and Richmond, Michigan.

[155] Table 1.3-1 of the final EIS provides a detailed and comprehensive list of issues raised during scoping.

[156] 80 Fed. Reg. 26,236 (May 7, 2015).

[157] 42 U.S.C. §§ 4321 *et seq.* (2012).

USCA Case #18-1032          Document #1715763          Filed: 01/29/2018          Page 66 of 140

Protection Agency (EPA), the U.S. Army Corps of Engineers, the U.S. Fish and Wildlife Service (FWS), the West Virginia Department of Environmental Protection, and the Ohio Environmental Protection Agency participated as cooperating agencies in the preparation of the EIS.

155.    Commission staff issued the draft EIS for the Rover Pipeline, Panhandle Backhaul, and Trunkline Backhaul Projects on February 19, 2016, which addressed the issues raised during the scoping period.  Notice of the draft EIS was published in the *Federal Register* on February 26, 2016, establishing a 45-day public comment period.[158] The draft EIS was mailed to the environmental mailing list including additional interested entities that were added since issuance of the November 4, 2014 NOI.  Seven public meetings were held between March 21 and April 7, 2016, to receive comments on the draft EIS.[159]  A total of 121 speakers provided comments at the meetings, and stakeholders submitted a total of 212 written comments in response to the draft EIS.

156.    The David Daniel/Jeanne Littlefield Daniel Trust (Daniel Trust) requested that the Commission delay issuance of the final EIS and extend the comment period to allow stakeholders sufficient time to review and comment on all information, including filings submitted after the close of the comment period.  Ms. Sherry Miller also asserted that the comment period for the draft EIS was too short and did not allow stakeholders enough time to review the document.[160]  Commission staff continued to accept and review comments for an additional two months after the close of the comment period on the draft EIS.  All filings remained (and remain) available on the docket for public review and inspection.  For these reasons, an extended comment period was not needed.

157.    On July 29, 2016, Commission staff issued the final EIS for the Rover Pipeline, Panhandle Backhaul, and Trunkline Backhaul Projects, and a public notice of the availability of the final EIS was published in the *Federal Register*.[161]  The final EIS

---

[158] 81 Fed. Reg. 9839 (Feb. 26, 2016).

[159] The draft EIS comment meetings were held in Cadiz, Fayette, Hamler, Navarre, and New Washington Ohio; Paden City, West Virginia; and Chelsea, Michigan.

[160] Ms. Miller also asserted that the Conotton Valley High School was not notified of the compressor station that will be built within a mile of the school.  However, the school is on the Commission's distribution list (listed as Conotton Valley) in appendix A of the final EIS, indicating that the school is on the project mailing list.  Therefore, the school would have received all notices and mailings from the Commission, including a copy of the draft and final EIS.

[161] 81 Fed. Reg. 51,433 (Aug. 4, 2016).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 67 of 140

addressed comments received on the draft EIS, and evaluated the projects' impacts on geology; soils; water resources; wetlands; vegetation; wildlife and fisheries; special status species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; and cumulative impacts.[162]  It also evaluated a range of alternatives to the proposed actions.  The final EIS was mailed to the same parties as the draft EIS, as well as to additional parties that commented on the draft EIS.[163]

158.   The final EIS concluded that if the projects are constructed and operated in accordance with applicable laws and regulations, the projects will result in some adverse and significant environmental impacts; specifically, on forested lands.[164]  However, the impacts described in the EIS can be reduced to acceptable levels with the implementation of Rover's, Panhandle's, and Trunkline's proposed mitigation; as well as staff's recommendations (now adopted as conditions in Appendix B attached to this order).  Major issues of concern addressed in the final EIS include:  construction in areas of karst geology; waterbodies and wetlands; interior forests and migratory birds; federally listed bat species; agricultural land; homeowners' insurance and property values; air and noise; cumulative impacts; and alternatives.

159.   We received several comments on the draft EIS filed well after the official close of the comment period, while the final EIS was in final production and beyond the time when it could be reasonably updated.  Additionally, numerous comments were filed on the final EIS.  The major environmental issues raised during this proceeding and comments from stakeholders not addressed in the final EIS are discussed below.

   2.   **Major Environmental Issues and Comments on the Final EIS**

   a.   **Selection of Third-Party Contractor**

160.   Cardno ENTRIX served as the Commission's third-party contractor during the preparation of the EIS for the Rover Pipeline Project.  G&B Landowners request

---

   [162] Appendix T of the final EIS includes responses to comments on the draft EIS through June 10, demonstrating that Commission staff continued to accept and consider comments received for nearly two months after the April 11, 2016 close of the official draft EIS comment period.

   [163] The distribution list is provided in Appendix A of the final EIS.

   [164] Final EIS at ES-12.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 68 of 140

documents and communications between Rover and Cardno Limited[165] or its corporate affiliates to determine if there was a conflict of interest between Rover and the Commission's third-party contractor. G&B Landowners state that, as Cardno ENTRIX had previously been investigated for a conflict of interest related to the EIS for the Keystone XL Pipeline, they should be investigated as associated with the Rover Pipeline Project. In regards to the EIS for the Keystone XL Pipeline, we note that the U.S. Department of State Office of the Inspector General found in February 2012 that there was no evidence that the applicant improperly influenced the Department of State's selection of Cardno ENTRIX as the third-party contractor and that there were no contractual or financial relationships between Cardno ENTRIX and the applicant that would result in a conflict of interest or that would impair the ability of Cardno ENTRIX to be objective in performing the work assigned.[166]

161.    The Commission uses a standard process for assessing and selecting third-party contractors, including a review for potential conflicts of interest. Prior to our staff's selection of Cardno ENTRIX, the Commission's Division of General and Administrative Law completed a comprehensive conflict of interest investigation and found no organizational conflict. Commission staff makes the selection of the third-party contractor based upon the experience and credentials of the contractor personnel; the applicant does not make this selection. Third-party contractors work under the sole direction and control of Commission staff, not the applicant. Ultimately, Commission staff is responsible for both the work of any contractor assisting staff and for the analysis contained in NEPA documents published by the Commission.

### b.    Alternatives and Route Variations

162.    During scoping, numerous commenters expressed concern with the Rover Pipeline Project's route and stressed the need for additional analysis of alternatives. The final EIS evaluates a range of alternatives for the Rover Pipeline Project, including the No-Action Alternative, system alternatives, collocation with existing or other proposed pipeline systems, route alternatives, and minor route variations. The final EIS evaluates these alternatives to the proposed Rover Pipeline Project to determine whether they are technically and economically feasible and environmentally preferable.

---

[165] Cardno ENTRIX is a subsidiary of Cardno Limited.

[166] U.S. DEPARTMENT OF STATE AND THE BROADCASTING BOARD OF GOVERNORS, OFFICE OF INSPECTOR GENERAL, AUD-SI-12-28, SPECIAL REVIEW OF THE KEYSTONE XL PIPELINE PERMIT PROCESS (Feb. 2012).

163.    Section 3.4.1 of the final EIS identifies major route alternatives which were evaluated for those project segments where Commission staff received comments from the public, identified potential collocation benefits, or where Rover's originally considered route appeared to have certain environmental advantages over the route Rover eventually proposed in its formal application or supplements.  This evaluation included the Berne Supply Lateral, Sherwood Supply Lateral, Mainlines A and B, and the Market Segment alternatives.[167]  In the final EIS, Commission staff recommended that Rover adopt the 3-mile-long Market Segment Alternative 2 to collocate with the International Transmission Company (ITC) corridor.  The Market Segment Alternative 2 was initially proposed by Rover in its application; however, Rover proposed a revised route in June 2015.  In response to the final EIS's recommendation, on September 9, 2016, Rover filed additional information regarding the Market Segment Alternative 2, citing specific issues that would make this recommended route infeasible.  Rover's primary objections to the Market Segment Alternative 2 route were that it would require crossing the ITC corridor at an angle of 13 degrees, which is less than the ITC's required 45 degree angle for crossings of its corridor, and that the Market Segment Alternative 2 route would require crossing an area that contains contaminated soils.  We find that the new information submitted by Rover demonstrates that the Market Segment Alternative 2 variation, while originally presented by Rover as a feasible alternative, has a number of constraints that persuade us not to adopt it, given the acceptability of the currently proposed route.  Therefore, we will not certificate construction of the Market Segment Alternative 2 as part of this project.

164.    Minor route variations are much smaller in scale than the major route alternatives referenced above, and involve minor shifts in the pipeline alignment to avoid a site-specific resource issue or concern.  Rover assessed numerous minor route variations over the course of project development.  Prior to the draft EIS, Rover had adopted 59 variations into its proposed route for various reasons, including landowner requests, avoidance of sensitive resources, or engineering considerations.

165.    The draft EIS identified 13 minor route variations for further evaluation.[168]  Rover has indicated it had reached easement agreements with three of the landowners, and thus the underlying landowner concerns are presumed to have been resolved.  Rover also indicated that concerns of four other landowners were addressed through reroutes or adjustments to the project's workspace.  With respect to the remaining six route variations, Rover has indicated that reroutes were not feasible and easement negotiations were still ongoing; thus, they were examined further.  The final EIS presented

---

[167] Final EIS § 3.4.1.

[168] Draft EIS at 3-38.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 70 of 140

Commission staff's independent assessment of these six variations and concludes that the route variations would not offer a significant environmental advantage for four of the variations, but would offer an advantage for the other two and recommended to the Commission that Rover should adopt staff's minor route variation.[169]  Rover has since made a filing adopting the remaining two route variations into the proposed route and we find that the variations address the landowners concerns.

166.    Between issuance of the draft EIS and final EIS, Rover adopted 69 additional minor route variations.  In addition, the final EIS examined 29 new minor route variations requested by various stakeholders.[170]  In the final EIS, Commission staff recommended that Rover adopt additional minor route variations or mitigation measures for 15 parcels where landowner concerns remain.[171]  In September 2016 (after issuance of the final EIS), Rover filed supplemental information on its project, including 43 newly-adopted route variations as well as updates on landowner negotiations.[172]  Some of these partly addressed the minor route variations and mitigation measures recommended by Commission staff in the final EIS and others were adopted as part of Rover's ongoing project development.  Commission staff reviewed the requested route variations and concluded that they were generally acceptable; however, Rover is still required to comply with Environmental Condition 5 in Appendix B to this order for the variations.  Although the route variations and mitigation measures are generally acceptable, we discuss below ongoing issues that require further resolution.

167.    Environmental Recommendation 15 of the final EIS required, among other route variations and modifications, a workspace modification for the residence at milepost 22.7 on the Seneca Lateral.  Rover has amended the workspace and the workspace is now 51.3 feet from the residence.  Although Rover states that it has updated the residential plan for this parcel, it did not provide the plan in its supplemental filing and thus, we are unable to confirm and verify the workspace modification.  Therefore, Environmental Condition 13 requires Rover to adopt a workspace modification at milepost 22.7 on the Seneca Lateral.[173]

---

[169] Final EIS at 3-38.

[170] Final EIS at 3-45.

[171] Final EIS at 3-46.

[172] One of the proposed route variations would result in impacts on a new landowner that was not previously crossed by the Rover Pipeline Project.

[173] Environmental Condition 15 is also updated to remove the reference to six

(continued...)

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 71 of 140

168.    Environmental Recommendation 16 in the final EIS recommends a route variation across property owned by the Daniel Trust at milepost 65.0 on the Market Segment. In its September 2016 filing, Rover states that it has adopted staff's recommended variation for this parcel. However, the Daniel Trust asserts that the variation proposed by Rover does not adhere to the Commission staff's recommended variation. Given that Rover has not provided any justification for its deviation from the staff recommended route, Environmental Condition 14 in Appendix B to this order specifically requires Rover to adopt Commission staff's recommended route for this parcel.

169.    For the parcel at milepost 13.5 on the Majorsville Lateral, Rover stated that it was unable to adopt Commission staff's recommended route variation given the severe (21 to 24 percent) side slopes. The length of the recommended route variation is about 0.25 miles. Commission staff has reviewed various other projects that are in areas of steep side slopes. There are several examples of other pipeline companies constructing or proposing to construct in areas of severe slide slopes including the Kern River Apex Expansion, which constructed its project in areas with steep side slopes of over 15 percent, the Ruby Pipeline Project, which constructed its project in areas of side slope between 15 and 40 percent, the Northwest Parachute Project, which was constructed in areas with steep side slopes much greater than 15 percent, the Constitution Pipeline Project, which would construct its project in areas with steep side slopes of 15 percent to greater than 30 percent, and the Mountain Valley Pipeline Project, which is proposing to construct in several areas of side slope greater than 30 percent. Therefore, we continue to require that Rover adopt the recommended route variation.

170.    After issuance of the draft EIS, Rover identified a planned commercial development at milepost 87.0 of the Market Segment. As part of the final EIS, staff recommended that Rover consult with the landowner and provide the Commission with documentation of its consultation and evidence of how the planned commercial development would be impacted. Since the submittal of the final EIS, Rover has reduced the workspace and adjusted the centerline within the parcel at the request of the landowner. With the proposed route changes, Rover has purchased the easement. Because the landowner has, on his own accord, reached an agreement with Rover for an easement, we believe that his concerns have been effectively mitigated. Therefore, we are no longer requiring any further coordination regarding this parcel and are not adopting Environmental Recommendation 35 from the final EIS. However, Rover is still required to comply with Environmental Condition 5 for the agreed-to variation.

---

parcels in Environmental Recommendation 15 where Rover has subsequently purchased an easement.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 72 of 140

171.    Rover's March 2016 proposed route crossed a wetland mitigation area owned by the CONSOL Mining Company (CONSOL) and restored for impacts associated with CONSOL's prior development activities. In the final EIS, Commission staff recommended that Rover adopt an alternate route around the area or provide documentation from federal and state agencies that the proposed crossing would be compatible with any permit conditions associated with CONSOL's existing wetland mitigation area.[174] In September 2016, Rover filed a route variation that would avoid the wetland mitigation area. The variation was developed in coordination with CONSOL and would avoid impacts on the wetland mitigation area and associated streams. We have reviewed the proposed route variation and find it acceptable. Therefore, Environmental Recommendation 24 from the final EIS had been removed; however, Rover is still required to comply with Environmental Condition 5 for this variation.

172.    Mr. Terrance Lahr objects to the proposed route variation on his property. Mr. Lahr is concerned that even with the adoption of staff's recommended route variation, his driveway, which represents the only access to the western portion of his property, will be on top of Rover's permanent easement. Mr. Lahr claims that if the permanent right-of-way becomes his *de facto* driveway, he could lose unfettered access to a majority of his parcel. He also asserts that county ordinances do not allow two-party shared driveways and that this could result in deed restrictions rendering it impossible to sell the property or obtain future bank financing. Mr. Lahr, in his October 5, 2016 filing, suggested a solution that involves moving the right-of-way about 20 feet to the south and re-routing his driveway slightly to the north. According to Mr. Lahr's aerial photo and schematic, this appears to be a workable solution that would not affect other landowners. Because the possibility of impairing Mr. Lahr's ability to access the western portion of his property exists, we believe that a re-route is warranted. Therefore, we have added Environmental Condition 45, which requires Rover to develop, in coordination with Mr. Lahr, a site-specific plan that allows Mr. Lahr to access his property without use of Rover's permanent easement.

173.    The Daniel Trust generally objects to Rover's selection process of adopting variations based on landowner requests and believes that Rover inconsistently applies the rationale that it would not adopt a variation if it merely transferred impacts from one landowner to another, stating that Rover had done just that in several cases without acknowledging the specific rationale behind the revision. The final EIS includes a thorough evaluation of requested variations and alternatives, including an evaluation of variations for the Daniel Trust's parcel discussed above, and identifies route variations recommended by Commission staff. Any route variation proposed by Rover must

---

[174] Final EIS at 3-49.

demonstrate that, on balance, it offers a beneficial resolution of landowner concerns or environmental issues when compared to a route that would no longer become part of the project. We note that in some instances, route variations were proposed by Rover for which the reason for the change was unclear. In these instances, staff requested further justification either in information requests or in the draft EIS, and evaluated this information prior to making any conclusions on project routing.

174. The Daniel Trust also objected to Rover's response to staff's June 7, 2016 data request, requesting that Rover assess alternatives for all aboveground facilities, in particular mainline valve MLV-05, for which Rover had not yet reached landowner agreements. The Daniel Trust stated that Rover again inconsistently applied its approach to relocating facilities with respect to considering alternatives that may affect additional landowners. The final EIS indicated that Rover had not reached agreements for all aboveground facilities such as mainline valves and meter stations.[175] Although Rover's response indicated that certain alternatives could not be analyzed or were impractical, Commission staff reviewed the proposed locations of aboveground facilities, including the location of mainline valve MLV-05, and determined that the locations were acceptable. Therefore, the final EIS did not recommend alternative sites, despite the landowner's objections.[176] In reaching this conclusion it is important to note that the footprint of a mainline valve is much less in comparison to other aboveground facilities such as a compressor station, and will have fewer operational trips, visits, and work activities, lessening the impact of its operation. Further, mainline valves would be situated within the permanent, operational pipeline right-of-way.

### c. **Karst Geology**

175. Potential impacts resulting from construction and operation of the Rover Pipeline Project on karst features, including groundwater impacts, were identified during both the scoping and draft EIS comment periods. Karst features, such as sinkholes, caves, and caverns, can form as a result of the long-term action of groundwater on soluble carbonate rocks. The Rover Pipeline Project crosses karst terrain in Ohio along Mainlines A and B.

176. Rover developed a *Karst Mitigation Plan* to mitigate potential impacts and hazards from karst features. During construction in areas of karst terrain, Rover will use best management practices including, but not limited to: preventing stormwater runoff from the construction area into karst features (i.e., open voids, cave entrances, etc.) using special controls; monitoring all sediment and erosion control measures; adhering to

---

[175] Final EIS at 4-171.

[176] Final EIS Table 3.4.3-3.

USCA Case #18-1032        Document #1715763        Filed: 01/29/2018        Page 74 of 140

Rover's *Spill Prevention and Response Procedures*; monitoring existing and any previously unidentified wells and springs within karst areas; and monitoring well yield and water quality for all wells within 150 feet of construction workspace. To ensure that impacts associated with construction in karst areas are minimized, Environmental Condition 15 in Appendix B to this order requires Rover to hire professional geologists to monitor construction in those areas identified in its January 2016 Field Reconnaissance of Karst Prone Areas Report.[177] We find that implementation of these measures will adequately protect karst features and related resources such as groundwater.[178]

#### d.    Waterbodies and Surface Water Resources

177.    The Rover Pipeline Project will cross a total of 864 surface waterbodies and 140 drainage features. Rover has proposed to cross 45 waterbodies using the horizontal directional drilling (HDD) method, including all eight major waterbodies. Additionally, Rover has proposed dry-ditch crossing methods that avoid in-stream construction impacts at 30 waterbodies. The remaining waterbodies and drainage features would be crossed using a traditional (wet) open-cut crossing method. No waterbodies would be impacted by the Panhandle or Trunkline projects.

178.    EPA filed several comments related to water resources. First, EPA requests that all hydrostatic test water be sampled and tested before discharge into upland areas to ensure that pre-cleaning sufficiently removed all petroleum products from the pipeline. Next, EPA recommends the construction of rain gardens at each compressor station as mitigation for the increase in impervious surfaces and runoff. EPA also recommends the use of water table observation wells to forecast the need for dewatering practices, particularly in areas of a high water table. Last, EPA recommends that the Commission require that Rover contact the water suppliers in the areas where the Rover Pipeline Project crosses Wellhead Protection Areas or crosses streams upstream of potable water supply surface water intakes.

---

[177] In EPA's September 2, 2016 comments, EPA concurred with Commission staff's recommendations requiring Rover to hire a professional geologist to monitor specified areas during construction and adopt the mitigation measures in its Geohazard Evaluation Report. However, EPA did note that our discussion in the final EIS of the Kaul Clay site was incorrect because it incorrectly states that the site is located in Pennsylvania. We acknowledge the error, and note that the site is in Toronto, Jefferson County, Ohio.

[178] Final EIS at ES-4.

179. We disagree with EPA's request that hydrostatic test water be sampled and tested. Prior to hydrostatic testing, the pipelines would be unused and would not contain petroleum products. The purpose of pre-cleaning prior to hydrostatic testing is to remove any debris that may have entered the pipe during welding and construction. The process of pre-cleaning and hydrostatic testing would not introduce petroleum products into the water. Additionally, Rover has stated that it will not use any chemicals during the testing process. Therefore, testing of the water is not necessary.

180. We also disagree with EPA's recommendation to require rain gardens at each compressor station. As stated in section 4.8.1.3 of the final EIS, Rover would be required to develop stormwater management plans for each of its aboveground facilities.[179] These plans will be required to meet all applicable federal and state requirements. The use of rain gardens, or other similar mitigation measures, would be developed as part of the stormwater management plans. Therefore, given that the applicant is required to meet all necessary permit requirements regarding stormwater management, it is not necessary for the Commission to dictate which mitigation measures that Rover would need to use to meet those requirements.

181. Regarding the use of water table observation wells, the final EIS explains that Rover will be required to follow the requirements in its *Construction Mitigation Plans* regarding dewatering, including the discharge of trench water into stable, vegetated, upland areas or through a filter bag or siltation barrier.[180] We disagree that the use of water table observation wells would increase the potential effectiveness of dewatering practices as it would be a superfluous measure. Based on staff experience of inspecting projects under construction, we note that dewatering activities are routine and occur in many locations along a construction right-of-way. In preparation, crews generally have ample supplies and equipment on-hand to conduct dewatering safely and in compliance with our standard environmental requirements. Trench dewatering frequently occurs in common and predictable locations during pipeline construction such as near waterbodies and wetlands and topographical concavities after localized rainfall events. Water table observation wells would provide Rover's construction contractor additional information regarding localized depths of surrounding water tables. However, we do not believe having this information available would significantly improve the effectiveness of the dewatering activities. Furthermore, drilling, operating, and maintaining water monitoring wells would require additional use of construction workspace potentially impacting additional resources.

---

[179] Final EIS at 4-166.

[180] Final EIS at 2-28.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 76 of 140

182.   With respect to EPA's recommendation that Rover contact water suppliers, Environmental Condition 17 requires that Rover consult with appropriate resource agencies for all public water supplies within 150 feet of the project.

183.   Additionally, Ms. Sherry Miller expressed concerns about construction through the Huff Run Watershed in Tuscarawas and Carroll Counties, Ohio, given that funding had been provided to the area over several years for restoration of the watershed from the impacts of acid mine drainage. As listed in Appendix L of the final EIS, Huff Run will be crossed using the open cut method.[181] As discussed in the final EIS and in Rover's *Wetland and Waterbody Construction and Mitigation Procedures*, appropriate mitigation measures would be used during construction through all waterbodies.[182] Therefore, there would be no significant impacts on Huff Run due to construction or operation of the Rover Pipeline Project.

184.   We find that use of the HDD crossing method to cross designated waterbodies and implementation of the mitigation measures outlined in Rover's *Construction Mitigation Plans* and other project-specific plans will avoid or adequately minimize impacts on surface water resources to the extent practicable.

### e.   Wetlands

185.   Construction of the Rover Pipeline Project will impact a total of 160.0 acres of wetlands, including 33.4 acres of forested wetlands, 97.4 acres of emergent wetlands, and 29.3 acres of scrub-shrub wetlands.[183] The wetland impacts associated with temporary workspaces will total 88.5 acres, and following construction these areas will eventually return to pre-construction conditions, although as indicated in the final EIS, this may take many years (areas that were composed of open lands or emergent wetlands would revert over a shorter period).[184] For the operation of the pipeline, Rover will permanently maintain 14.2 acres of the 33.4 acres of previously forested wetlands in a scrub-shrub or herbaceous state. Rover has avoided wetland impacts at 18 locations by using the HDD construction method. Rover's Defiance Compressor Station will impact 0.3 acre of emergent wetland during construction, with 0.2 acre permanently impacted during

---

[181] Final EIS, Appendix L.

[182] Final EIS at ES-4.

[183] Final EIS at 4-96.

[184] Final EIS at 4-97.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 77 of 140

operation. No wetlands will be impacted by construction of the Panhandle and Trunkline projects.

186.    In order to further minimize impacts on wetlands from construction of the Rover Pipeline Project, Environmental Condition 21 prohibits Rover from clearing trees between the entry and exit locations of HDD crossings except for minor brush clearing less than 3 feet wide using hand tools. This condition, along with a reduced right-of-way width in wetlands, as described below, will minimize the overall acreage of wetlands that will be impacted during construction.

187.    In the final EIS, Commission staff recommended that Rover limit its construction right-of-way width in all 548 wetlands crossed by the project to 75 feet for single pipelines and 95 feet for dual pipelines.[185] In Rover's September 2016 filing, it agreed to limit its construction right-of-way width as recommended by staff for all wetlands, with one exception. Rover has requested that the originally proposed 100-foot-wide construction right-of-way through the wetland at milepost 86.7 on the Market Segment be maintained in order to accommodate spoil storage. Rover stated that given the size of the wetland and the site-specific constraints, the additional right-of-way would be needed to safely construct the pipeline through the wetland. We have reviewed the information provided by Rover and conclude that the additional right-of-way width is acceptable for this wetland and therefore, Environmental Condition 22 in Appendix B to this order requires Rover limit its construction right-of-way width in 547 of the 548 wetlands crossed by the project to 75 feet for single pipelines and 95 feet for dual pipelines. While the Commission's *Wetland and Waterbody Construction and Mitigation Procedures* specify that extra workspace should not be within 50 feet of wetlands, Rover has requested additional temporary workspace within 50 feet at three other wetlands. We have reviewed the requested additional temporary workspace locations and approve the requests finding Rover has provided sufficient justification demonstrating that the siting of these workspaces is needed in order to facilitate safe construction.

188.    EPA states that due to a lack of a wetland mitigation plan and the number of wetlands that will be crossed, the Rover Pipeline Project should be permitted via an individual U.S. Army Corps of Engineers section 404 permit. As stated in section 4.4 of the final EIS, section 404 permitting falls under the jurisdiction of the U.S. Army Corps of Engineers and associated state agencies.[186] Therefore, the decision whether the Rover Pipeline Project should be permitted under an individual or nationwide permit will be made by the U.S. Army Corps of Engineers. Additionally, as stated in section 4.4.5 of

---

[185] Final EIS at 4-100.

[186] Final EIS at 4-93.

the final EIS, Rover continues to coordinate with the U.S. Army Corps of Engineers and state agencies in the development of its wetland mitigation plan.[187]

189.     Based on the avoidance and minimization measures developed by Rover, as well as our conditions, impacts on wetland resources will be effectively minimized or mitigated to the extent practicable.

### f.     Interior Forests and Migratory Birds

190.     Throughout scoping and NEPA review, commenters expressed concerns about general impacts on upland forest, with particular concern for interior forest.  Commenters indicated that the disturbance of large areas of unfragmented forest required for the pipeline will cause permanent effects on forested habitats as well as forest-dwelling species such as some migratory birds.

191.     Rover will cross 79 miles of interior forest habitat, which includes both upland and wetland communities.  Rover attempted to route its pipeline adjacent to previously disturbed areas and outside of forested areas where possible.  However, impacts on the interior forest habitat and on migratory birds and other wildlife that use this habitat still account for about 1,315.7 acres of the total Rover Pipeline Project land impacts.[188] Consequently, the final EIS concluded these impacts on forested lands would be significant.[189]

192.     As discussed in the final EIS, Rover developed a draft *Migratory Bird Conservation Plan* that includes avoidance, minimization, and mitigation measures regarding migratory birds and their habitat, per the intent of the Migratory Bird Treaty Act.[190]  Rover has consulted with FWS to develop measures for its plan.  In addition to the conservation measures described throughout the final EIS, FWS requested that Rover provide compensatory mitigation to offset the removal of forested habitat.  FWS utilized a habitat equivalency analysis to identify a level of mitigation it deemed appropriate to the project's impacts.  Rover ultimately disagreed with FWS's conclusion and committed to providing an alternate, but lesser amount of compensatory mitigation.  In response, FWS requested that the Commission not consider Rover's *Migratory Bird Conservation*

---

[187] Final EIS at 4-101 through 4-102.

[188] Final EIS at 4-106.

[189] Final EIS at 4-107.

[190] Final EIS at 4-107.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 79 of 140

*Plan* as complete until it committed to provide FWS's full requested amount of compensatory mitigation.[191] Alternatively, FWS argues that if the Commission does not require the full amount of compensatory mitigation, the Commission should reassess the final EIS's determination that the proposed projects would not have a significant adverse effect on wildlife. EPA and Sierra Club[192] recommend that the final *Migratory Bird Conservation Plan* be reviewed and agreed to by FWS prior to issuance of this order.[193]

193.    Rover and FWS collaborated and continue to collaborate to develop a final *Migratory Bird Conservation Plan* that includes avoidance, minimization, and mitigation measures to reduce the potential population-level effects on migratory birds and their habitat. However, Rover and FWS have apparently reached an impasse on the specifics of compensatory mitigation. The Commission typically does not require or encourage applicants to participate in compensatory mitigation to groups, governments, or agencies. Mitigation measures proposed or recommended in the final EIS's analysis target specific natural resources. In order to further reduce impacts on migratory birds, staff recommended that Rover restrict clearing to avoid the known migratory bird nesting period. This clearing restriction, combined with other minimization measures such as restricting mowing of the right-of-way between April 15 and August 1 and narrowing of the right-of-way through forested wetlands, would provide satisfactory minimization of the project's impacts. We believe this is sufficient and in compliance with the Migratory Bird Treaty Act. Therefore, Environmental Condition 24 requires that Rover finalize this plan, including any additional measures developed in its consultation with FWS.[194]

194.    We also disagree with Sierra Club's and EPA's request to finalize the *Migratory Bird Conservation Plan* prior to issuance of this order. As stated above, Environmental

---

[191] Similarly, Ms. Sherry Miller believes the amount of compensatory mitigation proposed by Rover is inappropriate or insufficient for loss of habitat.

[192] Sierra Club's comments were also filed on behalf of the Ohio and Michigan Chapters of the Sierra Club.

[193] Sierra Club also argues that Rover wrongly asserted that FWS's letter on the draft *Migratory Bird Conservation Plan* constitutes final agency action that could be challenged in court. The Commission has no jurisdiction to determine what action by another agency constitutes a final agency action under the Administrative Procedure Act.

[194] The Daniel Trust states that Rover's *Migratory Bird Conservation Plan* is inadequate, claiming that Rover was requesting unrestricted clearing windows and only voluntary wetland mitigation terms. However, as discussed, Rover has not finalized the *Migratory Bird Conservation Plan*; nor are its clearing windows unrestricted.

Condition 24 requires that Rover file its final *Migratory Bird Conservation Plan* prior to the start of construction, including documentation of its consultation with FWS. Thus, Rover will be unable to begin construction until it files its final *Migratory Bird Conservation Plan.*

195.     Last, Mr. Ronald Kardos and Ms. Marjorie Bringham-Kardos argue that the Commission should not take responsibility for altering the *Migratory Bird Conservation Plan.* Rather, they assert that the Commission must assume that the decisions made by FWS are valid. The commenters further state that the Memorandum of Understanding between the Commission and FWS provides that FWS may make recommendations to the Commission and the Commission must evaluate the information and consider the recommendations provided. As discussed above, the Commission finds that the mitigation measures submitted by Rover and recommended by staff adequately protect migratory birds and are in compliance with the Migratory Bird Treaty Act.

196.     Based on the avoidance and minimization measures developed by Rover, as well as the requirements in Environmental Condition 24, we agree with the final EIS's conclusion that impacts on interior forests and migratory birds will be effectively minimized or mitigated to a reasonable extent of practicability.[195]

### g.     Invasive Species

197.     EPA and the Daniel Trust filed comments concerning Rover's draft *Invasive Species Plan.* The Daniel Trust requests that the Commission require Rover to consult with the Michigan Department of Natural Resources and FWS regarding minimizing the spread of oak wilt virus. EPA concurs with the recommendation in the final EIS for Rover to update its *Invasive Species Plan*; however, EPA requests that the updated plan be issued as a part of this order.

198.     As discussed in section 4.5.4 of the final EIS, Rover would control the spread of oak wilt through adherence to federal and state regulations.[196] Rover includes these measures in its *Invasive Species Plan*, and Environmental Condition 23 requires Rover to revise its plan in consultation with federal, state, and local agencies, to include updated mitigation measures during construction to minimize the spread of invasive species. With the measures proposed by Rover, and our condition, impacts from invasive species, and diseases such as oak wilt, would be appropriately minimized. With respect to the timing of the finalized plan, since Rover will be unable to begin construction until the

---

[195] Final EIS at 5-6 through 5-7.

[196] Final EIS at 4-107 through 4-108.

USCA Case #18-1032        Document #1715763        Filed: 01/29/2018        Page 81 of 140

Director of the Office of Energy Projects approves Rover's updated *Invasive Species Plan*, we conclude that the Environmental Condition 23 is sufficient to minimize the impact or spread of invasive species.

### h.     Federal- and State-Listed Species

199.    The final EIS includes an analysis of the projects' impact on 16 federally listed threatened or endangered species.[197] Due to the amount of tree clearing that will be needed for the Rover Pipeline Project, FWS raised concerns about the Rover Pipeline Project's effect on federally listed bat species, including the Indiana bat, northern long-eared bat, and the Virginia big-eared bat.

200.    Rover conducted mist net surveys for the Indiana bat, northern long-eared bat, and Virginia big-eared bat in West Virginia, Pennsylvania, Ohio, and Michigan, from May 19 to July 30, 2015.  During the same timeframe, Rover conducted potential roost tree surveys and habitat plot assessments to further qualify and quantify the suitability of summer roosting by bats in the project area.  Rover also conducted surveys in 2015 to identify cave and portal openings to address the potential for bat presence within these habitats located within proposed workspaces.  Rover conducted additional surveys in June 2016 and filed the final survey results in July 2016.

201.    A total of 1,510 bats were captured during 2015 mist net surveys at 435 sites in the project area.  No Indiana bats or Virginia big-eared bats were captured; however, 91 northern long-eared bats were captured.  Of the 91 captured northern long-eared bats, 56 bats were fitted with transmitters and tracked to roosting locations.  Radio telemetry tracking of the bats identified eight roost trees that were adjacent to or within project workspaces.  Cave portal surveys did not identify any suitable winter hibernacula for Indiana bats, northern long-eared bats, or Virginia big-eared bats.  Rover has stated that it would avoid all roost trees through changes in the route or workspace.  Prior to the start of construction, once Rover files its Implementation Plan, Commission staff will verify that all roost trees have been avoided based on final project alignment sheets.

202.    In order to minimize impacts on federally listed bat species, FWS recommended that tree clearing only occur during certain seasons of the year.  Environmental Condition 25 restricts clearing activities to between October 1 and March 31 in Michigan, Ohio, and Pennsylvania, and between November 15 and March 31 in West Virginia.[198]

---

[197] Final EIS § 4.7.

[198] FWS concurred with these tree clearing windows.

203.   On October 3, 2016, FWS concurred with Commission staff's finding in the final EIS that the Rover Pipeline Project is not likely to adversely affect any of the federally listed species except for the Indiana bat. Rover subsequently filed an updated *Indiana Bat Conservation Plan* with the FWS West Virginia Field Office on November 2, 2016. As a result of the revisions, which included several new conservation measures, FWS indicated by letter dated November 14, 2016, that the projects are not likely to adversely affect Indiana bats in Michigan, Ohio, Pennsylvania, or West Virginia, and no further consultation under the Endangered Species Act (ESA) is required. These measures included the girdling of 75 trees to create snags, erecting 33 artificial roosting structures and monitoring them for three years, and replanting 91.4 acres of temporary workspace with trees suitable for Indiana bats.

204.   Commission staff also recommended in the final EIS that Rover restrict construction activities to between October 31 and March 15 in areas of potential eastern massasauga rattlesnake habitat. As identified by Rover, these areas were from mileposts 83.9 to 84.0 and from mileposts 85.2 to 87.9 on the Market Segment. Rover conducted surveys in these areas during April, May, and July 2016. No eastern massasauga rattlesnakes were observed. Based on the results of the surveys, we have removed this requirement.

205.   The final EIS recommended that Rover not begin construction until all mitigation plans have been approved and any necessary section 7 consultation, whether formal or informal, has been completed between the Commission and FWS. Because consultation is considered complete, this requirement is no longer necessary. However, because Rover has not filed it revised *Indiana Bat Conservation Plan* with the Commission or affirmed its commitment to the plan's measures, we will require this as Environmental Condition 26.

206.   The Daniel Trust submitted a comment criticizing Rover's bat conservation plans as well as Rover's route selection, particularly its selection without consideration of bat species habitat. As discussed above, Rover conducted surveys in 2015 and 2016 for Virginia big-eared bats, Indiana bat, and northern long-eared bats and has made several adjustments to its route based on identified roost trees. Further, we note above that staff has concluded its consultations with FWS under section 7 of the ESA regarding bat species. As a result, we have required Environmental Condition 26 which states that Rover shall not begin construction until it submits its final *Indiana Bat Conservation Plan*. Additionally, Environmental Condition 25 requires Rover to adhere to the FWS recommended clearing windows.

207.   Last, the Ohio Department of Natural Resources (OHDNR) identified the barn owl as a state-listed threatened species. Given that construction of the Rover Pipeline Project will require the removal of several structures that represent potential barn owl habitat, the final EIS recommended that prior to removing barns and structures that represent potential barn owl habitat, Rover shall evaluate and assess each barn or similar structure

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 83 of 140

for the presence of barn owls. In July 2016, Rover conducted a survey of the seven barns that would be removed during construction of the Rover Pipeline Project. The survey found no evidence that barn owls were currently inhabiting the barns nor evidence that they had inhabited or nested in the barns in the recent past. Rover provided results of the survey to the OHDNR. On August 3, 2016, the OHDNR concurred that impacts on the barn owl are not likely and stated that no further coordination between Rover and OHDNR regarding the barn owl was required. We have reviewed the survey report and the correspondence between Rover and OHDNR and conclude that the requirements of the recommendation have been met. Therefore, we have removed the recommendation.

### i.     **Agricultural Land**

208.    Throughout scoping and NEPA review, commenters expressed concerns about impacts on agricultural lands, particularly to drainage tile systems and productivity of the land once construction is complete. Construction of the Rover Pipeline Project will affect 5,328.1 acres of agricultural land.[199] During operation of the project, the permanent pipeline right-of-way and aboveground facilities will affect 1,999.8 acres of agricultural land.[200]

209.    The final EIS acknowledges that construction activities such as clearing, grading, trenching, stripping, and backfilling could impact agricultural lands by causing soil erosion, by damaging surface or subsurface irrigation or drainage systems, and by degrading fertile soils through mixing and compaction.[201] These impacts could result in direct loss of crops or pasture, as well as reduced crop productivity in future planting seasons.

210.    In order to minimize these impacts, Rover will adhere to the mitigation measures outlined in its state-specific *Agricultural Impact Mitigation Plans* for Ohio and Michigan and its *Upland Erosion Control, Revegetation, and Maintenance Plan* for agricultural land crossed in Pennsylvania and West Virginia. Typical mitigation measures include topsoil segregation, decompaction, and repair/replacement of irrigation and drainage structures. We received comments on the draft EIS from the Ohio Department of Agriculture regarding differences between Rover's *Agricultural Impact Mitigation Plan* for Ohio and the Department's standard specifications for pipeline construction.[202] Thus,

---

[199] Final EIS at 4-161.

[200] Final EIS at 4-161.

[201] Final EIS at 4-225.

[202] Final EIS at 4-177.

the final EIS recommended and Environmental Condition 31 in Appendix B to this order requires Rover to consult with the Ohio Department of Agriculture regarding Rover's *Agricultural Impact Mitigation Plan* for Ohio to ensure the plan includes measures consistent (and not in conflict) with normal standards required by the state.

211.    Although Rover has developed the state-specific *Agricultural Impact Mitigation Plans*, landowners continued to raise concerns about the long-term impacts of construction on crop productivity.  In order to address landowner concerns, Environmental Condition 30 requires Rover to develop a 5-year post-construction monitoring program to evaluate crop productivity in areas impacted by project construction.

212.    Sean McGovern and Carolyn Stanley each filed comments requesting that the Commission ensure that organic farms are adequately protected during construction of the project.  As discussed in section 4.8.5 of the final EIS, only one organic farm was identified as being crossed by the Rover Pipeline Project.[203]  However, Rover did not identify any specific mitigation measures it would employ to ensure the farm does not lose any organic certification it may have.  Environmental Condition 35 requires Rover to develop, in consultation with the landowner, an impact avoidance, minimization, or mitigation plan for the only organic farm (which is not owned by either commenter) crossed by the Rover Pipeline Project.  As such, the final EIS concludes, and we agree, that the organic farm will not be significantly impacted.

213.    To mitigate impacts on drain tile systems, Rover has retained a consultant with knowledge and expertise in drain tile systems in the project area to meet with individual landowners and develop site-specific plans for mitigation and restoration of agricultural lands (*Drain Tile Relocation and Reclamation Plans*).  However, landowners have submitted comments raising concerns about the review and approval process for these plans.  In order to ensure that landowners are involved in the development of these plans, Environmental Condition 32 requires that Rover file these site-specific plans, including documentation of consultation with the landowner, with the Commission.  Additionally, Environmental Condition 33 requires that Rover commit to hire local drain tile contractors to install/repair drain tiles damaged during construction, and Environmental Condition 34 requires that Rover provide information on encountered, severed, or damaged drain tile lines to the landowner and local county Soil and Water Conservation District.

---

[203] Final EIS at 4-180.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 85 of 140

214.    G&B Landowners state that drain tile remediation must occur during a specific time of year[204] and assert that Rover has improperly imposed an unworkable deadline for the completion of drain tile remediation on parcels where Rover has already negotiated an easement.  Likewise, E&W Landowners request that Rover develop site-specific plans to address individual drain tile concerns.  As discussed above, Environmental Condition 32 requires Rover to develop site-specific plans for drain tile remediation in consultation with landowners and to file the resulting plans with the Commission.  This condition will ensure that appropriate planning measures will be taken prior to conducting drain tile remediation on all impacted parcels to protect individual landowner resources and minimize short- or long-term impacts of construction.

215.    Based on Rover's proposed measures, as well as on the additional measures imposed as environmental conditions in Appendix B to this order, we conclude that impacts on agricultural land will be adequately minimized.

216.    G&B Landowners contend that Rover's refusal to perform pre-construction drain-tile remediation prior to negotiation of a final easement compels landowners to surrender their right to an eminent domain trial, in violation of the Fifth Amendment of the United States Constitution and Articles I and XIII of the Ohio Constitution.  In support of this position, G&B Landowners state that entities exercising public authority may not impose conditions that compel individuals to surrender constitutional rights,[205] nor may they suspend an individual's rights or withhold benefits conditioned upon that individual's surrender of constitutional rights.[206]  G&B Landowners also argue that conditions imposed when conferring some benefit to an individual must bear an "essential nexus" to and serve the same governmental purpose underlying the grantor's exercise of public authority.[207]

---

[204] Mr. Kyle Cohrs also notes that drain tile repair can only be completed during certain times of the year.

[205] G&B Landowners April 11, 2016 Protest at 7 (citing *Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583, 593 (1926) (*Frost & Frost*)).

[206] G&B Landowners April 11, 2016 Protest at 7-8 (citing *Sherbert v. Verner*, 374 U.S. 398, 404-05 (1963) (*Sherbert*); *Elrod v. Burns*, 427 U.S. 347, 361 (1976) (*Elrod*); *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995) (*National Amusements*)).

[207] G&B Landowners April 11, 2016 Protest at 8 (citing *Nollan v. California Coastal Comm'n.*, 483 U.S. 825, 837 (1987) (*Nollan*); *Dolan v. City of Tigard*, 512 U.S. 374 (1994) (*Dolan*)).

217.   In its answer, Rover emphasizes that the NGA expressly authorizes the use of eminent domain when pipeline companies are unable to acquire the necessary property rights through negotiation.  Rover distinguishes the cases cited by G&B Landowners for the proposition that entities exercising public authority may not impose conditions,[208] nor suspend rights or withhold benefits,[209] in order to compel an individual to surrender constitutional rights.  Here, Rover states that it is not a government entity attempting to achieve a goal by withholding or dispensing a public benefit.  Rather, it is a private entity that is attempting to negotiate easements with landowners, and has taken the position that that it cannot acquiesce to all of the landowners' demands for drain-tile remediation prior to the Commission's grant of certificate authority.  If negotiations fail, however, after certificate authority has been issued, landowners have the right to seek just compensation in an eminent domain proceeding.

218.   Rover also asserts that G&B Landowners' reliance on *Nollan v. California Coastal Comm'n.* and *Dolan v. City of Tigard* is unavailing, as the Court in both decisions found that a government entity commits a taking by imposing a condition that encumbers a permit applicant's use of property that is unrelated (or lacks a "nexus") to the purpose of the permit itself.  Rover argues that it is not a government that is conditioning the issuance of a permit on the permittee's agreement to provide an unrelated property right without compensation.  Instead, Rover is a private party negotiating contracts that are directly connected to its effort to construct a pipeline.  Rover further notes that whether the landowners settle or receive compensation in the eminent domain proceeding, the landowners are compensated for the use of their property.

219.   G&B Landowners attempt to rely on the doctrine of unconstitutional conditions to argue that Rover cannot refuse to perform pre-construction drain tile remediation prior to finalizing easement agreements.  Each case cited by G&B Landowners examined the constitutionality of state, county, or local government action that limited or interfered

---

[208] Unlike the circumstances at issue in *Frost & Frost*, Rover states that there is no unavoidable legislative mandate that leaves the landowners with no option but to renounce a constitutional right.  Furthermore, Rover continues, there is no constitutional right to have drain-tile remediation on the landowners' terms.  To the extent G&B Landowners claim they are deprived of a use of their property, Rover states that they will have the right to seek just compensation in an eminent domain proceeding.

[209] Rover explains that *Sherbert*, *Elrod*, and *National Amusements* are similarly inapposite as the cases narrowly address instances in which the government predicated the receipt of public benefits on the renunciation or abstention from the exercise of First Amendment rights.

with an individual's exercise of constitutional rights.[210]  G&B Landowners' argument appears to hinge on the premise that Rover is either a government entity, or is acting with public authority.  G&B Landowners assert that Rover has engaged in the exercise of public authority by entering upon private lands and conducting physical surveys pursuant to Ohio Revised Code section 163, and by expressing intent to use eminent domain authority to acquire the necessary property rights upon receipt of certificate authority. We disagree.  Rover is a private entity attempting to acquire land rights through negotiations with landowners.  Until issuance of this certificate, Rover had no right to obtain property through eminent domain under section 7(h) of the NGA and was not acting on behalf of any government in obtaining whatever rights it has acquired thus far. In any event, G&B Landowners have not demonstrated an established right to pre-construction drain-tile remediation,[211] and they will be compensated for the use of their property regardless of whether they settle or participate in an eminent domain proceeding.

### j.  **Homeowners' Insurance and Property Values**

220.  Throughout the NEPA review process, commenters expressed concerns about the Rover Pipeline Project's potential to have negative impacts on their individual homeowner's insurance policies, such as increases in premiums, reductions in coverage, or outright termination of a policy.  There is no peer-reviewed literature available regarding the potential effect of pipeline proximity on property insurance, nor was

---

[210] *Frost & Frost*, 271 U.S. 583 (holding that State of California could not condition use of public highways on a private carrier becoming a common carrier); *Sherbert*, 374 U.S. 398 (holding that state of South Carolina could not withhold unemployment benefits where an individual refused to accept a job that conflicted with her free exercise of religion); *Elrod*, 427 U.S. 347 (holding that Cook County sheriff and democratic organizations could not condition public employment on affiliation with a particular political party); *National Amusements,* 43 F.3d 731 (holding that while Town of Dedham's ban on licensed entertainment during certain hours may constitute a condition on a license, it was not an unconstitutional condition);  *Nollan*, 483 U.S. 825 (holding that California Coastal Committee could not condition approval of development permit on applicant's grant of a public easement across beachfront property); *Dolan*, 512 U.S. 374 (holding that City of Tigard could not condition approval of development permit on applicant's grant of a floodplain easement).

[211] As stated in Rover's answer, to the extent that landowners were asserting a right to use their property, the landowners continue to have the right to receive just compensation through an eminent domain proceeding.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 88 of 140

Docket No. CP15-93-000, *et al.*                                                                    - 78 -

Commission staff able to confirm the validity of these claims through independent research and interviews with regional and local experts.[212]  Even with the existing thousands of miles of interstate natural gas pipelines present within the United States, staff has not identified any instances where these pipelines have resulted in changes in coverage; thus, we do not find cause to believe this project would be any different.  However, to further address this issue and ensure that no undue changes to an individual's insurance policy occurs as a result of the project, Environmental Condition 39 requires that Rover report the nature of any documented insurance complaints.  Rover must describe how it has mitigated the impact in its weekly status reports filed during construction and in quarterly reports for a two-year period following the in-service date of the project.

221.    Both during the pre-filing and scoping periods, commenters also expressed concerns about the project's impacts on property values.  Specific issues included devaluation of property if encumbered by a pipeline easement; responsibility among parties for property taxes within a pipeline easement; and negative economic effects resulting from changes in land use (e.g., loss of timber production within the permanent right-of-way).  We agree with the final EIS's conclusion that a significant loss of property value due to construction of a pipeline is not supported by Commission staff's research and available data.[213]  Moreover, any loss of productivity associated with an easement, including the loss of timber production, is more appropriately addressed through compensation negotiations or eminent domain proceedings.

### k.    Air Quality

222.    The Rover Pipeline Project consists of several aboveground facilities including: 10 compressor stations, 17 meter stations, 77 mainline valves, 6 tie-ins, and 11 pig launchers/receivers.  The majority of new emissions from the Rover Pipeline Project would result from operation of the 10 new compressor stations.  The Panhandle and Trunkline Backhaul Projects would not significantly contribute to negative impacts on air emissions.

223.    Construction of the projects will result in temporary and localized increases of tailpipe emissions from mobile diesel- and gas-fueled equipment.  In addition, temporary increases in fugitive dust emissions would occur due to surface disturbance caused by construction activities, construction vehicle travel on unpaved roads, and open burning of downed trees and brush.  Rover identified several mitigation measures it would

---

[212] *See* Final EIS § 4.9.6.

[213] Final EIS at 4-204 to 4-206.

Docket No. CP15-93-000, *et al.*                                             - 79 -

implement to reduce construction emissions and fugitive dust. However, the final EIS concluded that the mitigation measures outlined in Rover's *Fugitive Dust Control Plan* were insufficient.[214]  Therefore, Environmental Condition 20 requires Rover to update its *Fugitive Dust Control Plan* with additional measures to minimize fugitive dust emissions, including measures that identify speed limits for construction equipment, how Rover will determine appropriate dust abatement measures, track-out devices[215] that construction traffic will cross, and the maintenance procedures for construction equipment that Rover will use to reduce dust.

224.    As part of the air-permit applications for compressor stations, Rover utilized the EPA-approved SCREEN3 air screening model[216] to identify impacts associated with each compressor station for nitrogen dioxide and particulate matter with a diameter of 2.5 microns or less. Results demonstrate that the Rover Pipeline Project compressor stations would not exceed the National Ambient Air Quality Standards, and the project areas would continue to remain protective of human health and public welfare for all listed pollutants. Accordingly, any emissions resulting from operation of Rover's compressor stations would not have significant impacts on local or regional air quality.

225.    Sherry Miller and Carl Miller filed comments expressing their concerns regarding the emissions and safety of Mainline Compressor Station 1 due to its proximity to Conotton Valley High School, which is located one mile away from the compressor station. As discussed in section 4.11.1 of the final EIS, modeled air emissions from Rover's compressor stations were all below applicable air quality standards.[217]  As stated above, based on the modeled impacts, any emissions resulting from operation of Rover's compressor stations would not have a significant impact on local or regional air quality, including at the high school located one mile from the compressor station.

226.    EPA recommends that Rover implement several advanced pollution controls to limit air impacts during construction. As discussed in section 4.11.1.3 of the final EIS, Rover will implement several mitigation measures to reduce construction emissions, including maintaining engines in accordance with manufacturer recommendations,

---

[214] Final EIS at 4-239.

[215] Track-out devices are rock-based construction entrances that minimize tracking mud or dirt onto a roadway and are used where the right-of-way intersects a road.

[216] While AERSCREEN is the current EPA-preferred screening tool, SCREEN3 is an EPA-approved screen tool that generally overestimates impacts.

[217] Final EIS at 4-240.

Docket No. CP15-93-000, *et al.*                                                                                      - 80 -

ensuring mobile sources have combustion engines that meet manufacturing requirements for control of emissions, and reducing fugitive dust by following its *Fugitive Dust Control Plan*.[218]  The final EIS concludes, and we agree, that these measures sufficiently reduce air emissions during construction of the projects and the additional advanced pollution controls are not necessary.

227.    EPA has also recommended that Rover follow the measures outlined by EPA to avoid, minimize, and mitigate methane emissions during operation of the Rover Pipeline Project.  However, as discussed in section 4.11.1.3 of the final EIS, no state or regional greenhouse gas emission reduction initiatives were identified or are applicable to any of the project's activities.[219]  Rover has committed to minimizing venting of natural gas during start-up, shut-down, and malfunctions using preventative maintenance and standard operating procedures.  Given the mitigation measures identified by Rover, the final EIS concludes, and we agree, that no additional measures are needed.

228.    EPA also recommends the use of trees and vegetation around compressor stations as a method of pollution reduction.  Staff has in fact recommended that Rover plant vegetation at compressor stations to provide visual screening which can also serve to absorb pollutants emitted at compressor stations as requested by EPA.

## l.    **Noise Impacts**

229.    Noise Sensitive Areas near the construction areas may experience an increase in perceptible noise, but the effect would be temporary and local.  Noise mitigation measures that will be employed during construction include the use of sound-muffling devices on engines and the installation of barriers between construction activity and Noise Sensitive Areas.  Generally, nighttime noise will not increase during construction with the exception of HDD activity.  Rover's proposed mitigation would attempt to reduce day-night sound levels ($L_{dn}$) from HDD activity to below 55 decibels on the A-weighted scale (dBA).  Environmental Condition 42 requires Rover to include HDD noise measurements in its construction status reports to verify that noise levels do not exceed 55 $L_{dn}$.  Based on modeled noise levels, mitigation measures proposed as well as those recommended by staff, and the temporary nature of construction, the final EIS concludes that the projects would not result in significant noise impacts on residents and the surrounding communities during construction.[220]

---

[218] Final EIS § 4.11.1.3.

[219] Final EIS at 4-243.

[220] Final EIS at 4-252.

Docket No. CP15-93-000, *et al.*                                                                   - 81 -

230.    The new compressor stations would generate noise on a continuous basis once operating.  Rover completed an analysis to identify the estimated noise impacts at the nearest Noise Sensitive Areas from the compressor stations and found that noise levels from each facility are projected to be below the Commission criterion of 55 dBA $L_{dn}$, and noise level increases would be undetectable at Noise Sensitive Areas for all compressor stations, except the Clarington Compressor Station.[221]  To ensure that the actual noise levels produced at the compressor stations do not result in significant impacts, Environmental Condition 43 in Appendix B to this order requires Rover to submit noise surveys once the compressor stations are placed in service and, if necessary, add noise mitigation until noise levels are below our acceptable thresholds.  Based on the analyses conducted, mitigation measures proposed, and the required noise surveys, we agree with the final EIS's conclusion that operation of the Rover Pipeline Project would not result in significant noise impacts on residents and the surrounding communities.[222]

231.    Karl Klement disagrees with the conclusion in the final EIS that turbines at compressor stations would not cause low frequency sound waves.  Mr. Klement states that no research data were provided in the final EIS to support this claim.  As discussed in section 4.11 of the final EIS, through the Commission's dispute resolution service helpline, we are aware that induced vibration, or a low frequency sound from pipelines, has occurred at a limited number of natural gas facilities in the over 300,000 miles of transmission pipeline in the United States.[223]  However, we are unaware of wide-scale cases of low frequency noise from natural gas transmission pipelines.  With hundreds of thousands of residents near natural gas pipelines, we have seen no system-wide evidence that natural gas pipelines are inducing noise effects on local residences.  This appears to be an isolated issue that we will continue to address when it arises through the dispute resolution service and landowner helpline.  While we acknowledge Mr. Klement's concerns, he has provided no evidence to support that there are effects from low frequency vibrations or that the Rover Pipeline Project is of particular concern.

**m.    Cumulative Impacts**

232.    The Council on Environmental Quality (CEQ) regulations define cumulative impacts as "the impact on the environment that results from the incremental impact of the

---

[221] Although the noise level increase at the Clarington Compressor Station would be perceptible, the station noise would be below 55 dBA $L_{dn}$.

[222] Final EIS at 4-257.

[223] Final EIS at 4-256.

Docket No. CP15-93-000, *et al.*                                          - 82 -

action when added to other past, present, and reasonably foreseeable future actions."[224]
A cumulative impacts analysis may require an analysis of actions unrelated to a proposed
project if they occur in the project area or region of influence of the project being
analyzed.[225] CEQ states that "it is not practical to analyze the cumulative effects of an
action on the universe; the list of environmental effects must focus on those that are truly
meaningful."[226] An agency is only required to include "such information as appears to be
reasonably necessary under the circumstances for evaluation of the project rather than to
be so all-encompassing in scope that the task of preparing it would become either
fruitless or well-nigh impossible."[227] The geographic scope of a pipeline project's
impacts varies depending on the resource being discussed. In establishing the geographic
scope of impacts for these projects, the final EIS included minor projects (e.g., residential
or small commercial development projects) within 0.25 mile of the proposed area for the
jurisdictional projects; major projects (e.g., large commercial, industrial, and energy
development, including natural gas well permitting projects) within 10 miles of the
project area; major projects within watersheds crossed by the projects; and projects with
potential to result in longer term impacts on air quality (e.g., natural gas pipeline
compressor stations) located within an Air Quality Control Region crossed by the
projects under consideration.[228]

233.    Throughout the environmental review process, we received comments on the
cumulative impacts associated with development of natural gas reserves in the Marcellus
and Utica Shales. Production and gathering activities are overseen by the affected
region's state and local agencies with jurisdiction over the management and extraction of
the Marcellus and Utica Shale gas resources. Development of these shale resources is
expected to continue in proximity to and during construction and operation of portions of
the Rover Pipeline Project in West Virginia, Pennsylvania, and Ohio. Although the final
EIS does not examine the impacts of Marcellus and Utica Shale upstream facilities to the
same extent as the proposed projects, the final EIS considered the general development of

---

[224] 40 C.F.R. § 1508.7 (2016).

[225] CEQ, *Considering Cumulative Effects Under the National Environmental
Policy Act* at 8 (January 1997) (1997 CEQ Guidance),
http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-
ConsidCumulEffects.pdf.

[226] *Id.* at 8.

[227] *Natural Res. Def. Council v. Calloway,* 524 F. 2d 79, 88 (2d. Cir. 1975).

[228] Final EIS at 4-273

Docket No. CP15-93-000, *et al.*                                                                    - 83 -

the Marcellus and Utica Shale in proximity to the projects within the context of cumulative impacts.[229]

234.    As discussed in the final EIS, most (but not all) cumulative impacts would be temporary and minor when considered in combination with past, present, and reasonably foreseeable activities.[230]  Some long-term cumulative impacts would occur on wetland and upland forested vegetation and associated wildlife habitats.  In particular, the final EIS identified that some short-term cumulative impacts would occur primarily in Monroe County, Ohio, where the Rover Pipeline Project and Columbia Gas Transmission, LLC's (Columbia) Leach XPress Project would construct two pipelines in the same non-exclusive easement.[231]  Adverse cumulative effects related to these two projects may occur on wetlands, water resources, vegetation, and soils, particularly if construction occurs concurrently or immediately preceding one another.  The final EIS acknowledges that both pipeline operators have committed to minimizing impacts through coordination of construction, but the final EIS was unable to assess the specifics of how these commitments would manifest into reduced impacts on the environment.[232]  Therefore, Environmental Condition 44 requires Rover to file a construction coordination plan that identifies measures that Rover and Columbia have agreed to implement during the construction of the parallel portions of their respective projects.

235.    The Switzerland Township submitted a letter on July 14, 2016, detailing the level of oil and gas infrastructure projects that already exist in the township and county.  The Township stated that previous infrastructure and development projects have resulted in destruction of historical buildings, increased traffic on small county roads, and damage to roads.  The Township does not challenge the final EIS's direct, indirect or cumulative impacts analysis.  Rather, the Township generally requests compensation.  As noted above, the Commission typically does not require or encourage applicants to participate in compensatory mitigation to groups, governments, or agencies.[233]  Mitigation measures

---

[229] Final EIS § 4.13.1.

[230] Final EIS at 4-293.

[231] Rover provided additional information in response to Environmental Recommendation 12 of the final EIS, which requires Rover to file as part of its *Implementation Plan* confirmation of the locations along the Seneca Lateral that would be collocated with Columbia's Leach XPress Project.

[232] Final EIS at 4-294.

[233] *See supra* P 192.

proposed or recommended in the final EIS's analysis target specific natural resources. As discussed in section 4.9 of the final EIS, Rover has developed several mitigation measures, as outlined in its *Residential and Traffic Mitigation Plan*, to minimize impacts on roadways and local traffic.[234] This would include restoration of all roadways damaged by construction or construction equipment/traffic to pre-construction conditions or better once construction is complete. Section 4.10 of the final EIS also provides a discussion of cultural resources identified in the area of the project and any necessary mitigation measures.

### n.    Property Access

236.    Mr. John Klotzle filed comments concerning Rover's ability to access his property as a result of the right-of-way easement. Mr. Klotzle is specifically concerned with the subsequent loss of recreation and the impact on his privacy. While Rover personnel will need to access the right-of-way during operation to assess the condition of the right-of-way and pipeline, and to conduct routine maintenance and as-needed repairs, Rover would contact the landowner at least 24 hours in advance to inform him that Rover personnel would be accessing the property. Additionally, as discussed in section 4.8.5 of the final EIS, recreational activities would not be impacted during operation of the project.[235] While certain activities may be prohibited on the right-of-way during construction, such as hunting and hiking, these activities will be allowed to resume once construction on the parcel is complete.

### o.    Pipeline Safety

237.    Several commenters raised issues regarding the safety of the proposed projects. Ms. Sherry Miller cited increased pipeline safety incidents over the last decade and requested that the Commission take Energy Transfer's[236] safety history into account during its decision. Mr. Terrance Lahr expressed concern that pipe for the Rover Pipeline Project is currently being stored at a stock yard, outside and uncovered.

238.    As discussed in the final EIS, the pipeline and aboveground facilities associated with the projects would be designed, constructed, operated, and maintained in accordance with or to exceed the U.S. Department of Transportation's Minimum Federal Safety

---

[234] Final EIS at 4-203.

[235] Final EIS at 4-179.

[236] As noted above, ET Rover, the majority interest owner, developer, and operator of the Rover Pipeline Project, is an affiliate of Energy Transfer.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 95 of 140

Standards.[237] These regulations, which are intended to protect the public and to prevent natural gas facility accidents and failures, include specifications for material selection and qualification; minimum design requirements; and protection of the pipeline from internal, external, and atmospheric corrosion. With respect to the comment regarding Energy Transfer's (Rover's parent company) safety record, neither Ms. Miller nor any of the other commenters provide any evidence of safety violations by any of Energy Transfer's Commission-jurisdictional pipeline subsidiaries. If there were any violations, they would be addressed by the U.S. Department of Transportation or its state agency partners.[238] The final EIS discloses aggregate pipeline accident data, including those in states crossed by the Rover Pipeline Project, finding that the minimal number of incidents distributed over more than 300,000 miles of natural gas transmission pipelines indicates a low risk for an incident at any given location.[239]

239.    EPA requests that the emergency response plan be filed as part of this order. However, as discussed in the final EIS, Rover would prepare an emergency response plan pursuant to the U.S. Department of Transportation's regulations.[240] The Commission does not review the plan or consider it as part of its decision making. To view the plan, the public should contact the U.S. Department of Transportation.

240.    EPA also recommends that the project proponents contact the EPA Remedial Project Manager regarding any updated information concerning the Reilly Tar Superfund site, which is in close proximity to the Dover Contractor Yard. Commission staff has contacted EPA staff for an update, and no new information has been received to date regarding this site.

241.    Last, Ms. Miller raised concerns about the proximity of the Rover Pipeline Project to the Countrywide Landfill and Bolivar Dam near Mainline A and B milepost 39, particularly in regards to safety in the event of a pipeline incident. While the pipeline does cross within the boundaries of the Countrywide Landfill parcel, it would not cross the landfill itself. No known sites of contaminated soil or hazardous materials were identified in the Rover Pipeline Project area near the site. As discussed in section 4.2.2.7 of the final EIS, if contaminated soil is encountered during construction, Rover will stop work, vacate the area, and notify its Chief Inspector to inform regulatory agencies, as

---

[237] 49 C.F.R. pt. 192 (2016).

[238] Final EIS at 4-258.

[239] Final EIS at 4-271.

[240] Final EIS at ES-10.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 96 of 140

appropriate.[241] With respect to the Bolivar Dam, it is located 1.3 miles from the project. In the event of a pipeline incident, damage to the dam would be unlikely given the distance from the Rover Pipeline Project area.

### p.   Cultural Resources

242.  As discussed in the final EIS, Rover conducted cultural resources field surveys for both archaeological and architectural resources. At the time of the issuance of the final EIS, archaeological surveys in West Virginia, Ohio, and Michigan, as well as architectural surveys in Ohio were still ongoing. The final EIS noted that once cultural resources surveys and eligibility evaluations were complete, a treatment plan would be prepared for any historic properties adversely affected by the project. Rover has submitted additional cultural resources survey reports since the issuance of the final EIS. Because staff review of these reports is still ongoing, Rover must satisfy Environmental Condition 40 in Appendix B to this order, which requires that Rover not begin construction until staff has determined that all reports have been submitted, reviewed the eligibility of resources, and resolved any adverse effects.

243.  Ms. Sherry Miller states that she is concerned that Rover would construct its pipeline through a cemetery that is located on nearby property. Ms. Miller made similar statements regarding the neighboring parcel during the draft EIS comment period. As discussed in appendix T of the final EIS, Rover has stated that the Rover Pipeline Project would not impact or cross the cemetery identified by the Ms. Miller. We note here that this order approves the pipeline route as proposed by Rover in its application and supplements, except for locations where we have dictated specific changes. Rover must adhere to these requirements and may not modify its route without first seeking additional approval from the Commission. Additionally, if human remains are discovered during construction of the Rover Pipeline Project, Rover would follow the measures outlined in its *Procedures Guiding the Discovery of Unanticipated Cultural Resources and Human Remains*. These procedures state that "Rover will treat any human remains encountered during the Rover Pipeline Project in a manner guided by the [Advisory Council on Historic Preservation's] Policy Statement Regarding Treatment of Burial Sites, Human Remains, and Funerary Objects (2007) and by the relevant state laws and guidelines."

244.  After the issuance of the final EIS, Commission staff became aware that Rover, acting independently, purchased and knowingly demolished an 1843 historic federal house known as the Stoneman House. The Stoneman House, as discussed in the final EIS, was located in Dennison, Ohio, across the street from Rover's proposed mainline

---

[241] Final EIS at 4-45.

USCA Case #18-1032   Document #1715763   Filed: 01/29/2018   Page 97 of 140

Compressor Station 1. Early-on during the pre-filing process, the house was identified as eligible for listing in the National Register of Historic Places and within the visual area of potential effects of the project. Accordingly, staff recommended that Rover mitigate the adverse effects of the compressor station and Rover committed to developing a solution that would avoid the adverse effect on this structure.

245.    Section 110(k) of the National Historic Preservation Act (NHPA) states that "[e]ach Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section [106 of the NHPA], has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur, unless the agency, after consultation with the [Advisory] Council, determines that circumstances justify granting the assistance despite the adverse effect created or permitted by the applicant."[242]

246.    Because the house was demolished with no forewarning to the Commission, staff determined that Rover had intentionally and adversely affected the historic property. Pursuant to section 110(k) of the NHPA and the Advisory Council on Historic Preservation's (ACHP) implementing regulations,[243] on November 16 and December 5, 2016, Commission staff notified the ACHP and requested its opinion on the matter. On December 16, 2016, the ACHP responded stating that it did not object to the Commission's continued review of Rover's project under section 110(k) of the NHPA. In continuing our review of this project, the ACHP urged the Commission to consider the appropriateness of making a determination of adverse effect for the undertaking, recognizing the damage to the Stoneman House. We agree that the effects on the Stoneman House were adverse.

247.    Under the regulations implementing section 106 of the NHPA,[244] Commission staff must consult with the State Historic Preservation Officer (SHPO) and other consulting parties to resolve the adverse effect to the Stoneman House prior to any construction activity. Staff will continue to consult with the Ohio SHPO, Rover, and the ACHP (as appropriate) to complete the section 106 process, and determine if additional mitigation measures to offset the adverse effect are appropriate. This consultation may conclude in the execution of an agreement document among the Commission, the Ohio

---

[242] 54 U.S.C. § 306113 (2012), Pub. L. No. 113-287, 128 Stat. 3188 (2014). The National Historic Preservation Act was recodified in Title 54 in December 2014.

[243] 36 C.F.R. § 800.9(c)(2) (2016).

[244] 36 C.F.R. § 800.6.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 98 of 140

SHPO, Rover, and the ACHP (if participating). We will defer to ongoing consultations by Commission staff to develop any appropriate mitigation measures. Because the adverse effects to the Stoneman House requires additional consultation by Commission staff, we have also added Environmental Condition 41, which states that construction of project facilities may not begin until staff concludes its resolution of adverse effects as they relate to the Stoneman House.

248.   While we acknowledge Rover's independent efforts to offset the impacts to the Stoneman House,[245] we do not take lightly our consideration of this issue. Rover's commitments made as part of an application or supplements such as environmental mitigation and minimization measures are the basis for determining the degree to which the applicant has taken real and meaningful steps to offset its project impacts. This is the most basic application of our established policy under the Certificate Policy Statement.

249.   Our review of the record for this project shows that Commission staff identified the Stoneman House as an issue of concern early-on during the pre-filing process. Seemingly acknowledging this, Rover committed to developing a solution that would avoid the adverse effect on this structure.[246] Nonetheless, despite staff's concern, Rover's commitment, and staff's recommendations in the final EIS, Rover demolished the structure with no prior notice or forewarning.[247] Therefore, in addition to the continued consultation required under the NHPA, we have referred this matter to the Office of Enforcement, for further investigation and action, as appropriate.

250.   Commenters have also raised a variety of additional concerns as related to the Stoneman House. The Daniel Trust, Ms. Sherry Miller, and Ms. Shirley Robinson cite ongoing activities related to the Dakota Access Pipeline, a project by Rover's parent. The commenters generally allege that the controversy surrounding the Dakota Access Pipeline demonstrates Rover's wrongdoing here. Ms. Miller also requests the

---

[245] Rover has independently agreed to provide the Ohio SHPO with compensatory mitigation funding to support activities agreed upon by the Ohio SHPO and Rover. On December 12, 2016, the Ohio SHPO acknowledged that it had received funding provided by Rover and committed to use the funds for activities with a "visible and tangible public benefit."

[246] Final EIS at 4-218.

[247] Rover did not even notify the Commission of its purchase of the Stoneman House; in fact, subsequent to the purchase, Rover filed a landowner list which listed the Stoneman House's prior owners.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 99 of 140

Commission hold additional public hearings to solicit comments and argues that the Commission should deny Rover's certificate because of this action.

251.    The Commission is not involved with the siting of the Dakota Access Pipeline and does not consider the affiliated company's engagement in other projects as part of our decision-making process. With respect to additional hearings, in addition to the ongoing investigative efforts of our Office of Enforcement, Commission staff will conduct additional consultations with relevant parties to conclude our consultation under Section 106 of the NHPA. Moreover, because the scope of Rover's project has not changed, additional public comment meetings are not required.

252.    Although section 110(k) permits the denial of a certificate, denial is not required if the Commission determines, after consultation with the ACHP, that circumstances justify granting the certificate despite the adverse effect. In our December 5, 2016 letter, Commission staff explained that the purpose and need for the project – the construction of facilities that would allow the transportation of up to 3.25 billion cubic feet of natural gas from points in Pennsylvania, West Virginia, and Ohio to the interstate pipeline grid and to markets in the Gulf Coast, Midwest, and Canada, providing gas consumers with access to readily-available, stable, and competitively-priced gas supplies– justified continuing review, to allow the Commission to address the public interest issues raised by the proposed project. As we have explained above, the record demonstrates that the Rover Pipeline Project would provide benefits throughout the natural gas sector and that the project is needed. Under these circumstances, we find that granting Rover a certificate for its project is justified despite the adverse impact on the Stoneman House.

253.    As part of its application, Rover has requested a Part 157, Subpart F blanket certificate. Such a certificate allows a natural gas company to undertake an extensive array of routine activities without the need to obtain a case-specific certificate for each individual undertaking. While the blanket certificate program provides an administratively efficient means to enable a company to construct, modify, acquire, operate, and abandon certain natural gas facilities, the program operates to protect the public interest only because each activity undertaken pursuant thereto is required to comply with constraints on costs and environmental impacts set forth in the Commission's regulations. Because this program allows natural gas companies to undertake certain construction activities, in some cases without even prior notice to the Commission, it depends on the Commission's confidence that a natural gas company will not act contrary to the Commission's regulations and other environmental statutes.

254.    Rover's intentional demolition of the Stoneman House raises the question of whether Rover would fully comply with our environmental regulations in future construction activities under a blanket certificate. Therefore, we deny Rover's request for a blanket certificate. In consequence, Commission staff will be able to fully analyze the environmental impacts of Rover's construction that would otherwise occur pursuant to a blanket certificate, prior to the company's being authorized to proceed, thus ensuring that

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 100 of 140

all construction activities by Rover comply with our environmental regulations. Rover may reapply for a blanket certificate after 18 months of full commercial operation. If Rover files such an application, the Commission will consider Rover's history of environmental compliance, including compliance with the Environmental Conditions in this order, in determining whether to grant its request.

### q. Indirect Impacts

255.    Several commenters request that the Commission analyze the environmental impacts associated with the upstream production and downstream combustion of the natural gas to be transported by the projects. EPA cites CEQ's *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews* issued on August 1, 2016 (2016 GHG Guidance),[248] noting that the final guidance document states that agencies should consider reasonably foreseeable direct and indirect emissions when analyzing a proposed action. CEQ's final guidance was issued after issuance of the final EIS. CEQ's final guidance recognizes this potential issue, recommending that the final guidance apply "to all new proposed agency actions when a NEPA review is initiated" and that "[a]gencies should exercise judgment when considering whether to apply this guidance to the extent practicable to an on-going NEPA process."[249] CEQ's final guidance document also emphasizes that "this guidance is not a rule or regulation, and the recommendations it contains may not apply to a particular situation based upon the individual facts and circumstances," and "agencies should provide the public and decision makers with explanations of the basis for agency determinations."[250]

256.    CEQ's regulations direct federal agencies to examine the indirect impacts of proposed actions.[251] Indirect impacts are defined as those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."[252] Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate,

---

[248] 2016 GHG Guidance.

[249] *Id.* at 33.

[250] *Id.* at 1-2.

[251] *See* 40 C.F.R. § 1508.25(c) (2016).

[252] *Id.* § 1508.8(b).

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 101 of 140

and related effects on air and water and other natural systems, including ecosystems."[253] Accordingly, to determine whether an impact should be studied as an indirect impact, the Commission must determine whether it: (1) is caused by the proposed action; and (2) is reasonably foreseeable.

257.    With respect to causation, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause"[254] in order "to make an agency responsible for a particular effect under NEPA."[255] As the Supreme Court explained, "a 'but for' causal relationship is insufficient [to establish cause for purposes of NEPA]."[256] Thus, "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation," will not fall within NEPA if the causal chain is too attenuated.[257] Further, the Court has stated that "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect."[258]

258.    An effect is "reasonably foreseeable" if it is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."[259] NEPA

---

[253] *Id.*

[254] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 at 767 (2004) (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).

[255] *Id.*

[256] *Id.; see also Sierra Club v. FERC*, 827 F.3d 36, 46 (D.C. Cir. 2016) (Freeport LNG) (FERC need not examine everything that could conceivably be a but-for cause of the project at issue); *Sierra Club v. FERC*, 827 F.3d 59, 68 (D.C. Cir. 2016) (Sabine Pass LNG) (FERC order authorizing construction of liquefied natural gas export facilities "are not the legally relevant cause" of increased production of natural gas).

[257] *Metro. Edison Co.*, 460 U.S. at 774.

[258] *Pub. Citizen*, 541 U.S. at 770; *see also* Freeport LNG, 827 F.3d at 47 (affirming that *Public Citizen* is explicit that FERC, in authorizing liquefied natural gas facilities, need not consider effects, including induced production, that could only occur after intervening action by the Department of Energy); Sabine Pass LNG, 827 F.3d at 68 (same); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 956 (D.C. Cir. 2016) (same).

[259] *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). *See also City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 102 of 140

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 103 of 140

requires "reasonable forecasting," but an agency is not required "to engage in speculative analysis" or "to do the impractical, if not enough information is available to permit meaningful consideration."[260]

259.   The Commission does not have jurisdiction over natural gas production.  The potential impacts of natural gas production, with the exception of greenhouse gas emissions and climate change, would be on a local and regional level.  Each locale includes unique conditions and environmental resources.  Production activities are thus regulated at a state and local level.  In addition, certain activities are subject to federal regulation.  For example, deep underground injection and disposal of wastewaters and liquids are subject to regulation by the EPA under the Safe Drinking Water Act.  The EPA also regulates air emissions under the Clean Air Act.  On public lands, federal agencies are responsible for the enforcement of regulations that apply to natural gas wells.

260.   We have previously concluded in natural gas infrastructure proceedings, based on the specifics of the project being proposed in each proceeding, that the environmental effects resulting from natural gas production are generally neither sufficiently causally related to specific natural gas infrastructure projects nor are the potential impacts from gas production reasonably foreseeable such that the Commission could undertake a meaningful analysis that would aid our determination.[261]  A causal relationship sufficient to warrant Commission analysis of the upstream production activity as an indirect impact would only exist if a proposed pipeline or Commission-jurisdictional infrastructure project would transport new production from a specified production area and such production would not occur in the absence of the proposed project facilities (i.e., there will be no other way to move the gas).[262]  To date, the Commission has not been

---

[260] *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011).

[261] *See, e.g., Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121, at PP 81-101 (2011), *order on reh'g*, 138 FERC ¶ 61,104, at PP 33-49 (2012), *petition for review dismissed sub nom., Coal. for Responsible Growth v. FERC*, 485 Fed. Appx. 472, 474-75 (2012) (unpublished opinion).

[262] *Cf. Sylvester v. U.S. Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir. 1989) (upholding the environmental review of a golf course that excluded the impacts of an adjoining resort complex project). *See also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 580 (9th Cir. 1998) (concluding that increased air traffic resulting from airport plan was not an indirect, "growth-inducing" impact); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) (acknowledging that existing

(continued...)

USCA Case #18-1032          Document #1715763          Filed: 01/29/2018          Page 104 of 140

presented with a proposed pipeline project that the record shows will cause the predictable development of gas reserves. In fact, the opposite causal relationship is more likely, i.e., once production begins in an area, shippers or end users will support the development of a pipeline to move the proposed gas.

261.    Even accepting, *arguendo*, that a specific pipeline project will cause natural gas production, to date, we have found that the potential environmental impacts resulting from such production are not reasonably foreseeable. As we have explained, generally there is not sufficient information available to determine the origin of the gas that will be transported. It is the states, rather than the Commission, that have jurisdiction over the production of natural gas and thus would be most likely to have the information necessary to reasonably foresee future production. We are aware of no such forecasts by the states or other entities, rendering the Commission unable to meaningfully predict production-related impacts, many of which are highly localized. Thus, even if the Commission knows the general source area of gas likely to be transported on a given pipeline, a meaningful analysis of production impacts would require more detailed information regarding the number, location, and timing of wells, roads, gathering lines, and other appurtenant facilities, as well as details about production methods, which can vary per producer and depending on the applicable regulations in the various states. Accordingly, to date, the impacts of natural gas production are not reasonably foreseeable because they are "so nebulous" that we "cannot forecast [their] likely effects" in the context of an environmental analysis of the impacts related to construction and modification of natural gas pipeline facilities.[263]

262.    Nonetheless, we note that, although not required by NEPA, a number of federal agencies have examined the potential environmental issues associated with unconventional natural gas production in order to provide the public with a more complete understanding of the potential impacts. DOE has concluded that such production, when conforming to regulatory requirements, implementing best management practices, and administering pollution prevention concepts, may have temporary, minor impacts to water resources.[264] EPA has concluded that hydraulic

---

development led to planned freeway, rather than the reverse, notwithstanding the project's potential to induce additional development).

[263] *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010) (agency need not discuss projects too speculative for meaningful discussion).

[264] U.S. Department of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas From The United States* (Aug. 2014) (DOE Addendum), http://energy.gov/sites/prod/files/2014/08/f18/Addendum.pdf.

fracturing can impact drinking water resources under some circumstances and identified conditions under which impacts from hydraulic fracturing activities can be more frequent or severe.[265]  With respect to air quality, DOE found that natural gas development leads to both short- and long-term increases in local and regional air emissions.[266]  It also found that such emissions may contribute to climate change.[267]  But to the extent that natural gas production replaces the use of other carbon-based energy sources, DOE found that there may be a net positive impact in terms of climate change.[268]

### i.      Causation

263.    The record in this proceeding does not demonstrate the requisite reasonably close causal relationship between the Rover Pipeline Project and Trunkline and Panhandle Backhaul Projects and the impacts of future natural gas production to necessitate further analysis.  The fact that natural gas production and transportation facilities are all components of the general supply chain required to bring domestic natural gas to market is not in dispute.  This does not mean, however, that the Commission's approval of these particular pipeline projects will cause or induce the effect of additional or further shale gas production.  The proposed projects are responding to the need for transportation, not creating it.

264.    Furthermore, arguments raised by commenters about the Rover Pipeline Project inducing natural gas production are similar to the arguments that were raised and rejected by both the Commission and Second Circuit Court of Appeals in *Central New York Oil*

---

[265] *See* U.S. EPA, *Hydraulic Fracturing for Oil and Gas:  Impacts from the Hydraulic Fracturing Water Cycle on Drinking Water Resources in the United States*, at ES3-4 (Dec. 2016) (final report), http://ofmpub.epa.gov/eims/eimscomm.getfile?p_download_id=529930 (finding significant data gaps and uncertainties in the available data prevented EPA from calculating or estimating the national frequency of impacts on drinking water resources from activities in the hydraulic fracturing water cycle).  *See also Oil and Gas; Hydraulic Fracturing on Federal and Indian Lands*, 80 Fed. Reg. 16,128, 16,130 (Mar. 26, 2015) (BLM promulgated regulations for hydraulic fracturing on federal and Indian lands to "provide significant benefits to all Americans by avoiding potential damages to water quality, the environment, and public health").

[266] DOE Addendum at 32.

[267] *Id*. at 44.

[268] *Id.*

*and Gas Co., LLC.*[269]  In that case, the Commission concluded, and the Second Circuit agreed, that under NEPA, Marcellus shale development activities are not sufficiently causally-related to the project to warrant in-depth consideration of the gas production impacts because, in part, Marcellus shale development activities were not "an essential predicate" for the project.[270]

265.    Similarly here, the Commission has not found any evidence that future gas development is an essential predicate for the projects.  Moreover, whether or how much *induced* gas will travel through the projects cannot be known given that a significant amount of unconventional natural gas production currently exists.[271]  Commenters fail to identify any new production specifically associated with the proposed projects.

266.    As we have explained in other proceedings, a number of factors, such as domestic natural gas prices and production costs drive new drilling.[272]  If the proposed projects

---

[269] *Central New York Oil and Gas Co., LLC*, 137 FERC ¶ 61,121 (2011), *order on reh'g*, 138 FERC ¶ 61,104 (2012), *pet. for review dismissed sub nom. Coal. for Responsible Growth v. FERC*, 485 Fed. App'x 472 (2d Cir. 2012).

[270] *Cent. N.Y. Oil & Gas Co., LLC*, 137 FERC ¶ 61,121 at P 91; *Coal. for Responsible Growth*, 485 F. App'x at 474 ("FERC reasonably concluded that the impacts of that [shale gas] development are not sufficiently causally-related to the project to warrant a more in-depth [NEPA] analysis").

[271] For example, in 2014, unconventional natural gas production in Pennsylvania was approximately 11.15 Bcf per day.  Penn. Dep't of Envtl. Prot., *2014 Oil and Gas Annual Report* at 7 fig. (July 2015), http://www.portal.state.pa.us/portal/server.pt/community/annual_report/21786 (aggregate 2014 unconventional production divided by 365 days yields 11.15 billion cubic feet per day).

[272] *See e.g., Rockies Express Pipeline LLC*, 150 FERC ¶ 61,161, at P 39 (2015) (*Rockies Express*).  *See also Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1045 (D. Minn. 2010) (holding that the U.S. Department of State, in its environmental analysis for an oil pipeline permit, properly decided not to assess the transboundary impacts associated with oil production because, among other things, oil production is driven by oil prices, concerns surrounding the global supply of oil, market potential, and cost of production); *Florida Wildlife Fed'n v. Goldschmidt*, 506 F. Supp. 350, 375 (S.D. Fla. 1981) (ruling that an agency properly considered indirect impacts when market demand, not a highway, would induce development).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 106 of 140

were not constructed, it is reasonable to assume that any new production spurred by such factors would reach intended markets through alternate pipelines or other modes of transportation.[273] Again, any such production would take place pursuant to the regulatory authority of state and local governments.

## ii. Reasonable Foreseeability

267. In addition, even if a causal relationship between our action here and additional production were presumed, the scope of the impacts from any such induced production in this case is not reasonably foreseeable. Knowing the identity of the producer of gas to be shipped on a pipeline, and the general area where that producer's existing wells are located, does not alter the fact that the number of and precise location of any additional wells cannot be identified in this proceeding. As we have explained previously, factors such as market prices and production costs, among others, drive new drilling.[274] These factors, combined with the immense size of the Marcellus and Utica shale formations and the highly localized impacts of production would result in general estimates. Thus, a broad analysis, based on generalized assumptions will not meaningfully assist the Commission in its decision making, e.g. evaluating potential alternatives. Thus, unless the Commission can ascertain specific factual information regarding the nature of the induced production, such induced production is not reasonably foreseeable.

268. We acknowledge that CEQ's final guidance includes the end use combustion of coal as an example of an indirect emission from coal production. However, that example also notes that the indirect effects of an action would vary with the circumstances of the proposed action. The final EIS explains that the upstream production and downstream combustion of gas is not causally connected because the production and end-use would occur with or without these specific projects. Therefore, the circumstances in this case do not warrant the inclusion of production or end-use as an indirect effect of the projects. Although EPA disagrees with this justification, this explanation does meet CEQ's final guidance in considering specific project circumstances and explaining the basis for the analysis that was performed. Further, beyond a generic recommendation that we include upstream and end-use emission in our NEPA document, EPA provides no information to refute our justification that these emissions are not causally connected.

269. Sierra Club argues that Rover's statement that "producer-shippers have made major capital investments and have committed to production and delivery schedules on

---

[273] *Rockies Express*, 150 FERC ¶ 61,161 at P 39.

[274] *Dominion Transmission, Inc.*, 153 FERC ¶ 61,284 (2015).

the basis of Rover's projected in-service dates"[275] demonstrates that production impacts are both caused by the project and reasonably foreseeable. We disagree. Rather than implying that the Rover project induced additional production of natural gas, this statement merely acknowledges that Rover's shippers have committed to provide natural gas to markets through its use of the Rover project. It does not distinguish between existing production that may be currently shut-in and new production. Further, it does not support a conclusion that if Rover's project were not available, the producers would not seek alternative projects and transportation options to ensure that their production reaches the market.

270.    As noted above, upstream and downstream impacts of the type described by commenters do not meet the CEQ definition of indirect impacts. Therefore, they are not mandated as part of the Commission's NEPA review. However, to provide the public additional information and to inform our public convenience and necessity determination under section 7(c) of the NGA,[276] Commission staff, after reviewing publicly-available DOE and EPA methodologies, has prepared the following analyses regarding the potential impacts associated with unconventional gas production and downstream combustion of natural gas. As summarized below, these analyses provide only an upper-bound estimate of upstream and downstream effects. In addition, these estimates are generic in nature because no specific end uses have been identified and reflect a significant amount of uncertainty.

271.    With respect to upstream impacts, Commission staff estimated the impacts associated with the production wells that would be required to provide 100 percent of the volume of natural gas to be transported by the projects, on an annual basis for greenhouse gases (GHG), and for the life of the project for land-use and water use within the Marcellus shale basin.[277] According to a 2016 study by DOE and National Energy Technology Laboratory (NETL), approximately 1.48 acres of land is required for each natural gas well pad and associated infrastructure (road infrastructure, water impoundments, and pipelines).[278] Based upon the project capacity and the expected

---

[275] Rover December 16, 2016 Request for Immediate Commission Action.

[276] 15 U.S.C. § 717f(c) (2012).

[277] Staff assumed a 30-year life for the project.

[278] Dep't of Energy and Nat'l Energy Tech. Laboratory, *Life Cycle Analysis of Natural Gas Extraction and Power Generation*, DOE/NETL-2015/1714, at 22, Table 3-6 (August 30, 2016) (2016 DOE/NETL Study).

USCA Case #18-1032      Document #1715763            Filed: 01/29/2018      Page 108 of 140

estimated ultimate recovery of Marcellus shale wells,[279] between 4,656 and 9,125 wells would be required to provide the gas over the estimated 30-year lifespan of the project. Therefore, on a normalized basis over the life of the project,[280] these assumptions lead us to estimate an upper bound between 230 and 450 additional acres per year may be impacted for well drilling.[281] This estimate of the number of wells is imprecise and subject to a significant amount of uncertainty.

272.    We also estimated the amount of water required for the drilling and development of these wells over the 30-year period using the same assumptions. The 2014 DOE/NETL Study finds that an average Marcellus shale well requires between 3.88 and 5.69 million gallons of water for drilling and well development, depending on whether the producer uses a recycling process in the well development.[282] Therefore, the production of wells required to supply the project could require as much as 602 million to 1.7 billion gallons of water per year on a normalized basis over the 30 year life of the project.

273.    With respect to impacts from GHGs, the final EIS discusses the direct GHG impacts from construction and operation of the projects and other projects that were considered in the Cumulative Impacts analysis, the climate change impacts in the region, and the regulatory structure for GHGs under the Clean Air Act. The final EIS also quantifies GHG emissions from the projects construction (369,790 metric tons, $CO_2$-equivalent [metric tpy $CO_{2e}$]) and operation (807,092 metric tpy $CO_{2e}$).[283] The final EIS does not include upstream emissions; however, we have conservatively estimated the

---

[279] U.S. Energy Info. Admin., *The Growth of U.S. Natural Gas: An Uncertain Outlook for U.S. and World Supply* (June 15, 2015), http://www.eia.gov/conference/2015/pdf/presentations/staub.pdf; Dep't of Energy and Nat'l Energy Tech. Laboratory, *Environmental Impacts of Unconventional Natural Gas Development and Production*, DOE/NETL-2014/1651, (May 29, 2014) (2014 DOE/NETL Study).

[280] Normalized yearly impacts are estimated based on the overall impacts for the life of the project averaged on a per year basis.

[281] The 2016 DOE/NETL Study estimates the land-use fractions of the Appalachian Shale region to be 72.3 percent forested lands, 22.4 percent agricultural land, and 5.3 percent grass or open lands. 2016 DOE/NETL Study at 24, Table 3-8.

[282] 2014 DOE/NETL Study at 76, Exhibit 4-1.

[283] Final EIS at 4-238 and 4-227 to 4-231.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 109 of 140

upstream GHG emissions have an upper bound of: 2.7 million metric tpy $CO_{2e}$ from extraction, 5.1 million metric tpy $CO_{2e}$ from processing, and 1.6 million metric tpy $CO_{2e}$ from the non-project upstream pipelines.[284]  Again, this is an upper-bound estimate that involves a significant amount of uncertainty.

274.    With respect to downstream GHG emissions, Commission staff used an EPA-developed methodology to estimate the downstream GHG emissions from a project, assuming all of the gas to be transported is eventually combusted.  The Rover Pipeline Project is designed to deliver up to 3.25 billion cubic feet per day of overall volumes, which can produce approximately 69,400,000 metric tpy $CO_{2e}$ from end-use combustion.[285]  We note that this estimate represents an upper bound for the amount of end-use combustion that could result from the gas transported by this project.  This is because some of the gas may displace other fuels, which could actually lower total $CO_{2e}$ emissions.  It may also displace gas that otherwise would be transported via different means, resulting in no change in $CO_{2e}$ emissions.  This estimate also assumes the maximum capacity is transported 365 days per year, which is rarely the case because many projects are designed for peak use.  Therefore, it is unlikely that this total amount of GHG emissions would occur, and emissions are likely to be significantly lower than the above estimate.

275.    On August 8, 2016, Oil Change International[286] filed comments, consisting of one paragraph and an attached 32-page report, in 11 pipeline certificate proceedings,

---

[284] The upstream GHG emissions were estimated using the methodology in a 2014 study conducted by DOE and NETL. Dep't of Energy and Nat'l Energy Tech. Laboratory, *Life Cycle Analysis of Natural Gas Extraction and Power Generation*, DOE/NETL-2014/1646, (May 29, 2014).  Generally, the average leak and emission rates identified in the analysis for each segment of extraction, processing, and transport were used.  The method is outlined in Section 2 of the DOE/NETL Study, and the background data used for the model is outlined in Section 3.1.  GHG emission estimates were based on the results identified in Tables 4.3, 4.4, and 4.5.  New NSPS Oil & Gas rules or other GHG mitigation was not accounted for.  Additionally, the length of non-project pipeline prior to the gas reaching project components was conservatively estimated.

[285] Estimated using EPA's GHG Equivalencies Calculator - Calculations and References *available at* https://www.epa.gov/energy/ghg-equivalencies-calculator-calculations-and-references.

[286] Oil Change International filed comments on behalf of the Sierra Club, Earthworks, Appalachian Voices, Chesapeake Climate Action, 350.org, Bold Alliance, Environmental Action, Blue Ridge Environmental Defense League, Protect Our Water, Heritage and Rights (Virginia & West Virginia), Friends of Water, Mountain Lakes

(continued...)

including this proceeding. Oil Change International asserts that there should be a climate test for all natural gas infrastructure, that, in light of CEQ's 2016 GHG Guidance, "the alignment of natural gas infrastructure permitting with national climate goals and plans should become a priority for FERC and other federal government agencies," and that the Commission should "conduct full Greenhouse Gas impact analysis as part of the NEPA process for all listed projects."[287] The report asserts generally that increased U.S. natural gas production in the Appalachian Basin is not consistent with safe climate goals, and that proposed pipeline projects will increase takeaway capacity from the basin and provide financial incentives for increased production.

276. The comments and the report provide no specific information about the Rover Pipeline Project (or any of the other listed projects). Accordingly, this material does not assist us in our analysis of the projects. As discussed above, we indeed do analyze the greenhouse gas impacts of proposed projects as part of our NEPA and NGA review.

277. As to the more global issues raised by Oil Change International, while the Commission does not utilize a specific "climate test," we do examine the impacts of the projects before us, including impacts on climate change. Under NEPA, we are required to take a "hard look" at the environmental impacts of the proposed project and we have done so. To the extent that Oil Change International suggests an alignment of project permitting with national climate change goals, we note that it is for Congress, the Executive Branch, and agencies with jurisdiction over broad environmental issues to establish such goals; our role under the NGA is considerably more limited, and we have no authority to establish national environmental policy.

### r.   **Climate Change**

278. EPA requests that we remove the comparison, as a frame of reference, of the projects' GHG emissions with state-wide GHG emission levels. EPA argues that although this type of comparison was included in the CEQ's draft guidance document,[288] it has been removed from the CEQ's final guidance document.[289] Although this

---

Preservation Alliance, Sierra Club West Virginia, and Sierra Club Virginia.

[287] Oil Change International August 8, 2016 comments at 1.

[288] CEQ, *Revised Draft Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in NEPA Reviews* (December 2014).

[289] CEQ, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National*

(continued...)

comparison was removed as a recommendation in the CEQ final guidance document, that guidance does not indicate that an EIS cannot include such information. We find that providing this frame of reference helps to better understand the magnitude of GHG emissions. Further, the final EIS includes a discussion of climate change impacts in section 4.13.6.10, identifies that the projects will contribute GHG emissions and the climate change impacts occurring in the projects' region, and notes the projects' consistency with climate goals in the Midwest.[290]

### 3.   Environmental Analysis Conclusion

279.   We have reviewed the information and analysis contained in the final EIS regarding potential environmental effects of the Rover Pipeline, Panhandle Backhaul, and Trunkline Backhaul Projects. Based on our consideration of this information and the discussion above, we agree with the conclusions presented in the final EIS and find that the projects, if constructed and operated as described in the final EIS, are environmentally acceptable actions. We are accepting the environmental recommendations in the final EIS as modified herein, and are including them as conditions in Appendix B to this order.

280.   Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this order. The Commission encourages cooperation between interstate pipelines and local authorities. However, this does not mean that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[291]

---

*Environmental Policy Act Reviews* (August 1, 2016) (2016 GHG Guidance).

[290] Final EIS at 4-291 through 4-292.

[291] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted) and *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 112 of 140

281.   The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the applications, and exhibits thereto, and all comments and upon consideration of the record,

The Commission orders:

(A)    A certificate of public convenience and necessity is issued authorizing Rover to construct and operate the Rover Pipeline Project, as described in this order and in the application in Docket Nos. CP15-93-000 and CP15-93-001.

(B)    Rover's request for a blanket construction certificate under Subpart F of Part 157 of the Commission's regulations is denied.

(C)    A blanket transportation certificate is issued to Rover under Subpart G of Part 284 of the Commission's regulations.

(D)    A certificate of public convenience and necessity is issued authorizing Panhandle to construct and operate the Panhandle Backhaul Project, as described in this order and in the application in Docket No. CP15-94-000.

(E)    A certificate of public convenience and necessity is issued authorizing Trunkline to construct and operate the Trunkline Backhaul Project, described in this order and in the application in Docket No. CP15-96-000.

(F)    The certificate authority issued in Ordering Paragraphs (A), (D), and (E) shall be conditioned on the following:

> (1) Applicants' completion of the authorized construction of the proposed facilities and making them available for service within three years from the date of this order,  pursuant to section 157.20(b) of the Commission's regulations;

> (2) Applicants' compliance with all applicable Commission regulations under the NGA including, but not limited to, Parts 154 and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the regulations;

> (3) Applicants' compliance with the environmental conditions listed in Appendix B to this order.

(G)    Rover, Panhandle, and Trunkline must execute firm contracts equal to the level of service and in accordance with the terms of service represented in their precedent agreements prior to commencement of construction.

(H)    Rover's initial rates and tariff are approved, as conditioned and modified above.

(I)    Rover is required to file actual tariff records reflecting the initial rates and tariff that comply with the requirements contained in the body of this order not less than 30 days and not more than 60 days prior to the commencement of interstate service consistent with Part 154 of the Commission's regulations.

(J)    As described in this order, not less than 30 days and not more than 60 days prior to commencement of service of the proposed facilities, Rover must file an executed copy of the non-conforming agreements reflecting the non-conforming language and a tariff record identifying these agreements as non-conforming agreements consistent with section 154.112 of the Commission's regulations.

(K)    Within three years after its in-service date, as discussed herein, Rover must make a filing to justify its existing cost-based firm and interruptible recourse rates. Rover's cost and revenue study should be filed through the eTariff portal using a Type of Filing Code 580. In addition, Rover is advised to include as part of the eFiling description, a reference to Docket Nos. CP15-93-000 and CP15-93-001 and the cost and revenue study.

(L)    Panhandle's and Trunkline's existing system rates are approved as initial rates for the certificated incremental capacity attributable to the proposed Panhandle Backhaul Project and Trunkline Backhaul Project, respectively.

(M)    Panhandle's and Trunkline's requests for a predetermination supporting rolled-in rate treatment of project costs attributable to the proposed Panhandle Backhaul Project and Trunkline Backhaul Project, respectively, in their next NGA general section 4 rate proceedings are granted, absent a significant change in material circumstances, as discussed in the body of this order.

(N)    Rover, Panhandle, and Trunkline shall notify the Commission's environmental staff by telephone or facsimile of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Rover, Panhandle, or Trunkline. The Applicants shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

(O)    The timely, opposed motions to intervene filed by the G&B Landowners and Ohio Farm Bureau Federation, Inc. are granted.

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 114 of 140

(P)     The late, unopposed motions to intervene filed before issuance of this order in each respective docket are granted pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure.

(Q)     The late, opposed motion to intervene filed by Sierra Club is granted.

(R)     The request for a full evidentiary, trial-type hearing is denied.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 115 of 140

**Appendix A**
**Intervenor List**

**Intervenors in CP15-93-000:**

- Allegheny Defense Project
- American Energy - Utica, LLC
- Mark Amicone
- Antero Resources Corporation
- Dave J. Baumberger
- Lawrence E. Bolind, Jr.
- Michael J. Boyce
- Esther M. Boyce
- Columbia Gas Transmission, LLC
- CONSOL Mining Company LLC
- Consumers Energy Company
- David A. Daniel
- E&W Landowners
- EQT Energy, LLC
- FirstEnergy Service Company
- FreshWater Accountability Project
- G&B Landowners
- Marijan E. Grogoza
- Janet Grogoza
- Jeff Grogoza
- Heartwood
- Larry H. Helmick
- Holzworth
- Gary A. Hummel
- Independent Oil & Gas Association of West Virginia, Inc.
- International Transmission Company d/b/a ITC Transmission and Michigan Electric Transmission Company, LLC
- J.D. Stillwater, Ann Stillwater and Barbara Dewey
- Catherine Jarrell and Denise Bing
- Judy A. Kaylor
- Terrance Lahr
- Gary A. Lehman
- Marshall Land LLC
- John J. McCarron
- Paul Melanko, Jr. and Joseph Munjas

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 116 of 140

- Michigan Public Service Commission
- David Morton
- Frank Munsell
- Murray Energy Corporation, American Energy Corporation, Ohio Valley Resources, The Ohio Valley Coal Company, The Oklahoma Coal Company, Murray American Energy Inc., Consolidation Coal Company, and The Ohio County Coal Company
- NJR Energy Services Company
- Ohio Farm Bureau Federation, Inc.
- Ohio Valley Environmental Coalition
- Putnam Township, Michigan
- Range Resources-Appalachia, LLC
- Rice Energy Marketing LLC
- Kurt and Heidi Roy-Borland
- Sequent Energy Management, L.P.
- Sierra Club
- STC Holdings, LLC; Stark Truss Company, Inc.; Yoder Florida, LLC; and V K S Farms, L.L.C.
- SWN Energy Services Company, LLC
- The East Ohio Gas Company d/b/a Dominion East Ohio
- Douglas Utz
- Vector Pipeline L.P.
- Wood/Hancock County Landowners Against Rover

**Intervenors in CP15-94-000:**

- Allegheny Defense Project
- American Energy - Utica, LLC
- Anadarko Energy Services Company
- Lawrence E. Bolind, Jr.
- Chevron U.S.A. Inc.
- Columbia Gas of Ohio, Inc.
- ConocoPhillips Company
- Consumers Energy Company
- DTE Gas Company
- EQT Energy, LLC
- Exelon Corporation
- FirstEnergy Service Company
- FreshWater Accountability Project
- Heartwood

USCA Case #18-1032      Document #1715763          Filed: 01/29/2018      Page 117 of 140

Docket No. CP15-93-000, *et al.*

- Indiana Gas Company, Inc. d/b/a Vectren Energy Delivery of Indiana, Inc.
- Laclede Gas Company
- Michigan Gas Utilities Corporation
- Michigan Public Service Commission
- Missouri Public Service Commission
- NJR Energy Services Company
- Ohio Valley Environmental Coalition
- Range Resources-Appalachia, LLC
- Sequent Energy Management, L.P.
- Sierra Club
- SWN Energy Services Company, LLC
- The East Ohio Gas Company d/b/a Dominion East Ohio
- Vector Pipeline L. P.
- Vectren Energy Delivery of Ohio, Inc.

**Intervenors in CP15-96-000:**

- Allegheny Defense Project
- Lawrence E. Bolind, Jr.
- Chevron U.S.A. Inc.
- Columbia Gas of Ohio, Inc.
- Consumers Energy Company
- DTE Gas Company
- EQT Energy, LLC
- Exelon Corporation
- FirstEnergy Service Company
- FreshWater Accountability Project
- Heartwood
- Laclede Gas Company
- Michigan Public Service Commission
- Missouri Public Service Commission
- NJR Energy Services Company
- Ohio Valley Environmental Coalition
- Range Resources-Appalachia, LLC
- Sequent Energy Management, L.P.
- Sierra Club
- SWN Energy Services Company, LLC
- Tennessee Valley Authority
- The East Ohio Gas Company d/b/a Dominion East Ohio
- The Peoples Gas Light and Coke Company

Docket No. CP15-93-000, *et al.*                                          - 108 -

- Vector Pipeline L. P.

## Appendix B
## Environmental Conditions

As recommended in the final environmental impact statement (EIS) and otherwise amended herein, this authorization includes the following conditions. The section number in parentheses at the end of a condition corresponds to the section number in which the measure and related resource impact analysis appears in the final EIS.

1. Each applicant shall follow the construction procedures and mitigation measures described in its application and supplements, including responses to staff data requests and as identified in the EIS, unless modified by the order. Each applicant must:

    a. request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);

    b. justify each modification relative to site-specific conditions;

    c. explain how that modification provides an equal or greater level of environmental protection than the original measure; and

    d. receive approval in writing from the Director of the Office of Energy Projects (OEP) **before using that modification**.

2. The Director of OEP has delegated authority to take whatever steps are necessary to ensure the protection of all environmental resources during construction and operation of the projects. This authority shall allow:

    a. the modification of conditions of the order; and

    b. the design and implementation of any additional measures deemed necessary (including stop-work authority) to ensure continued compliance with the intent of the environmental conditions as well as the avoidance or mitigation of adverse environmental impact resulting from construction and operation of the projects.

3. **Prior to any construction**, each applicant shall file an affirmative statement with the Secretary, certified by a senior company official, that all company personnel, environmental inspectors (EI), and contractor personnel will be informed of the EIs' authority and have been or will be trained on the implementation of the environmental mitigation measures appropriate to their jobs **before** becoming involved with construction and restoration activities.

4. The authorized facility locations shall be as shown in the EIS, as supplemented by filed alignment sheets. **As soon as they are available, and before the start of**

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 120 of 140

**construction**, the applicants shall file any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the order. All requests for modifications of environmental conditions of the order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets.

Rover's exercise of eminent domain authority granted under Natural Gas Act (NGA) Section 7(h) in any condemnation proceedings related to the order must be consistent with these authorized facilities and locations. Rover's right of eminent domain granted under NGA Section 7(h) does not authorize it to increase the size of its natural gas pipeline to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

5.    Each applicant shall file detailed alignment maps/sheets and aerial photographs at a scale not smaller than 1:6,000 identifying all route realignments or facility relocations, and staging areas, contractor yards, new access roads, and other areas that would be used or disturbed and have not been previously identified in filings with the Secretary. Approval for each of these areas must be explicitly requested in writing. For each area, the request must include a description of the existing land use/cover type, and documentation of landowner approval, whether any cultural resources or federally listed threatened or endangered species would be affected, and whether any other environmentally sensitive areas are within or abutting the area. All areas shall be clearly identified on the maps/sheets/aerial photographs. Each area must be approved in writing by the Director of OEP **before construction in or near that area**.

This requirement does not apply to extra workspace allowed by Rover's Plans and/or minor field realignments per landowner needs and requirements which do not affect other landowners or sensitive environmental areas such as wetlands.

Examples of alterations requiring approval include all route realignments and facility location changes resulting from:

a.    implementation of cultural resources mitigation measures;

b.    implementation of endangered, threatened, or special concern species mitigation measures;

c.    recommendations by state regulatory authorities; and

d.    agreements with individual landowners that affect other landowners or could affect sensitive environmental areas.

6.    **Within 60 days of the acceptance of the Certificate and before construction begins**, each applicant shall file its respective Implementation Plan for review and

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 121 of 140

written approval by the Director of OEP. Each applicant must file revisions to its plan as schedules change. The plans must identify:

a.      how the applicants will implement the construction procedures and mitigation measures described in its application and supplements (including responses to staff data requests), identified in the EIS, and required by the order;

b.      how the applicants will incorporate these requirements into the contract bid documents, construction contracts (especially penalty clauses and specifications), and construction drawings so that the mitigation required at each site is clear to onsite construction and inspection personnel;

c.      the number of EIs assigned, and how the company will ensure that sufficient personnel are available to implement the environmental mitigation;

d.      company personnel, including EIs and contractors, who will receive copies of the appropriate material;

e.      the location and dates of the environmental compliance training and instructions the applicants will give to all personnel involved with construction and restoration (initial and refresher training as the projects progress and personnel change) with the opportunity for OEP staff to participate in the training sessions;

f.      the company personnel (if known) and specific portion of the applicant's organization having responsibility for compliance;

g.      the procedures (including use of contract penalties) the applicants will follow if noncompliance occurs; and

h.      for each discrete facility, a Gantt or PERT chart (or similar project scheduling diagram), and dates for:

   (1)      the completion of all required surveys and reports;
   (2)      the environmental compliance training of onsite personnel;
   (3)      the start of construction; and
   (4)      the start and completion of restoration.

7.      **Rover** shall employ at least one EI per construction spread. **Panhandle and Trunkline** shall employ at least one EI per project. The EIs shall be:

a.      responsible for monitoring and ensuring compliance with all mitigation measures required by the order and other grants, permits, certificates, or other authorizing documents;

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 123 of 140

b.     responsible for evaluating the construction contractor's implementation of the environmental mitigation measures required in the contract (see condition 6 above) and any other authorizing document;

c.     empowered to order correction of acts that violate the environmental conditions of the order, and any other authorizing document;

d.     a full-time position, separate from all other activity inspectors;

e.     responsible for documenting compliance with the environmental conditions of the order, as well as any environmental conditions/permit requirements imposed by other federal, state, or local agencies; and

f.     responsible for maintaining status reports.

8.     Beginning with the filing of its Implementation Plan, **Rover** shall file updated status reports with the Secretary on a **weekly basis until all construction and restoration activities are complete**. Beginning with the filing of their respective Implementation Plans, **Panhandle and Trunkline** shall file updated status reports with the Secretary on a **monthly basis until construction and restoration activities are complete**. On request, these status reports will also be provided to other federal and state agencies with permitting responsibilities. Status reports shall include:

a.     an update on the applicant's efforts to obtain the necessary federal authorizations;

b.     the construction status of the their respective project facilities, work planned for the following reporting period, and any schedule changes for stream crossings or work in other environmentally sensitive areas;

c.     a listing of all problems encountered and each instance of noncompliance observed by the EIs during the reporting period (both for the conditions imposed by the Commission and any environmental conditions/permit requirements imposed by other federal, state, or local agencies);

d.     a description of corrective actions implemented in response to all instances of noncompliance, and their cost;

e.     the effectiveness of all corrective actions implemented;

f.     a description of any landowner/resident complaints that may relate to compliance with the requirements of the order, and the measures taken to satisfy their concerns; and

g.     copies of any correspondence received by the applicants from other federal, state, or local permitting agencies concerning instances of noncompliance, and the applicant's response.

9.  Prior to receiving written authorization from the Director of OEP to commence construction of their respective project facilities, each applicant shall file documentation that it has received all applicable authorizations required under federal law (or evidence of waiver thereof).

10. Each applicant must receive written authorization from the Director of OEP **before placing its respective project into service**. Such authorization will only be granted following a determination that rehabilitation and restoration of areas affected by the project are proceeding satisfactorily.

11. **Within 30 days of placing the authorized facilities in service**, each applicant shall file an affirmative statement with the Secretary, certified by a senior company official:

    a.  that the facilities have been constructed in compliance with all applicable conditions, and that continuing activities will be consistent with all applicable conditions; or

    b.  identifying which of the Certificate conditions the applicant has complied or will comply with. This statement shall also identify any areas affected by their respective projects where compliance measures were not properly implemented, if not previously identified in filed status reports, and the reason for noncompliance.

12. **As part of its Implementation Plan**, Rover shall confirm the location of the Seneca Lateral within its non-exclusive easement and identify any locations where the lateral would deviate from the non-exclusive easement in accordance with condition 5.

13. **Prior to construction,** Rover shall adopt workspace modifications for MPs SEL 22.7, or file with the Secretary written documentation that Rover and the landowner have reached an alternative agreement. Additionally, Rover shall file with the Secretary revised alignment sheets for the Seneca Lateral that incorporates the modification into the Rover Pipeline Project.

14. **Prior to construction,** Rover shall adopt the minor route variations for mileposts (MP) MJL 13.5 and MS 65.0 (as specified in table 3.4.3-3 and depicted in appendix I2 of the final EIS) and adopt the additional mitigation measures for MP BGL 1.0 (see table 3.4.3-3 of the final EIS). Rover shall file with the Secretary updated alignment sheets incorporating these minor route variations.

15. **Prior to construction,** Rover shall hire a professional geologist to monitor construction of the project in the five areas that were identified in the January 2016 Field Reconnaissance of Karst Prone Areas Report.

16. **Prior to construction,** Rover shall file with the Secretary clarification that it has adopted the mitigation measures outlined in its October 2015 Geohazard Evaluation Report.

17. **Prior to construction,** Rover shall file information identifying the type of all public water wells located within 150 feet of the project area without an identified well type and documentation of consultation with appropriate resource agencies for all public water supplies within 150 feet of the project area.

18. Rover shall provide affected landowners with copies of applicable pre- and post-construction evaluation reports for all wells within 150 feet of the proposed construction work area (and within 2,000 feet of horizontal directional drill [HDD] locations in areas of karst terrain). Post-construction evaluations shall be performed **as soon as practicable** following the completion of construction in the area of applicable well(s).

19. **Prior to construction,** Rover shall confirm that it will use dry-ditch crossing methods for all waterbodies designated as coldwater fisheries or exceptional warmwater habitat, except those already proposed as an HDD crossing.

20. **Prior to construction,** Rover shall file with the Secretary, for the review and written approval by the Director of OEP, a revised Fugitive Dust Control Plan that identifies the following:

    a. the name and approximate intake location (if applicable) of each water source that will be used to obtain water for dust suppression activities;

    b. how Rover will determine that dust abatement is necessary;

    c. the specific maximum speed limit for construction equipment and procedure for posting and enforcing this speed limit;

    d. the site and/or construction activity conditions requiring the installation of gravel pads;

    e. the track-out control devices that construction traffic will cross;

    f. the maintenance procedures that Rover will use for construction equipment to reduce dust; and

    g. how and under what circumstances Rover will cover open-bodied haul trucks, as appropriate.

21. **During construction of its project,** Rover shall not clear any trees between the workspaces for HDD entry and exit sites. Rover may conduct minor brush clearing, less than 3 feet wide, using hand tools only, to facilitate the use of the HDD tracking system or acquisition of water for the makeup of the HDD slurry.

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 125 of 140

**During operation**, Rover shall not conduct any routine vegetation maintenance along the HDD segments.

22. **Prior to construction,** Rover shall file revised alignment sheets that limit its construction right-of-way width in areas of dual pipeline to 95 feet and in areas of single pipeline to 75 feet in all wetlands (excluding the wetland at MP 86.7 on the Market Segment).

23. **Prior to construction**, Rover shall revise the Invasive Species Plan, in consultation with the appropriate federal, state, and local agencies, to include mitigation measures that would be taken during construction to prevent the spread of invasive species. Mitigation may include, but is not limited to: training of workers in the recognition of invasive species and to be familiar with locations where invasive species were identified during surveys, cleaning of equipment prior to entering the right-of-way, or setting up wash stations to remove invasive species from vehicles, equipment, and materials in areas identified as having an invasive species present. Rover shall file the revised plan with the Secretary, for review and written approval of the Director of OEP.

24. **Prior to construction**, Rover shall file with the Secretary its final Migratory Bird Conservation Plan that includes documentation of its consultation with the U.S. Fish and Wildlife Service (FWS) regarding avoidance, minimization, and mitigation measures.

25. **During construction of its project**, Rover shall adhere to the FWS tree clearing window and shall restrict tree clearing activities to **between October 1 and March 31** in Michigan, Ohio, and Pennsylvania and to **between November 15 and March 31** in West Virginia.

26. Rover shall not begin construction of the Rover Pipeline Project **until** it files with the Secretary its Indiana Bat Conservation Plan and has received written notification from the Director of OEP that construction and/or use of mitigation may begin.

27. **Prior to construction**, Rover shall confirm that it will incorporate into its construction plans requirements that worksites be maintained in a neat and orderly manner, with all personal trash items disposed of properly; and that construction debris be removed from all work areas in a timely manner, and disposed of in a state-approved off site location by the end of each work day.

28. **Prior to construction**, Rover shall continue to consult with applicable state agencies to identify any additional mitigation measures for state-protected species and the need for additional surveys for Ohio, Michigan, West Virginia, and

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 126 of 140

Pennsylvania. The results of such consultations and any outstanding surveys shall be filed with the Secretary.

29. **Prior to construction,** Rover shall file with the Secretary, for the review and written approval of the Director of OEP, evidence of landowner concurrence with the site-specific residential construction plans for all locations where construction work areas would be within 10 feet of a residence (including residences within the construction workspace).

30. **Prior to construction,** Rover shall file with the Secretary a 5-year post-construction monitoring program to evaluate crop productivity in areas impacted by the construction of the project. Rover shall include in the program a commitment to file with the Secretary quarterly reports for a period of 5 years following construction documenting any crop-related problems, including soil heating near compressor stations identified by the company or landowner, and describing any corrective action taken to remedy those problems. The program shall stipulate that if any landowner agrees that revegetation and crop productivity are successful prior to the 5-year requirement, Rover shall provide documentation in its quarterly reports, indicating which landowners have agreed that monitoring is no longer necessary. This documentation shall include the landowner name, tract number, and the date of agreement.

31. **Prior to construction,** Rover shall consult with the Ohio Department of Agriculture (OHDA) on construction procedures to be used in agricultural land in Ohio, and Rover shall file with the Secretary any updates to the Ohio Agriculture Impact Mitigation Plan (AIMP) that result from coordination with the OHDA. Any comments received from the OHDA on Rover's Ohio AIMP shall also be filed with the Secretary.

32. **Prior to construction in agricultural lands,** Rover shall file with the Secretary its final Drain Tile Relocation and Reclamation Plans, including documentation of landowner consultation with the plans.

33. **Prior to construction,** Rover shall commit to hire local drain tile contractors to install/repair drain tiles that are damaged or need to be rerouted due to construction activities.

34. **Upon completion of construction,** Rover shall provide information on encountered, severed, and/or damaged drain tile lines to the landowner, the local county Soil and Water Conservation District, and the information shall be kept in the company's landowner records for future reference.

35. **Prior to construction,** Rover shall file with the Secretary, for review and written approval of the Director of OEP, an impact avoidance, minimization, or mitigation

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 127 of 140

plan for the organic farm at MP MAB 57.8. Rover shall include documentation that the plan was developed in consultation with the landowner.

36. **Prior to construction**, Rover shall file with the Secretary, for review and written approval of the Director of OEP, a complete list of all Conservation Reserve Program (CRP) enrolled lands that would be crossed by the project by milepost. In addition, Rover shall file with the Secretary any revised impact mitigation measures or conservation plans that will be necessary in order to maintain CRP compliance along with confirmation from the U.S. Department of Agriculture's Farm Service Agency that parcels will remain eligible for the program if the specified mitigation is implemented. If parcels will no longer be eligible for enrollment, Rover shall identify how it will compensate landowners for the lost program benefits.

37. **Prior to construction**, Rover shall file with the Secretary, for review and written approval of the Director of OEP, an impact avoidance, minimization, or mitigation plan for the trails located in the Pinckney Recreation Area. Rover shall include documentation that the plan was developed in consultation with the Michigan Department of Natural Resources.

38. **Prior to construction of Mainline Compressor Stations 1 and 3**, Rover shall file with the Secretary revised visual screening plans for these compressor stations that incorporate a second row of Colorado blue spruce and adopt a spacing of 20 feet or less between the trees in each row.

39. Rover shall file with the Secretary reports describing any documented complaints from affected landowners that a homeowner's insurance policy was either cancelled or voided due directly to the grant of the pipeline right-of-way or installation of the pipeline and/or that the premium for the homeowner's insurance increased materially and directly as a result of the grant of the pipeline right-of-way or installation of the pipeline. The reports shall also identify how Rover has mitigated the impact. These reports shall be included in Rover's weekly construction status reports and in its quarterly reports **for a 2-year period following in-service of the project**.

40. Rover shall not begin implementation of any treatment plans/measures (including archaeological data recovery); construction of facilities; or use of staging, storage, or temporary work areas and new or to-be-improved access roads **until**:

    a. Rover files with the Secretary:

        (1) the Ohio State Historic Preservation Office's (SHPO) comments on Ohio archaeological and architectural survey reports;

USCA Case #18-1032    Document #1715763    Filed: 01/29/2018    Page 128 of 140

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 129 of 140

(2) the Michigan SHPO's comments on the Michigan final report, addendum 1 and 2 reports, and avoidance plan for 11 sites;

(3) the West Virginia SHPO's comments on the revised West Virginia survey report;

(4) the Pennsylvania SHPO's comments on the additional architectural information requested in its April 13, 2015 letter;

(5) all outstanding cultural resources survey/testing reports and any required evaluation reports, and the SHPOs' comments on the reports;

(6) any necessary treatment plans or site-specific protection plans, and the appropriate SHPO's comments on the plans;

b. the Advisory Council on Historic Preservation is provided an opportunity to comment if historic properties would be adversely affected; and

c. the FERC staff reviews and the Director of OEP approves all cultural resources survey reports and plans, and notifies Rover in writing that treatment plans/mitigation measures may be implemented or construction may proceed.

All material filed with the Secretary containing **location, character, and ownership information** about cultural resources must have the cover and any relevant pages therein clearly labeled in bold lettering: **"CONTAINS PRIVILEGED INFORMATION - DO NOT RELEASE."**

41.   Rover **shall not begin construction of project facilities until FERC** staff concludes its resolution of adverse effects as they relate to the Stoneman House, in compliance with section 106 of the National Historic Preservation Act.

42.   Rover shall file in the **weekly construction status reports** the following for each HDD entry and exit site:

a. the noise measurements from the nearest noise-sensitive area (NSA) for each drill entry/exit site, obtained at the start of drilling operations;

b. the noise mitigation that Rover implemented at the start of drilling operations; and

c. any additional mitigation measures that Rover would implement if the initial noise measurements exceeded an day-night sound level ($L_{dn}$) of 55 decibels on the A-weighted scale (dBA) at the nearest NSA and/or increased noise is over ambient conditions greater than 10 decibels.

43.   Rover shall file a noise survey with the Secretary **no later than 60 days** after placing each of the Rover Pipeline Project compressor stations in service. If a full

load condition noise survey of the entire station is not possible, Rover shall instead file an interim survey at the maximum possible horsepower load and file the full load survey **within 6 months**. If the noise attributable to the operation of all of the equipment at any compressor station under interim or full horsepower load conditions exceeds 55 dBA $L_{dn}$ at any nearby NSAs, Rover shall file a report on what changes are needed and shall install the additional noise controls to meet the level **within 1 year** of the in-service date. Rover shall confirm compliance with the 55 dBA $L_{dn}$ requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

44.     **Prior to construction**, Rover shall file with the Secretary, for the review and written approval of the Director of OEP, a construction coordination plan that identifies the specific construction measures (such as retention of the same contractor, re-use of equipment bridges, coordinated installation of erosion control devices, or restoration commitments) that Rover and Columbia Gas Transmission System, LLC have agreed to implement in the construction of the parallel portions of their respective projects in the non-exclusive easement.

45.     **Prior to construction**, Rover shall revise the route alignment on tract OH-ST-024.000 (Terrance Lahr property) as shown on page 3 of Mr. Lahr's October 5, 2016 filing; or, develop, in coordination with Mr. Lahr, a mutually agreeable site-specific parcel access plan that accommodates temporary and permanent vehicular access to the Lahr property.

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 130 of 140

161 FERC ¶ 61,244
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Neil Chatterjee, Chairman;
Cheryl A. LaFleur and Robert F. Powelson.

| | |
|---|---|
| Rover Pipeline LLC | Docket Nos. CP15-93-002 |
| Panhandle Eastern Pipe Line Company, LP | CP15-94-001 |
| Trunkline Gas Company, LLC | CP15-96-001 |

ORDER ON CLARIFICATION AND DENYING REHEARING

(Issued November 30, 2017)

1.      On February 2, 2017, the Commission issued an order under section 7(c) of the Natural Gas Act (NGA)[1] authorizing Rover Pipeline LLC (Rover) to construct and operate approximately 510.7 miles of new interstate pipeline and related facilities extending from the Appalachian supply area to an interconnection with Vector Pipeline, LP in Livingston County, Michigan (Rover Pipeline Project).[2]  In doing so, the Commission denied Rover's request for a blanket certificate under Part 157, Subpart F of the Commission's regulations to perform certain routine construction activities and operations in light of Rover's intentional demolition of a house identified as eligible for listing in the National Register of Historic Places and within the visual area of potential effects of the project.

---

[1] 15 U.S.C. § 717f(c) (2012).

[2] *Rover Pipeline LLC,* 158 FERC ¶ 61,109 (2017) (February 2 Order).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 131 of 140

2.      On March 6, 2017, Rover sought rehearing.[3]  For the reasons discussed below, this request is denied.

3.      No other requests for rehearing were filed.  However, on February 27, 2017, the Freshwater Accountability Project and Sierra Club (jointly Sierra Club) filed an objection to the mitigation commitments and implementation reflected in the February 2 Order.[4]  Sierra Club's filing points out a misstatement in the February 2 Order which we will clarify below.

## I.      **Blanket Certificate Authority**

### A.      **Background and Rehearing Request**

4.      During the certificate proceeding, the Commission learned that Rover had demolished the Stoneman House, an 1843 historic federal house that was eligible for listing in the National Register of Historic Places and within the area of potential effects of the project.  In the February 2 Order, the Commission found that Rover's demolition of the Stoneman House indicated that Rover could not be relied upon to comply with the environmental regulations required for all blanket certificate projects.  Accordingly, the Commission denied Rover's request for a Part 157, Subpart F blanket certificate of public convenience and necessity.[5]  On rehearing, Rover argues that this decision was arbitrary and capricious because the Commission did not find that Rover "intended" to circumvent the requirements of section 106 of the National Historic Preservation Act (NHPA).  Rover maintains that such a finding is a necessary prerequisite to a denial of Rover's blanket certificate request and that no evidence in the record showed that Rover had such intent.  We disagree with each point.

---

[3] On March 2 2017, ECOV-Vrindaban, Inc., d/b/a ECOV and ECO Village and ISKCON New Vrindaban, Inc., known as Krishna Consciousness, also filed a request for rehearing, but subsequently withdrew its request.  *See* March 28, 2017 Letter to the Commission from Thomas Butz, Counsel for Krishna Consciousness.

[4] Rule 713(c)(2) of the Commission's Rules of Practice and Procedure requires that a rehearing request include a separate section entitled "Statement of Issues" listing each issue presented to the Commission in a separately enumerated paragraph.  Any issue not so listed will be deemed waived.  18 C.F.R. § 385.713(c)(2) (2017).  Sierra Club's objection does not satisfy these requirements and thus will not be treated as a request for rehearing.

[5] February 2 Order, 158 FERC ¶ 61,109 at PP 253-54.

5.      Section 106 of the NHPA requires the Commission to take into account the effect of a proposed project on any historic property.[6] A "historic property" is any property that is "in, or eligible for inclusion in," the National Register of Historic Places.[7] The Commission must consult with the relevant State Historic Preservation Officer (SHPO) to identify those properties, identify any adverse effects that a proposed project might have on them, and then evaluate modifications to the project that would avoid, minimize, or mitigate those adverse effects, subject to agreement by the SHPO.[8] If adverse effects cannot be avoided, the Commission may only grant a Certificate after notifying the Advisory Council on Historic Preservation (Advisory Council).[9]

6.      Section 110(k) of the NHPA directs federal agencies to withhold federal assistance, including licenses or permits, when "an applicant who, with intent to avoid the requirements of [section 106], has intentionally significantly adversely affected a historic property," unless the agency, after consultation with the Advisory Council, determines that "circumstances justify granting such assistance."[10]

7.      During the pre-filing process, Rover identified the Stoneman House, located across the street from Rover's proposed mainline Compressor Station 1, as potentially eligible for listing in the National Register of Historic Places.[11] To mitigate any potential project effects, Rover committed to developing a solution that would avoid adverse effects on the structure. [12] In the draft and final Environmental Impact Statement (EIS), staff recommended that Rover develop a visual screening plan for Compressor

---

[6] 54 U.S.C. § 306108 (2012).

[7] *Id.* § 300308.

[8] *See* 36 C.F.R. §§ 800.3–800.6 (2017).

[9] 54 U.S.C. § 306108, 36 C.F.R. § 800.6.

[10] 54 U.S.C. § 306113 (2012).

[11] On February 4 and 5, 2015, staff met with representatives from Rover and expressed concern about the proposed compressor station's potential visual impacts on the Stoneman House.

[12] Rover, Application of Rover Pipeline LLC for a Certificate of Public Convenience and Necessity, Docket No. CP15-93-000, at Volume IIA, Resource Report 4 at 4-11 (filed February 20, 2015).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 133 of 140

Station 1.[13]  Instead, Rover, without notice to the Commission, demolished the Stoneman House.[14]

8.      Rover claims that it bought the property on May 11, 2015, in part, for use as office space and only demolished it after learning that the home was not suitable for such use. But e-mail correspondence between Rover employees and its contractors shows that Rover contemplated demolishing the Stoneman House before purchasing the property.  In March 2015, immediately before buying the property, Rover asked its contractors whether tearing down the historic house was permitted.[15]

9.      In response, Rover's contractor explained that the proposed screening may not fully mitigate likely visual and auditory adverse effects on the eligible property.[16]  The contractor acknowledged that no one could stop Rover from demolishing the house and by doing so the project "would no longer be causing an adverse effect to an eligible property in the [area of potential effects]," but also warned that demolition was a "politically risky strategy." [17]  To address the project-caused adverse effect on the eligible property, the contractor suggested that Rover consider alternative sites for the house free of adverse effects, while acknowledging that such alternative sites could involve "cost differences" and "may be physically difficult []."[18]  Otherwise, if the compressor station could not feasibly be relocated, the contractor explained that Rover would need to work with the SHPO to mitigate the adverse effect.[19]  Rather than pursuing either suggestion,

---

[13] Staff issued the draft EIS on February 19, 2016, and the final EIS on July 29, 2016.

[14] While Rover and its contractors had notified the Ohio SHPO of its plans to demolish the Stoneman House by April of 2016, it did not disclose this information to the Commission.  *See* September 26, 2016 Rover Response to FERC Environmental Information Request, at 3.

[15] *Id.* at Attachment 2, March 3, 2015 e-mail from Rover, 2-3.  Rover subsequently released a public version with names redacted on November 2, 2016.

[16] *Id.* at Attachment 2, March 3, 2015 e-mail from Rover's contractor, 1 (noting that the proposed vegetative screening "may not be totally effective for visual in this situation and may not be effective at all for audial.").

[17] *Id.*

[18] *Id.*

[19] *Id.*

USCA Case #18-1032      Document #1715763            Filed: 01/29/2018      Page 134 of 140

Rover demolished the house. Based on this evidence, the Commission concluded that Rover both understood the requirements of section 106 and demolished the house with the intent to avoid the section 106 process.

10.    In November 2016, after learning that Rover demolished the Stoneman House, Commission staff commenced consultations with the Advisory Council under section 110(k), which, as discussed, applies when federal applicants have intentionally significantly adversely affected a historic property with intent to avoid the requirements of section 106 of the NHPA.[20] During the course of those consultations, Commission staff explained that "Rover was aware" that the Stoneman House was subject to section 106 of the NHPA and that Rover's actions adversely affected the property.[21] Accordingly, the Commission concluded that "section 110(k) of the NHPA applies to the demolition of the house."[22] To the extent the February 2 Order left any ambiguity, we agree with staff's conclusions regarding Rover's conduct.

11.    In any event, the denial of the blanket certificate was not based on a violation of section 110(k) of the NHPA. It was Rover's conduct in connection with the demolition of the Stoneman House that led the Commission to conclude that it could not be confident that "Rover would fully comply with our environmental regulations in future construction activities under a blanket certificate."[23]

12.    Rover argues that the public convenience and necessity standard for blanket certificates does not factor the Commission's confidence in the applicant's future compliance with environmental regulations. According to Rover, the Commission has stated in other orders that the public convenience and necessity standard involves "relatively little scrutiny" because the blanket certificate only authorizes routine activities or relatively modest investments.[24]

---

[20] 54 U.S.C. § 306113.

[21] December 5, 2016, Letter Re: Notification Pursuant to Title 36 of the Code of Federal Regulations Part 800.9(c)(2), from Ann F. Miles, Director, Office of Energy Projects, Federal Energy Regulatory Commission, to Reid Nelson, Director, Office of Federal Agency Programs, Advisory Council on Historic Preservation, at 2.

[22] *Id.*

[23] February 2 Order, 158 FERC ¶ 61,109 at P 254.

[24] March 6, 2017 Request for Rehearing by Rover, at 12 (Rover Rehearing Request).

13.    This argument conflates our rationale for the type of project eligible under a blanket certificate with whether issuing a blanket certificate is in the public convenience and necessity.  The Commission has explained that blanket certificate procedures, which include environmental requirements, are appropriate for "routine pipeline operations and investments which . . . are so well understood as an established industry practice that relatively little scrutiny is required to determine their compatibility with the public convenience and necessity."[25]  However, authorizing a company to utilize the self-implementing blanket procedures is only appropriate to the extent the Commission has a reasonable basis to expect that the program's requirements will be adhered to for each individual project.  Hence, the Commission's confidence that a pipeline company will indeed comply with all the requirements of the blanket certificate program, including the environmental requirements, is critical.  Rover's failure to comply in this project-specific proceeding with our requirements with respect to the Stoneman House[26] provides a reasonable basis for the Commission to conclude that it cannot be trusted at this time to do so in future cases where there would be no direct Commission scrutiny.[27]

14.    Rover next argues that its failure to proactively inform the Commission of its plans for the Stoneman House is neither evidence of intent to evade the section 106 process nor is it required by any law or regulation.  Rover argues that it had no obligation, as a private landowner, to notify the Commission of its intent to demolish its property.  It points to regulations stating that even the listing of a property on the National Register of Historic Places does not restrict the owner from taking any action it wishes to its property.[28]  Rover also suggests that it is the Commission's responsibility, not Rover's, to investigate any changes on property acquired by a pipeline.  Rover points

---

[25] *Distrigas of Massachusetts Corp.*, 60 FERC ¶ 61,274 at 61,930–31 (1992).

[26] *See, e.g., infra* P 15.

[27] We noted in the February 2 Order that Rover could reapply for a blanket certificate after 18 months of full commercial operation.  At that time, in evaluating such request, the Commission would consider all of Rover's activities with respect to the construction and operation of the pipeline, including those activities related to the inadvertent release of drilling mud that occurred during the completion of the horizontal directional drilling activity at the Tuscarawas River.

[28] Rover Rehearing Request at 5 (citing 5 C.F.R. § 60.2).

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 136 of 140

to an instance where the Commission noted in a separate project's Final EIS that residential noise limits no longer applied to a property purchased by a project sponsor.[29]

15.     Because the Commission's denial of Rover's blanket certificate request was not based upon its conclusions regarding Rover's intent to evade section 106, these arguments are beside the point. Nonetheless, we note that Rover mischaracterizes its role in the certificate proceeding. The project sponsor, as a non-Federal party, assists the Commission in meeting its obligations under the NHPA and NEPA during the section 7(c) certificate process. Project sponsors are required to show documentation of required consultation with the appropriate SHPO.[30] The project sponsor is also under an ongoing obligation to supplement its application with relevant information, namely any known changes to the proposed project's effects, during the NEPA process.[31] Rover did neither. Rover failed to provide documentation of ongoing consultation with the Ohio SHPO or notify the Commission of the demolition.

16.     Rover disputes the Commission's claim that we consider such notification when deciding whether a blanket certificate is in the public convenience and necessity. Rover cites a case in which Columbia Gas Transmission Corporation (Columbia) violated a condition of its certificate order when it conducted archaeological testing to determine if a property was eligible for listing on the National Register of Historic Places.[32] Columbia performed data recovery archaeological excavations, which prevented the Commission and the Advisory Council from determining if an eligible property had been adversely affected. Rover contends that circumstantial evidence suggested that Columbia intended to evade the section 106 process because Columbia failed to provide the Commission with an internal report suggesting the site may be eligible for listing. Rover argues, notwithstanding this evidence, the Commission failed to invoke section 110(k) even though it reached the opposite conclusion with respect to Rover.

17.     The two cases are not analogous. Columbia was not requesting a blanket certificate; Columbia had been in operation for years and had a long history of complying with Commission regulations. Unlike Rover, Columbia had not immediately violated Commission regulations in its first proceeding. And the Commission did not invoke

---

[29] *Id.* at 5 & n.16 (citing the Cameron Liquefaction Project Final EIS, CP13-25-000, CP13-27-000).

[30] The Commission's regulations also state that project sponsors may contact the Commission at any time for assistance. 18 C.F.R. § 380.14(a).

[31] *See* 18 C.F.R. § 380.3.

[32] Rover Rehearing Request at 7.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 137 of 140

section 110(k) because Columbia made a good faith effort to notify the Commission. Information in the record showed that the Pennsylvania SHPO reviewed and approved the treatment plan in a letter and had also indicated that it had sent the report on cultural resources to the Commission, even though the SHPO did not in fact share this information.[33] There was no indication that Rover intended to alert the Commission.[34] And while Columbia may have had an adverse effect on the site, those effects were mitigated by the fact that a data recovery report would document what was found through the excavations.[35] Such mitigation was not possible here because Rover completely destroyed the Stoneman House.

18.     Finally, Rover argues that the Stoneman House's demolition was not material since Rover continued to engage in the section 106 process and agreed to mitigation. Specifically, Rover agreed to provide visual screening for its compressor station and provide $1.5 million to the Ohio History Connection Foundation.[36] But this mitigation does not undo the Rover-caused adverse effect on the Stoneman House or reverse the Commission's determination under section 110(k) that Rover intentionally caused such an adverse effect. Most importantly, Rover's subsequent actions on mitigation have done little to convince the Commission that it can be relied upon to comply with the Commission's blanket certificate requirements with respect to any future construction project.

## II.     Noise Mitigation

19.     Sierra Club's objection to the February 2 Order arises from a discrepancy in two descriptions of the project compressor units. The February 2 Order stated that Rover

---

[33] May 19, 2003 Letter from Robert K. Arvedlund, Chief, Gas Branch 1, Office of Energy Projects, FERC, to Laura Dean, Advisory Council on Historic Preservation, Docket No. CP02-142-000.

[34] Rover notified the Ohio SHPO via a courtesy phone call and email on April 5, 2016, and, after it demolished the Stoneman House, on June 15, 2016, sent a letter restating its intent to remove the house. September 26, 2016 Rover Response to FERC Environmental Information Request, at 3.

[35] May 19, 2003 Letter from Robert K. Arvedlund, Chief, Gas Branch 1, Office of Energy Projects, FERC, to Laura Dean, Advisory Council on Historic Preservation, Docket No. CP02-142-000.

[36] June 16, 2017, Amendment to Memorandum of Agreement Among FERC, the Advisory Council, the Ohio State Historic Preservation Office, and Rover Regarding the Rover Pipeline Project.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 138 of 140

would install reciprocating units at the compressor stations,[37] whereas the final EIS stated that project compression would not induce low frequency sound in adjacent pipelines because this effect is associated with reciprocating engines, while turbine units would be installed at the project.[38] Sierra Club contends that the EIS treated the turbine units as a noise mitigation measure, and thus the Commission violated the National Environmental Policy Act by failing to explain why it rejected the turbine units in the February 2 Order.

20.     Sierra Club is correct that the EIS stated that turbine units would be installed in the project's compressor stations.[39] In response to commentators' concerns regarding low frequency noise and vibration from compressor stations, the EIS acknowledged that induced vibration along pipelines can be caused by reciprocating engines and mitigation measures exist during the design of these facilities to avoid such impact. The EIS then erred by stating that this problem is absent at the project because Rover would install turbines and then, in response to commenters' specific turbine-related concerns, went on to address other low frequency sound related to specific turbine compressor units.[40]

21.     But neither the EIS nor the February 2 Order treat turbines as a mitigation measure. In its application, Rover proposed using reciprocating engines,[41] and the EIS assessed project noise impacts based on the use of reciprocating engines.[42] For example, the analysis of operational noise impacts upon noise-sensitive areas within one mile of the compressor stations was premised upon the use of reciprocating engines at those stations.[43] The noise mitigation measures discussed in the February 2 Order and EIS include, but are not limited to, the use of acoustically-treated building materials, use of

---

[37] *See* February 2 Order, 158 FERC ¶ 61,109 at P 10 (noting use of "natural gas-fired reciprocating compressor units").

[38] EIS at 4-253 ("the proposed compressor units at all compressor stations are turbines. Therefore, the effect commenters are concerned about would not occur.")

[39] *Id.* at 4-252 – 53.

[40] *Id.* at 4-252 – 53, 4-256 – 57.

[41] February 23, 2015, Rover Pipeline Project Application, Resource Report 1: General Project Description, at 1-53.

[42] The EIS also uses the term "engines" throughout, which is associated with reciprocating engines. *See, e.g.,* EIS at 4-227, 4-232, 4-245, 4-253.

[43] *See id.* at 4-253 – 55 (Table 4.11.2-5).

USCA Case #18-1032     Document #1715763     Filed: 01/29/2018     Page 139 of 140

silencers, and piping insulation.[44] Further, the final EIS explained that Commission regulations require that compressor stations cannot result in a perceptible increase in vibration at nearby receptors.[45] Therefore, the final EIS recommended, and the February 2 Order included, a condition requiring Rover to perform post-construction noise surveys to ensure that operation noise levels at the compressor stations meet the Commission's criterion. Based on this assessment, no further mitigation was deemed necessary. Based on the foregoing, we reject Sierra Club's claim that the Commission's noise analysis treated turbine units as a mitigation measure and that the Commission subsequently rejected that measure without explanation.

The Commission orders:

   (A)   The request for clarification filed February 27, 2017 by Sierra Club is denied.

   (B)   The request for rehearing filed March 6, 2017 by Rover is denied.

By the Commission. Commissioner Glick is not participating.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

[44] *See* February 2 Order, 158 FERC ¶ 61,109 at PP 229-30 (discussing construction noise mitigation measures and noting the possibility of future operational noise mitigation measures); EIS at 4-247 to 4-252 (discussing construction noise mitigation); *id.* at 4-253 (discussing acoustically-treated building materials); *id.* at 4-255 –57 (discussing operational noise surveys and potential mitigation).

[45] *Id.* at 4-257.

USCA Case #18-1032      Document #1715763      Filed: 01/29/2018      Page 140 of 140